# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

|  |  |
|---|---|
| KYLON MIDDLETON; DEON TEDDER; AMOS WELLS; CARLYLE DIXON; TONYA WINBUSH; ERNESTINE MOORE; SOUTH CAROLINA DEMOCRATIC PARTY; DNC SERVICES CORPORATION/DEMOCRATIC NATIONAL COMMITTEE; and DCCC, | Case No. 3:20-cv-1730-JMC **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Plaintiffs, | |
| v. | |
| MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; and CLIFFORD J. EDLER and SCOTT MOSELEY, in their official capacities as members of the South Carolina State Election Commission, | |
| Defendants. | |

Plaintiffs Kylon Middleton, Deon Tedder, Amos Wells, Carlyle Dixon, Tonya Winbush, Ernestine Moore, the South Carolina Democratic Party ("SCDP"), Democratic National Committee ("DNC"), and DCCC, by and through the undersigned attorneys, file this First Amended Complaint for Injunctive and Declaratory Relief against Defendants Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission (the "Commission"), John Wells, in his official capacity as Chair of the Commission, and Clifford J. Edler and Scott Moseley, in their official capacities as members of the Commission. This First Amended Complaint is based on the facts and allegations below. Plaintiffs allege as follows:

## INTRODUCTION

1.      As the COVID-19 pandemic rages on, impacting over one million people and taking over 60,000 lives in the United States in the past six weeks alone, a collection of South Carolina elections laws (the "Challenged Provisions") operate independently and together to impose upon the State's voters an untenable and unconstitutional choice between exercising their right to vote or avoiding needless and serious risk to their health, the health of their friends and family, and the broader community.

2.      South Carolina categorically prohibits all voters under 65 from casting a mail-in absentee ballot unless they fall into narrow and limited categories such as disabled or confined in jail (the "Absentee Ballot Age Restriction"), S.C. Code Ann. § 7-15-320(B)(8). Thus, the vast majority of voters must appear in person at the polls to cast their ballot on election day in order to exercise their right to vote, for no other reason than they have not yet had their 65th birthday.

3.      The decision to parcel out voting rights "on account of age" is prohibited under any circumstances by the plain text of the 26th Amendment to the U.S. Constitution. But under the current circumstances, as a global pandemic unprecedented in our time infects thousands more Americans daily and shows few signs of abating, the Absentee Ballot Age Restriction also imposes unconscionably severe burdens on voters that cannot be justified by the State's interests in the restrictions, such that the provision also violates the First and Fourteenth Amendments to the Constitution.

4.      For the select group of voters who are permitted to vote by absentee ballot, South Carolina law imposes several additional challenges, all of which independently and together will unconstitutionally burden the right to vote in the coming elections.

5.     *First*, South Carolina will not count a voter's mail-in absentee ballot unless the voter has had another person witness and sign their absentee ballot envelope (the "Witness Requirement"). *Id.* § 7-15-380. For the segment of the population that lives alone, obtaining a witness signature to cast a mail-in absentee ballot requires them to suspend adherence to social distancing requirements and risk contracting a potentially deadly disease. Many of these voters are elderly citizens who are most at risk for the worst complications of the virus and interacting with a witness for this purpose could quite literally risk their lives. Preliminary reports from the U.S. Centers for Disease Control and Prevention ("CDC") indicated that the fatality rate ranged from 10% to 27% among Americans over 85 who contracted the disease, and 3% to 11% for those between the ages of 65 and 84. The Witness Requirement thus needlessly compels voters to put their and other's lives at risk to vote, imposing a severe burden in violation of the First and Fourteenth Amendments.

6.     *Second*, even if a voter successfully navigates the Witness Requirement , South Carolina rejects all mail-in absentee ballots not received by the county by 7:00 p.m. on Election Day (the "Election Day Cutoff"). *Id.* § 7-15-230. During the 2018 statewide general election, the State discarded over 1,300 ballots as a result. In a time when requests for mail-in absentee ballots have dramatically increased and the U.S. Postal Service is under unique and taxing demands causing substantial delays in processing, many voters who timely request their ballots will not receive them until shortly before—or even after—the election. As a result, the Election Day Cutoff threatens to disfranchise thousands more voters this cycle than in years past, for reasons entirely out of the voters' control.

7.     *Third*, South Carolina makes it a felony for a candidate or paid campaign staff to assist voters with returning their voted absentee ballots to elections officials (the "Absentee

Assistance Ban"). *Id.* § 7-15-385. This hamstrings the ability of candidates like Plaintiffs Deon Tedder and Kylon Middleton and their respective campaigns to assist voters in the upcoming elections, where a substantial number of individuals adhering to social distancing requirements and seeking to prevent the continued spread of COVID-19 will need assistance with returning their ballot, and makes it more likely that far more voters will be disenfranchised as a result of the Election Day Cutoff.

8.        Although the Challenged Provisions have the potential to impact all South Carolina voters, they particularly burden the African American population, which statistically accounts for a disproportionately significant portion of the State's residents with confirmed cases of the virus and reported deaths due to COVID-19. As such, South Carolina's African American voters have an increased need to adhere to social distancing requirements to protect their health and suffer more significant burdens as a result of the Challenged Provisions, which will unlawfully operate to disproportionately abridge and deny them their right to vote in the upcoming elections. Simply put, venturing out to vote in person, seek out a witness to sign their ballot envelope, or attempt to timely submit their ballot before the Election Day Cutoff threatens African Americans' well-being and the well-being of their communities far more acutely than white South Carolinians' well-being.

9.        The reasons for this disparity are varied, but each is traceable to South Carolina's long and sordid history of discrimination against African Americans since the first Africans were brought to South Carolina as slaves. Due to resulting and persistent disparities in education, healthcare, housing, and income, South Carolina's African-American voters experience higher rates of poverty than white voters and have less access to reliable transportation, making it more

- 4 -

difficult for them to successfully navigate the hurdles imposed by the Challenged Provisions to cast and have their ballots counted.

10.     For all of these reasons, Plaintiffs file this action and seek an emergency injunction from this Court to ensure that the Challenged Provisions do not unconstitutionally abridge or deny the fundamental rights of Plaintiffs, their members or constituents, and countless other lawful South Carolina voters in the coming elections.

## PARTIES

11.     Plaintiff Kylon Middleton is a 45-year-old African American and a citizen and a resident of Charleston County, South Carolina. Plaintiff Middleton is the pastor of Mt. Zion AME Church in Charleston. In addition to playing an active role in the civic life of Charleston, Plaintiff Middleton is a registered voter and a Democratic candidate for Charleston County Council. He is actively campaigning in the contested June 9, 2020 Democratic Party primary and hopes to progress to the November 3 general election. Plaintiff Middleton would like to ensure that he, his congregants, and all eligible voters in South Carolina have an opportunity to safely cast their ballots in upcoming elections, and he recognizes that the need to social distance because of COVID-19 will cause many voters to seek to cast absentee ballots. Plaintiff Middleton would assist voters who were unable to cast their absentee ballots in person by returning their absentee ballots on their behalf, but, because he is a candidate for political office, he cannot because of a South Carolina election law that criminalizes this act.

12.     Plaintiff Deon Tedder is a 30-year-old African American and a citizen and a resident of Charleston County, South Carolina. Plaintiff Tedder is a Democratic candidate for South Carolina State House District 109. He is actively campaigning in the contested June 9, 2020 Democratic Party primary and hopes to progress to the November 3 general election. Plaintiff

Tedder would like to ensure that he and the eligible voters in the constituency that he seeks to represent have an opportunity to safely cast their ballots in upcoming elections, and he recognizes that the need to social distance because of COVID-19 will cause many voters to seek to cast absentee ballots. Plaintiff Tedder has made service to others a central point of his campaign activities. Consistent with his campaign activities, Plaintiff Tedder would like to assist voters who seek to cast absentee ballots but cannot leave their homes. But because he is a political candidate, South Carolina law prevents him and members of his campaign staff from engaging in this act of assistance.

13. Plaintiffs Middleton and Tedder, along with all other candidates running for public office in 2020 elections, will face irreparable harm but for adequate measures taken to ensure fair and effective elections that comply with the U.S. Constitution. Plaintiffs Middleton and Tedder have an interest in ensuring that every voter in their respective districts who is legally permitted to vote has an opportunity to effectively cast a ballot. Plaintiffs Middleton and Tedder and their respective campaigns also have an interest in educating, mobilizing, assisting, and turning out voters in South Carolina, including assisting voters in submitting their absentee ballots. And, as voters themselves, Plaintiffs Middleton and Tedder have an interest in ensuring that they have an opportunity to effectively cast their own ballots in the upcoming elections. Because they are under the age of 65 and presently have no other qualifying excuse, they are not eligible to vote by absentee ballot.

14. Plaintiff Amos Wells is a 77-year-old African American and a citizen and a resident of Anderson County, South Carolina. Although Plaintiff Wells has been able to cast his ballot absentee because of his age for over a decade, he generally casts his ballot in person because he believes doing so is symbolically important and he wants to make sure that he has as much

information about the races as possible before he votes. Plaintiff Wells would prefer to cast his ballot in person on election day in the upcoming elections, but recognizes that his age puts him at a high risk for COVID-19 and that he may be forced to cast an absentee ballot for his safety and the safety of others in his community. If he is forced to vote absentee, Plaintiff Wells would do so by mail, but has concerns that his ballot may be delayed, both in being sent to him and in being returned to the county board of elections. To determine whether it is safe to vote in person and to ensure that he has the most up-to-date information on the races in which he votes, Plaintiff Wells intends to mail his absentee ballot as close to Election Day as possible. But because of delays in mail delivery, he is concerned that even if he risks his health to hand deliver his absentee ballot to the post office, it will not make it to the county board of elections before the polls close.

15.     Plaintiff Carlyle Dixon is a 71-year-old African American and a citizen and a resident of Horry County, South Carolina. Plaintiff Dixon has had a quadruple-bypass heart surgery, and because major surgery has been known to impact immune system health, his social-distancing precautions pre-date COVID-19. Plaintiff Dixon has previously cast absentee ballots in person and intends to cast an absentee ballot from his home by mail as long as COVID-19 poses a threat in the upcoming elections. Plaintiff Carlyle is concerned about the reliability of mail service at his home and what that may mean for the timely receipt and delivery of his absentee ballot before the polls close. Plaintiff Carlyle wants to ensure that his absentee ballot is counted.

16.     Plaintiff Tonya Winbush is a 45-year-old African American and a citizen and a resident of Anderson County, South Carolina. Because of COVID-19 and the risk it poses to her and her community, Plaintiff Winbush would like to have the option to cast her ballots in the upcoming elections absentee. Plaintiff Winbush has previously voted by absentee ballot in person using a qualifying excuse, but she does not have a qualifying excuse for the upcoming elections..

Voting absentee, either in person or by mail, would make it more easy for Plaintiff Winbush to practice social distancing than casting a ballot in person on Election Day. If Plaintiff Winbush were above the age of 65, she would be able to cast her ballot absentee. As president of the Anderson County Democratic Party, Plaintiff Winbush has an interest in ensuring that all qualified voters have an opportunity to safely cast ballots in the Democratic primaries and general elections.

17.    Plaintiff Ernestine Moore is a 68-year old African American and a citizen and a resident of Edgefield County, South Carolina. Plaintiff Moore lives alone, and her age places her in a high-risk category for COVID-19. As long as COVID-19 poses a health risk, Plaintiff Moore intends to cast her ballot absentee to minimize the risk to her health. As long as social distancing remains in place, the South Carolina election law that requires that a witness sign her absentee ballot envelope burdens Plaintiff Moore's right to vote because it requires Plaintiff Moore and others in her position—that is, those who live alone and are at high risk for COVID-19 infection—to unnecessarily risk exposure to COVID-19.

18.    Plaintiff South Carolina Democratic Party ("SCDP") brings this action on its own behalf and on behalf of its members. SCDP is a political party within the meaning of S.C. Code Ann. § 7-1-20 and is the South Carolina state party committee of the national Democratic Party. SCDP is certified by the S.C. State Election Commission to nominate candidates for offices to be voted on in a general or special election and nominates candidates on a regular basis by party primary. SCDP has an interest in ensuring that voters have an opportunity to express their will regarding Democratic Party candidates running for elections, as well as ballot measures and initiatives those individuals support. To accomplish its purpose, SCDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through a meaningful opportunity to cast ballots in South Carolina. SCDP has hundreds of

thousands of members and constituents from across the State, including South Carolinians who regularly support candidates affiliated with the Democratic Party and Democratic Party candidates. SCDP works to accomplish its mission by, among other things, working closely with Democratic candidates and assisting county parties by making expenditures on candidates' behalves, providing get-out-the-vote ("GOTV") assistance, and actively supporting the development of programs benefiting Democratic Party candidates. SCDP has previously engaged in, and plans to continue to engage in, expenditures on behalf of Democratic Party candidates, GOTV assistance, and the development of programs to elect Democratic Party candidates in South Carolina. An election held under the Challenged Provisions, and without adjustments for the COVID-19 pandemic, directly harms SCDP because it frustrates its mission and the effectiveness of its efforts to persuade and mobilize voters to vote for Democratic candidates and causes, and will require it to divert resources from other efforts in the State to attempt to help its voters overcome the barriers presented by the lack of safe and effective means to cast their ballots. Specifically, SCDP will need to spend additional resources on educating voters about the Challenged Provisions as opposed to simply persuading them to vote for Democratic candidates and other GOTV activities. The need to expend these additional resources could double the costs as it relates to digital voter communications. In addition, the laws at issue will cause the SCDP to be further directly injured by decreased turnout, which will undermine its fundamental right to choose its standard bearers through a vote that accurately reflects the preferences of its membership. African American voters in South Carolina overwhelmingly support Democratic candidates, and the Challenged Provisions disparately burden African American voters. If not enjoined, the Challenged Provisions will directly harm the mission of the SCDP.

19.     Plaintiff Democratic National Committee ("DNC") is the national committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14), and its mission is to elect local, state, and national candidates of the Democratic Party to public office throughout the United States, including South Carolina. The DNC works to accomplish its mission by, among other things, making expenditures for, and contributions to, Democratic candidates (at all levels) and assisting state parties throughout the county, including in South Carolina. The DNC has members and constituents across the United States, including eligible voters in South Carolina whose rights to vote have been and will continue to be severely burdened and denied outright by the challenged matters during the current coronavirus crisis. An election held under the Challenged Provisions, and without adjustments for the COVID-19 pandemic, directly harms the DNC because it frustrates its mission and the effectiveness of its efforts to persuade and mobilize voters to vote for Democratic candidates and causes, and will require it to divert resources from other efforts in the State to attempt to help its voters overcome the barriers presented by the lack of safe and effective means to cast their ballots. The laws and policies at issue in this case directly harm the DNC by frustrating its mission of, and efforts in, electing Democratic candidates in South Carolina, whose supporters face greater obstacles in casting a vote and having their votes counted. African American voters in South Carolina overwhelmingly support Democratic candidates, and the Challenged Provisions disparately burden African American voters. If not enjoined, the Challenged Provisions will directly harm the mission of the DNC.

20.     Plaintiff DCCC is the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). DCCC's mission is to elect Democratic candidates to the U.S. House of Representatives from across the United States, including from South Carolina's seven congressional districts. DCCC works to accomplish its mission by, among other things, assisting

state parties throughout the country, including in South Carolina. DCCC intends to again expend significant resources to support Democratic candidates in 2020, including specifically in South Carolina. In 2018, DCCC made millions of dollars in contributions and expenditures to persuade and mobilize voters to support congressional candidates who affiliate with the Democratic Party. For 2020, DCCC has identified districts in South Carolina as targeted races, in which it will expend significant resources to support the Democratic candidates. If elections are held without adjustments for COVID-19, DCCC will divert and expend additional funds and resources to promote safe voter education and turnout efforts in South Carolina at the expense of other efforts in South Carolina and other states. An election held under the Challenged Provisions, and without adjustments for the COVID-19 pandemic, directly harms DCCC because it frustrates its mission and efforts to register voters and persuade and mobilize those voters to elect Democratic candidates in South Carolina. An election held without adjustments for the COVID-19 pandemic also necessarily reduces the pool of eligible voters who can vote for Democratic candidates for U.S. Congress. In addition, due to the Challenged Provisions, DCCC will be further directly injured by decreased turnout, which will undermine its fundamental right to choose its standard bearers through a vote that accurately reflects the preferences of Democratic Party membership. African American voters in South Carolina overwhelmingly support Democratic candidates, and the Challenged Provisions disparately burden African American voters. If not enjoined, the Challenged Provisions will directly harm the mission of DCCC.

21.     Defendant Andino is sued in her official capacity as Executive Director of the South Carolina State Election Commission. The Executive Director is the Chief Administrative Officer for the State Election Commission and is required by law to supervise the County Boards of Elections and Voter Registration. S.C. Code Ann. § 7-3-20. In this role, she is tasked with ensuring

that those County Boards comply with state and federal law in conduct of elections and voter registration. *Id.* at § 7-3-20(C).

22.     Defendant John Wells is the Chair of the South Carolina Election Commission and is sued in his official capacity. Defendants Clifford J. Edler and Scott Mosley are members of the South Carolina Election Commission and are sued in their official capacities. The Executive Director serves at the pleasure of the South Carolina Election Commission. S.C. Code Ann. § 7-3-20(A). The South Carolina Election Commission is responsible for carrying out all laws related to absentee registration and voting, including the Challenged Provisions, and to promulgate relevant regulations. *Id.* § 7-15-10. The enumerated mission of the Commission is, in relevant part, to ensure that every eligible citizen has the opportunity to participate in fair and impartial elections with the assurance that every vote will count.

## JURISDICTION AND VENUE

23.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution and under 52 U.S.C. §§ 10301 and 10302.

24.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

25.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

26.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

27.     This Court has the authority to enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS AND LAW

**A.**    **The United States and South Carolina are in the midst of an unprecedented public health crisis.**

28.    Over the course of the last several weeks, a novel coronavirus known as COVID-19 has been quickly spreading through communities all across the United States, impacting hundreds of thousands of residents throughout the country, including in South Carolina.

29.    As of the date of this filing, COVID-19 was the reported cause of over 60,000 deaths in the United States, all occurring over the course of approximately six short weeks.

30.    The crisis is getting worse by the day in South Carolina in particular. As of April 30, 2020, the South Carolina Department of Health was reporting that nearly 6,100 people in the State have tested positive for the virus and 244 have died. These numbers likely underestimate by far the actual statistics, due to broad unavailability of adequate testing, and the fact that it is becoming increasingly clear that a significant number of the population has been unwittingly infected, with mild or entirely asymptomatic cases.

31.    In certain populations, the virus has proven to be particularly deadly. Elderly Americans are particularly at risk, but so are Americans of all ages, particularly those with relatively common pre-existing conditions, such as high blood pressure.

32.    It has also become clear that communities of color, including in particular the African American community, is acutely at risk:   the State Department of Health and Environmental Control ("DHEC") reports that 43% of South Carolina's confirmed infections and 53% of its reported deaths are among African Americans residents, despite the fact that African Americans make up only 27% of the State's population.

- 13 -

33.    To prevent the spread of the disease, the U.S. Centers for Disease Control and Prevention ("CDC") and DHEC recommend that people stay at home and avoid close contact with others.

34.    Consistent with that advice, Governor Henry McMaster declared a state of emergency in early March and issued several executive orders closing schools, bars, restaurants, and other business, prohibiting gatherings of 10 or more people, and requiring residents to engage in social distancing and "remain[] at home whenever possible." Exec. Order 2020-21 (Apr. 6, 2020); *see also* Exec. Order 2020-08 (Mar. 13, 2020); Exec. Order 2020-09 (Mar. 15, 2020); Exec. Order 2020-15 (Mar. 28, 2020); Exec. Order 2020-16 (Mar. 30, 2020). Though on April 27, 2020, Governor McMaster modified the orders to allow public beaches and certain retail businesses to reopen, he extended the stay-at-home order for an additional 15 days.  Exec. Order 2020-29 (Apr. 27, 2020).

35.    State health care professionals and epidemiologists have cautioned repeatedly that the pandemic is going to get worse. National trends from the CDC show that the curve is climbing rapidly.

36.    Many scientists believe it will take at least a year to develop a vaccine for COVID-19 and provide it to the general public, but the precise timing is unknown.

37.    Public health officials are additionally warning that unless Americans continue to adhere to strict social distancing practices, a second wave of COVID-19 infections will occur in the summer or fall, with a possible peak between October and November—in other words, just as Americans head to the polls to cast their ballots in the general election.

38.    Even if the community spread of COVID-19 in South Carolina has significantly decreased by November, CDC guidelines recommend that individuals take meaningful social

distancing measures even if there is a "minimal" threat of community transmission of COVID-19 in the area.

39.     This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and until there is a vaccine or widespread "herd immunity" (i.e., at least 60% of the population has been infected and recovered), Americans will remain at serious risk of contracting this unpredictable and deadly virus.

40.     Jurisdictions that have held elections since the onset of the pandemic have encountered substantial challenges in administering elections that will only be exacerbated if South Carolina holds the coming elections with the Challenged Provisions in place.

41.     South Carolina's ability to offer in-person voting at the scale and breadth that it has offered it in the past is likely to be highly compromised by social distancing guidelines, a dearth of volunteers to staff the polls (as election day volunteers have traditional disproportionately been older Americans at heighted risk from the virus, who have been declining to risk their health in primaries around the country), and locations that previously served as polling places being deemed no longer suitable or declared off limits.

42.     As a result, even jurisdictions with far fewer restrictions on absentee voting than South Carolina have seen alarmingly long lines for in-person voting, and in the weeks that followed, have traced additional coronavirus infections to those elections.

43.     The CDC, anticipating difficulties in conducting elections during the COVID-19 crisis, has now recommended that jurisdictions encourage voting by mail and reduce methods of voting that lead to direct contact with other voters or poll workers. CDC, *Recommendations for Election Polling Locations*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last visited May 1, 2020). Other federal, state, and local officials have

increasingly come to the same realization. Congress, for example, recently authorized $400 million to help states increase access to mail ballots.

44.     Commission Director Andino, in recognition of these challenges, sent a letter on March 30, 2020, to the Governor and leaders of the General Assembly requesting changes to South Carolina law.  Director Andino noted that South Carolina's "elections, as currently prescribed by law, require large numbers of people to congregate in one place – something that everyone is currently being asked not to do by public safety and health officials." Ex. 1, Ltr. from Commission to Gov. McMaster, Senator Peeler, and Representative Lucas (hereinafter "Andino Letter") at 1-2.  In addition, the number of polling places is likely to shrink given that many poll workers fall into high-risk categories and certain facilities (schools, churches) will opt out of serving as polling places.  Director Andino asked that the State allow no-excuse absentee voting, remove the witness requirement for absentee ballots, allow absentee ballot requests to be submitted electronically, use vote-by-mail, where the Commission would mail ballots to every registered voter, allow early voting at vote centers, and give county officials extra time to process voted absentee ballots.  No action was taken on these requests.

45.     The South Carolina Association of Registration and Election Officials, Inc. ("SCARE") raised similar concerns. Ex. 2, April 6, 2020 Letter from SCARE to Governor McMaster, Senate President Peeler, and House Speaker Lucas (hereinafter "SCARE Letter") at 1-2. But South Carolina's voting laws remain unchanged.

**B.     South Carolina's Absentee Ballot Age Restriction broadly prohibits voters under 65 years of age from voting by mail-in absentee ballot.**

46.     Unless the Governor decides to extend a state of emergency declaration within 45 days of an election, the vast majority of South Carolina's 3.3 million registered voters are categorically prohibited from voting in any way other than by going to the polls, in person, on

election day. S.C. Code Ann § 7-13-710 *et seq.* (outlining process for voting in person); S.C. Code Ann. § 7-13-771 (permitting curbside voting for "handicapped or elderly voter[s] [who] cannot enter the polling place or cannot stand in line to vote"). Only a limited subset of South Carolina voters may cast their ballots before election day through absentee voting, either in person or by mail. S.C. Code Ann. § 7-15-320 (listing categories of voters eligible to cast absentee ballots).

47.     These prohibitions on and absentee voting, combined with what Director Andino has predicted will be widespread poll closures as a result of the virus, is almost certain to lead to extremely long lines on election day. If anything, South Carolina voters can expect to encounter even longer lines than those that voters in Wisconsin recently experienced, because Wisconsin allows both no-excuse absentee voting and early voting.  Those long lines mean more time spent in close proximity to people *and* exposure to more people.

48.      One notable exception to South Carolina's broad prohibition on absentee voting is for voters "sixty-five years of age or older," all of whom the State permits to vote by absentee ballot for no other reason than their chronological age. S.C. Code Ann. § 7-15-320(B)(8).

49.     In contrast, all voters who have not yet turned 65 are categorically prohibited from voting by absentee ballot, unless they can qualify for one of the other narrow exceptions permitted by law. If a voter will not be "absent from their county of residence on election day," he or she must be "physically disabled" or a person attending a sick or physically disabled person, "certified poll watchers, poll managers, county board of voter registration and elections members and staff, county and state election commission members and staff working on election day," "persons admitted to hospitals as emergency patients on the day of an election or within a four-day period before the election," "persons with a death or funeral in the family within a three-day period before the election," persons serving on juries, "persons confined to a jail or pretrial facility pending

disposition of arrest or trial," or "members of the Armed Forces and Merchant Marines of the United States, their spouses, and dependents residing with them."  *See* S.C. Code Ann. § 7-15-320(B).

50.     South Carolina's historical turnout statistics reflect the restrictions imposed by the Absentee Ballot Restriction. In 2016, 75% of voters aged 65 and over participated in the election, as compared to only 59% of voters between 18 and 24 years old. In 2018, the turnout rate of older voters similarly nearly doubled the youth turnout rate—with 68% of the former group participating in the election, but only 35% of the latter.

51.     As South Carolinians socially distance themselves to comply with public health advice and protect themselves and their community against the spread of the virus, the Absentee Ballot Age Restriction prohibits the majority of South Carolina's voters from exercising their right to vote safely from their homes—for no other reason than their chronological age.

52.     The disparity in turnout rates in voters by age is likely to only increase as younger voters are forced to choose between exercising their right to vote and putting themselves, and their communities at risk by voting in-person on election day—the only means by which South Carolina will permit most of them to access the franchise.

53.     As jurisdictions that have held elections since the pandemic began have discovered, even in communities where mail-in voting is broadly available, a substantial number of voters will have no choice but to appear to vote in person. The result has been extraordinarily long lines, as voters attempt to comply with social distancing protocol and navigate overstressed and substantially understaffed polling locations.

54.     Political scientists have consistently found that young voters are particularly susceptible to being disenfranchised by long lines. Thus, this public health crisis only exacerbates the disenfranchising effects of the Absentee Ballot Age Restriction.

55.     In South Carolina, more people who are permitted to vote by absentee ballot have been choosing to do so.  For example, during the February 2020 Democratic Presidential Preference Primary ("PPP"), the State saw a 38 percent increase in absentee voting compared to the Democratic PPP election in 2016. Similarly, there was a 29 percent increase in absentee voting from 2012 to 2016 general elections. This trend shows that voting by absentee ballot is, for obvious reasons, the best option for voting in the current pandemic and other voters should not be prohibited from doing the same.

**C.     South Carolina imposes a number of additional hurdles that threaten disenfranchising lawful voters who vote using absentee voting.**

56.     For those who are able to vote by absentee ballot in South Carolina, there are additional restrictions they must contend with to avoid disenfranchisement by using this method of voting.  The additional provisions challenged in this litigation and are discussed briefly below.

<u>**The Witness Requirement**</u>

57.     For an absentee ballot to be counted, a voter must sign the oath on the back of the return envelope and that oath must be witnessed by another individual, whose address "shall appear on the oath." S.C. Code Ann. § 7-15-380; *see also id.* §§ 7-15-220, -385.

58.     Election officials must reject all unwitnessed ballots and need not give the voter notice or an opportunity to cure. S.C. Code Ann. § 7-15-420.

59.     Over a quarter of a million South Carolinians are estimated to live alone. A significant portion of this population is comprised of elderly South Carolina citizens who are most

at risk from COVID-19. In fact, almost 12 percent of all South Carolina households consist of a single person age 65 or over living alone.

60.     The proportion of South Carolinians who live alone is also more significant in the State's African American population. Of all African American households, 33.2% consist of people who live alone, whereas only 28.2% of all white households include people who live alone. Thus, African American voters will be more likely to need to risk exposure to COVID-19 in order to obtain a witness signature for their absentee ballots.

61.     The Witness Requirement requires voters to leave the safety of their homes during the ongoing pandemic and find and procure a witness in order to exercise their right to vote.

62.     The Governor's current order requires voters to shelter in place. If voters leave their homes, the government requires that they maintain at least six feet of distance from other individuals, consistent with guidance from public health officials and doctors. In addition, the voter and witness will have to touch the same object—the ballot—to provide a signature. Thus, this requirement increases the risk of COVID-19 transmission.

## **ELECTION DAY CUTOFF**

63.     Even if a voter successfully navigates the Witness Requirement, in order to be counted, the voter's mail-in absentee ballot must be received by 7:00 p.m. on Election Day. S.C. Code Ann. § 7-15-230.

64.     The Election Day Cutoff means that, regardless of the date a ballot is postmarked, and regardless of how responsible a voter was in timely mailing their absentee ballot, if an absentee ballot is not received by 7:00 p.m. on Election Day, it will be rejected.[1]

65.     Although state law gives county election officials until 12:00 pm on the Saturday after the election to complete the canvass and certify the count to the Board of State Canvassers, S.C. Code Ann. § 7-17-20, the Board of State Canvassers has the authority to begin its canvassing 15 days after the election, *id.* § 7-17-230. And voters who fill out provisional ballots because they forgot their photo identification can show up at a hearing two days after a primary and three days after a general election to present it.  *Id.* § 7-13-710(C)(1).

66.     The Election Day Cutoff has caused numerous numbers of lawful ballots to be rejected in prior elections, even before the onset of the pandemic.

67.     In 2018, for example, over 1,330 timely requested absentee ballots arrived too late to be counted during the 2018 statewide general election.

68.     Even in more ordinary years, when voters have requested more absentee ballots than elections officials originally anticipated there have been concerns that elections officials would be unable to process the influx of applications in a timely fashion, so as to dispatch the ballots out to the voters sufficiently in advance of the election to have then returned by the Cutoff.

69.     For example, during the 2016 general election, where the State saw a more than 20 percent increase in the number of absentee ballots requested, a Commission spokesperson stated

---

[1]  The term "postmark" refers to any type of imprint applied by the U.S. Postal Service to indicate the location and date the Postal Service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, it should be presumed to have been mailed on or before election day unless the preponderance of the evidence demonstrates it was mailed after election day.

that voters "could be putting [their] ballot[s] at risk" given that the amount of time it could take for applications and ballots to pass through the mail. Bristow Marchant, *400,000+ in SC expected to vote before Election Day*, The State, Nov. 1, 2016, https://www.thestate.com/news/politics-government/article111671007.html.

70.    In fact, *even earlier this year*, some counties in South Carolina mailed absentee ballots late to voters even before the state of emergency. Matt Moore, *Mailed absentee ballots sent late in Greenville County*, https://www.wyff4.com/article/south-carolina-democratic-primary-absentee-ballots-mailed-late/31138127 (Feb. 28, 2020).

71.    The pandemic will only make this situation more dire, and for a greater number of voters. Despite the strict limitations that South Carolina puts on the types of voters who may vote by absentee ballot, the State has already seen a record increase in requests for absentee ballots since the pandemic began.

72.    As of April 23, nearly 40,000 South Carolinians had already requested their absentee ballots for the June primary elections. In comparison, in the 2018 primary, only approximately 19,000 South Carolinians voted absentee by mail.

73.    Commission Director Andino anticipated this sharp increase, noting that "[e]ven before the coronavirus pandemic, elections officials were challenged with a significant increase in the number of absentee ballots." Ex. 1 at 4.

74.    At the same time that mail-in voting is increasing exponentially, USPS is facing a budget crisis that will likely lead to delays in mail delivery, raising particular concerns for South Carolina, which already experiences slow mail service.

75.    In the recent primary election in Wisconsin, a massive increase in requests for absentee ballots, combined with decreases in available elections staff, placed a significant strain

on local election officials, several of which were not able to send voters a ballot in time for it to be returned—or even delivered to them—by the election day receipt deadline normally imposed in that State. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at *38-39 (W.D. Wis. Apr. 2, 2020).

76.    This crisis ultimately necessitated federal litigation that reached the U.S. Supreme Court and resulted in extension of the Election Day receipt deadline by six days, so long as the ballots were postmarked by Election Day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702, at *2 (Apr. 6, 2020); *See Bostelmann*, 2020 WL 1638374, at *38-39. As a result, over 100,000 ballots that would have been rejected were counted because they were postmarked by, but arrived after, Election Day.

## ABSENTEE BALLOT ASSISTANCE BAN

77.    As an alternative to returning the absentee ballot by mail, voters may authorize another person to return their absentee ballots. S.C. Code Ann. § 7-15-385. The authorization must be signed and "given in writing on a form prescribed by the State Election Commission and must be turned in to the board of voter registration and elections at the time the envelope is returned." *Id.*

78.    However, "[a] candidate or a member of a candidate's paid campaign staff including volunteers reimbursed for time expended on campaign activity is not permitted to serve as an authorized returnee for any person unless the person is a member of the voter's immediate family." *Id.*

79.    Thus, the Absentee Assistance Ban prohibits candidates and paid campaign staff from assisting any non-immediate family members with returning their ballots, even if that voter asks for help because they have a disability or cannot read or write, or are sheltering at home and

afraid to venture out to return the ballot themselves, but are concerned that their ballot will not reach the appropriate elections officials in time to be counted.

80.    A violation of the Absentee Assistance Ban is punishable as a felony punishable by a fine up to $1,000 or term of imprisonment up to five years. S.C. Code. Ann. § 7-25-190.

81.    As noted above, even before the COVID-19 crisis, the Commission expressed concern that voters who returned their absentee ballots by mail put their ballots at risk of not being counted.

82.    But with the additional stressors placed on individual voters, the postal service, and elections officials as a result of the pandemic, the Absentee Assistance Ban becomes all the more problematic, prohibiting candidates and their paid campaign staff from helping to assist voters in having their ballots timely cast as they continue to social distance.

**D.    South Carolina's history of racial discrimination exacerbates the racially disparate impact of the Challenged Provisions during this pandemic.**

83.    South Carolina has a lengthy history of discrimination that has made it more difficult for African Americans to participate in the political process and elect candidates of their choice.

84.    Around 40 percent of all enslaved Africans forcibly brought to the United States arrived in Charleston harbor. Although many enslaved Africans who arrived in Charleston were sold and transported away from the State, a great many stayed in South Carolina. By 1860, enslaved Africans made up more than 55% of the population of South Carolina.

85.    In the period immediately following the Civil War, South Carolina's sizeable African-American population exercised its newfound freedom at the ballot box by electing a significant number of African Americans to state political offices. S.C. H. Con. Res. 3695 (Mar.

13, 2007) (identifying "former slaves and their descend[a]nts [who] took their rightful seats in the highest offices of the state and federal governments").

86.     But when Reconstruction ended and federal troops left the State, so, too did hopes for African-American political opportunity and equality.

87.     White South Carolinians enacted legislation to quell African-American political participation after Reconstruction. In 1895, South Carolina adopted a literacy test that effectively disenfranchised the majority of African American voters. That same year, South Carolina instituted a poll tax, which it kept in place through 1950. And from 1896 until 1947—three full years after the Supreme Court decided the issue in *Smith v. Allright*—South Carolina maintained an all-white primary. *Elmore v. Rice*, 72 F. Supp. 516 (D.S.C. 1947).

88.     Segregated education was *de jure* throughout South Carolina until the Supreme Court's decision in *Brown v. Board of Education*, a consolidated case that included *Briggs v. Elliot*, a challenge to school segregation in Clarendon County, South Carolina.

89.     After the Supreme Court cosigned Judge Waites Waring's dissenting assertion that "[s]egregation is per se inequality," *Briggs v. Elliott*, 98 F. Supp. 529, 548 (E.D.S.C. 1951), most white public schools in South Carolina did not desegregate until a 1970 order from the Fourth Circuit. *Stanley v. Darlington Cty. Sch. Dist.*, 424 F.2d 195 (4th Cir. 1970) (requiring immediate implementation of *Brown v. Board of Education*).

90.     But because of racial segregation in housing and the proliferation of whites-only private school "segregation academies" in the 1960s and 1970s, true integration never occurred. Jennifer Berry Hawes, Seanna Adcox, Paul Bowers, Thad Moore, and Glen Smith, *Minimally Adequate – Part Two: No accident of history*, Post & Courier (Nov. 14, 2018), https://data.postandcourier.com/saga/minimally-adequate/page/2.

- 25 -

91.     The effects of racially segregated schools and racially disparate treatment of public schools lingered for decades, leading 36 predominately African-American and socioeconomically disadvantaged school districts along I-95—the Corridor of Shame—to file a lawsuit against the State for alleging inadequate funding and resource allocation in 1999. *See Abbeville Cty. Sch. Dist. v. State*, 515 S.E.2d 535 (S.C. 1999).

92.     After nearly two decades of litigation, the South Carolina Supreme Court issued an opinion just six years ago, upholding the trial court's finding that children in the plaintiff school districts were denied a "minimally adequate education." *Abbeville Cty. Sch. Dist. v. State*, 767 S.E.2d 157, 163 (S.C. 2014).

93.     The case continued to wind its way through the State court system until November 2017, when a divided South Carolina Supreme Court ended its oversight of the General Assembly. *Abbeville Cty. Sch. Dist. v. South Carolina*, Appellate Case No. 2007-065159 (S.C. Nov. 17, 2017).

94.     Because of its history of racial discrimination, South Carolina was required to seek preclearance for all new voting changes from 1964 until 2013, when the Supreme Court held that the coverage formula used in Section 4(b) of the Voting Rights Act was unconstitutional. *Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013).

95.     During the time that South Carolina was subject to the preclearance requirement, the State experienced marked improvements in African Americans registration and voting and, relatedly, in the overall representation of African-American elected officials in the State.

96.     Nevertheless, South Carolina has a recognized history of racially polarized voting that continues to this day. *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 640 (D.S.C. 2002) ("The history of racially polarized voting in South Carolina is long and well-documented— so much so that in 1992, the parties in *Burton* [*v. Sheheen*] stipulated that since 1984 there is

evidence of racially polarized voting in South Carolina.") (quotation marks omitted); *Smith v. Beasley*, 946 F. Supp. 1174, 1202 (D.S.C. 1996) ("In South Carolina, voting has been, and still is, polarized by race."); *see also United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 278 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004) ("Even in general election contests for Charleston County Council involving no African-American candidates, there was polarization between African-American and white voters 87.5% of the time."); Richard L. Engstrom, *The Elephant in the Room: NAMUDNO, Shelby County, and Racially Polarized Voting*, 10 n.39–11 n.44 Transatlantica (2015), https://journals.openedition.org/transatlantica/7427 (finding racially polarized voting in 2002-2010 South Carolina races submitted for preclearance).

97. To that end, no African-American political candidate had been elected to statewide office since 1872. In fact, until Tim Scott was elected to the U.S. Senate in the 2014 special election, no African-American political candidate had won a statewide election in over 120 years. Senator Scott is still the only African American to win a statewide election in South Carolina since Reconstruction.

98. The lingering effects of racial discrimination in South Carolina can also be observed in the areas of such as economics, housing, and health.

99. Around 25 percent of African Americans in South Carolina live in poverty, which is more than double the poverty rate of white South Carolinians. Consistent with these findings, the median income of African-American South Carolinians is slightly more than half of the median income of white South Carolinians, and African-American South Carolinians substantially trail white South Carolinians in other traditional economic indicators such as home ownership rates and home values.

100.    With respect to health outcomes, African Americans in South Carolina have a higher prevalence of diabetes, hypertension, obesity, physical inactivity, poor health, and poor diet than whites in South Carolina, and this holds true for urban and rural areas. *See, e.g.*, Sarah Levin *et al.*, *Racial/Ethnic Health Disparities in South Carolina and the Role of Rural Locality and Educational*, 94 S. Med. J. 711–18 (2001).

101.    Decades of research have demonstrated that deficiencies in socioeconomic standing, such as those described above, significantly impact an individual's ability to participate fully in the political process.

102.    COVID-19 operates to significantly exacerbate the disparate challenges faced by African American voters in South Carolina.

103.    Dr. Linda Bell, the State Health Department's epidemiologist, has warned that African Americans are "at an increased risk for complications [from the virus] should they become infected" because they disparately suffer from underlying health conditions like cardiovascular disease, diabetes, obesity, lung disease, and asthma that have been found to make the virus more dangerous, and because "they are less likely to have access to health care." Sammy Fretwell, *Weakened minority health office left blacks vulnerable to coronavirus, critics say*, The State (Apr. 27, 2020), https://www.thestate.com/news/local/environment/article242274416.html.

104.    The Brookings Institute has stated that, "structural conditions that inform pre-existing conditions and health disparities are the main culprit" behind the racially disproportionate impact that COVID-19 is having on African Americans. Rashawn Ray, *Why are Blacks dying at higher rates from COVID-19?*, Brookings (Apr. 9, 2020), https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19/ (identifying facts that African Americans are more likely to live in "neighborhoods []

rooted in the historical legacy of redlining," reside in densely populated areas that increase contact with other people, and be involved in "essential" work as reasons why African-American infection and death rate outpaces African-American population percentage).

105.   These disparate health outcomes significantly impact an individual's ability to fully participate in the political process, as the interaction between these disparities, the lingering impact of racial discrimination, and the Challenged Provisions in the wake of the COVID-19 pandemic make clear.

106.   African Americans who must leave their homes in order to engage in the voting process—either because the Absentee Ballot Age Restriction prohibits them from voting by absentee ballot, or as a result of features of the absentee ballot process, including the Witness Requirement—risk not only their own health but the broader well-being of their communities in a manner that is more acutely felt among South Carolina's African American communities, which have proved far more vulnerable to the virus than their white South Carolinian counterparts.

107.   Further, given the higher rates of poverty, African-American voters often have less access to reliable transportation and less flexible work schedules, both of which make it more difficult for them to travel to the county board of registration and elections' office to submit their ballots in time to meet the Election Day Cutoff. For the same reasons, African Americans are far more likely to be disenfranchised if they are forced to wait in long lines to vote.

## CLAIMS FOR RELIEF

### COUNT I
### Twenty-Sixth Amendment
### U.S. Const. amend. XXVI; 42 U.S.C. § 1983
### Denial or Abridgement of the Right to Vote on Account of Age
### *(Absentee Ballot Age Restriction)*

108.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

109.    The Twenty-Sixth Amendment to the U.S. Constitution provides: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." U.S. Const. amend. XXVI, § 1.

110.    Thus, by its plain terms, the Twenty-Sixth Amendment prohibits restrictions on the right to vote "on account of age."

111.    The Twenty-Sixth Amendment guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process and broadly protects against both blatant and subtle forms of discrimination. *See, e.g.*, *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

112.    As a result, laws that have the purpose, at least in part, of denying or abridging the right to vote on account of age are unconstitutional. *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance "unexplainable on grounds other than age").

113.    In direct contravention of the Twenty-Sixth Amendment, the Absentee Ballot Age Restriction facially discriminates on the basis of age by making voting by absentee ballot available due solely to a voter's age.

114.    Absent relief, voters under the age of 65 like Plaintiffs Middleton, Tedder, and Winbush will continue to suffer the effects of unconstitutional discrimination because of age.

**COUNT II**
**First Amendment and Equal Protection**
**U.S. Const. amends. I, XIV, 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**
*(Absentee Ballot Age Restriction, Witness Requirement, Absentee Assistance Ban)*

115.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

116.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted).

117.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that a plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation marks omitted). "We believe that a regulation which imposes only moderate burdens could well fail the

*Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995). "This balancing test requires hard judgments—it does not dictate automatic results." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016) (quotation marks omitted).

118.   A court considering a challenge need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018); *see McLaughlin*, 65 F.3d at 1221 n.6.

119.   Here, unless Plaintiffs are granted the relief requested herein, the right to vote of thousands of South Carolina voters, including Plaintiffs and their constituents, will be severely burdened (and in some cases, entirely denied) by the Challenged Provisions, which will operate, both independently and together, to unduly burden the right without sufficient justification to outweigh the imposition of that burden.

120.   Because of the virulent spread of the dangerous novel coronavirus and the disease it causes, COVID-19, as well as the unprecedented social distancing measures that South Carolina citizens must take to slow the spread of the virus and to ensure their safety as well as the safety of their friends, families, and neighbors, many of whom would have voted in-person on Election Day will no longer have an opportunity to do so safely.

121.   The Absentee Ballot Age Restriction categorically forces people under 65 years of age to vote in person on election day.  Given the lack of early voting and the inevitable poll closures, South Carolinians will have to stand for a long time in lines with many other people,

increasing their risk of exposure to COVID-19.  In light of the current pandemic, this restriction will require people to endanger their health in order to vote, an undue burden.

122.    The Witness Requirement will also severely burden, and in some cases disenfranchise, lawful, eligible South Carolina voters who do not live with another individual who can witness their ballot. The Witness Requirement forces those voters to put themselves at risk of transmitting or catching COVID-19 because the voter and witness will have to touch the same item and be in physical proximity. There also is no colorable state justification for this requirement in view of the COVID-19 crisis and the social distancing recommendations.

123.    Lastly, the Absentee Assistance Ban imposes an undue burden on mail-in absentee voters because it will effectively disenfranchise voters who require assistance turning in their mail-in absentee ballots, particularly those whose work schedules, family care responsibilities, lack of transportation, language barriers, disabilities, inability to afford the Postage Tax, or need to remain socially distanced during the COVID-19 pandemic make returning mail-in absentee ballots before the Election Day Cutoff more difficult, if not impossible. And in a time where the mail delivery is especially delayed given COVID-19, Candidates and their campaign staff barred by the Absentee Assistance Ban from helping voters to submit their mail-in absentee ballots play an important role in ensuring that these South Carolinians have an opportunity to exercise their right to vote. The State's interest in enforcing the Absentee Assistance Ban cannot justify disenfranchising voters who require assistance because they choose to seek assistance from candidates and their campaigns.

124.    Based on the foregoing, Defendants, acting under color of law, by enforcement of the Challenged Provisions will deprive Plaintiffs, their members, constituents, the rights secured

to them by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983.

## COUNT III
### Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301
### Vote Denial
### *(Witness Requirement, Election Day Cutoff, Absentee Ballot Age Restriction, and Absentee Assistance Ban)*

125.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

126.    Section 2 of the Voting Rights Act prohibits vote denial: the use of voting laws, policies, or practices, like absentee ballot procedures and qualifications, that deny, abridge, or otherwise limit African-American voter access or increase the burden for African-American people to exercise the right to vote. 52 U.S.C. § 10301. Discriminatory intent is not required to prove a Section 2 violation.

127.    "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

128.    Section 2 requires a "totality of the circumstances" analysis that includes, but is not limited to factors such as (1) the history of voting-related discrimination in the pertinent State or political subdivision; (2) the extent to which voting in the elections of the pertinent State or political subdivision is racially polarized; (3) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; and (4) the extent to which members of the minority group have been elected to public office in the jurisdiction. *League of Women*

*Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (citing *Gingles*, 478 U.S. at 44–45).

129.    There is a history of voting-related discrimination against African Americans in the State of South Carolina. Moreover, voting in South Carolina is highly polarized, no African American has been elected to statewide office since Reconstruction, and the shameful legacy of racial discrimination is visible today in South Carolina's housing, economic, and health disparities.

130.    African Americans in South Carolina are acutely and disparately impacted by COVID-19, which compounds the deleterious impact of the already-present disparate impact of interrelated economic, housing, and health disparities that stem from past discrimination. Housing in South Carolina is often segregated by race, and African American South Carolinians are more likely to have health conditions that place them at high risk for COVID-19 infection. This means that even if a particular African American South Carolina voter does not have a health condition that places them at risk for COVID-19 infection, they likely live in a community with members who are at high risk for COVID-19 infection.

131.    COVID-19 exacerbates the social and historical conditions discussed above "to cause an inequality in the opportunities enjoyed by [African American] and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. For the personal and community health reasons mentioned above, African American voters in South Carolina have a greater incentive to cast an absentee ballot than their white counterparts. This, along with historical socioeconomic factors, means that African American voters who vote absentee to safely cast their ballots by practicing social distancing are disproportionately impacted by the Challenged Provisions.

132.    Under the totality of circumstances—which here includes not only the history of past racial discrimination and its lingering impacts but also a fatal virus that is having a disparate

impact on African Americans precisely because of the residual impacts of the State's long history of racial discrimination—the Challenged Provisions abridge and in some cases entirely deny the rights of African American voters like Plaintiffs Middleton, Tedder, Wells, Dixon, Winbush, and Moore, as well as the majority of South Carolinian African American voters overwhelmingly support the candidates and issues championed by Plaintiffs SCDP, DNC, and DCCC. African American voters have less opportunity than white voters in the State of South Carolina to participate in the political process and elect representatives of their choice in violation of Section 2. 52 U.S.C. § 10301.

## COUNT IV
### Freedom of Speech
### U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983
### Infringement on Speech
### *(Absentee Assistance Ban)*

133.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

134.    The First Amendment protects against the promulgation of laws "abridging the freedom of speech" or  "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

135.    The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214,

- 36 -

223 (1989)). Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999).

136.    Voter turnout efforts, including assisting voters with the submission of absentee ballots, are a means by which candidates like Plaintiffs Middleton and Tedder and their campaigns communicate their belief in the power and importance of participating in democratic elections, and in encouraging voters to vote by absentee ballot. Such activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988); *see League of Women Voters*, 400 F. Supp. 3d at 720 ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity.") (internal quotation marks and alterations omitted). And it does not matter if the individuals performing those acts are candidates or paid campaign staff and volunteers. The act of assisting voters to submit ballots by any individuals is inherently expressive and an individual that conducts such activities engages in speech by encouraging voting and voting by absentee ballot in particular. *See Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting the argument that regulating an election "process" raises no First Amendment concerns).

137.    Furthermore, under the United States Constitution, First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969).

138.    The conversations and interactions between Plaintiffs, their campaign staff, and voters surrounding the submission of mail-in absentee ballots are forms of protected political speech and association. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (describing the

"overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively"); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006) (explaining that "participation in voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls"). Thus, by limiting the ability of candidates like Plaintiffs Tedder and Middleton and their campaign staff to assist voters to deliver mail-in absentee ballots, the Absentee Assistance Ban burdens the speech and associational rights of Plaintiffs, their campaign staff, and South Carolina voters who seek their assistance.

139.    Moreover, the threat of significant fines for violating these laws deters individuals from participating in Plaintiffs Middleton and Tedder's GOTV efforts and has a chilling effect on Plaintiffs Middleton and Tedder's GOTV efforts, including their speech. *See League of Women Voters*, 400 F. Supp. 3d at 720 (noting that the threat of civil penalties "is likely to have a chilling effect on the entirety of [a voter registration] drive, including its communicative aspects.").


140.    The burdens the Absentee Assistance Ban impose are severe, and the ban is not justified by a compelling state interest. Thus, the Absentee Assistance Ban represents an overbroad restriction on political speech that infringes on the rights of Plaintiffs Tedder and Middleton and other South Carolinians under the First Amendment.

### COUNT V
### Violation of Section 208 of the Voting Rights Act of 1965,
### 52 U.S.C. § 10508
### Preemption
### *(Absentee Assistance Ban)*

141.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

142.    The Absentee Assistance Ban conflicts with and violates Section 208 of the Voting

Rights Act, 52 U.S.C. § 10508, and is thus preempted and invalid. *Altria Grp., Inc. v. Good*, 555

U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are without effect.") (citations

omitted); *Gade v Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (conflict preemption

occurs when (a) where state law stands as an obstacle to the accomplishment and execution of the

full purposes and objectives of Congress, or (b) "where state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress") (quotation marks

omitted).

143.    Section 208 of the Voting Rights Act provides that "[a]ny voter who requires

assistance to vote by reason of blindness, disability, or inability to read or write may be given

assistance by a person of the voter's choice." Within the context of the Voting Rights Act, the act

of voting includes "all action necessary to make a vote effective in any primary, special, or general

election." 52 U.S.C. § 10310(c)(1). This includes casting an absentee ballot. *OCA-Greater Hous.*

*v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) ("'To vote,' therefore, plainly contemplates more than

the mechanical act of filling out the ballot sheet. It includes steps in the voting process before

entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the

ballot box, 'having such ballot counted properly.' Indeed, the definition lists 'casting a ballot' as

only one example in a nonexhaustive list of actions that qualify as voting."). Section 208's only

limitation on this right is that the person providing assistance may not be connected to the voter's

employer or union.

144.    Congress passed the Voting Rights Act to correct entrenched "racial discrimination

in voting" that was "an insidious and pervasive evil." *South Carolina v. Katzenbach*, 383 U.S. 301,

309 (1966). In recommending that Section 208 be added to the Voting Rights Act, the Senate

Judiciary Committee recognized that voters with disabilities "run the risk that they will be discriminated against at the polls and that their right to vote in State and Federal elections will not be protected." S. Rep. No. 97-417, at 62 (1982). To limit that risk, those voters "must be permitted to have the assistance of a person of their own choice." *Id.*

145.    Section 208 preempts the Absentee Assistance Ban because state law criminalizes conduct expressly allowed by Section 208. The Absentee Assistance Ban unlawfully limits the rights afforded to voters by Section 208 by prohibiting voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice. *See* S.C. Code. Ann. § 7-15-385. Under South Carolina law, a voter is not free to choose anyone they like to help return an absentee ballot. *Id.* Section 208 cannot be interpreted to permit the Absentee Assistance Ban to stand. *See OCA-Greater Hous.*, 867 F.3d 604 (Section 208 preempted a Texas law restricting who may provide interpretation assistance to English-limited voters); *United States v. Berks Cty., Pa.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003) (county election law restricting who may provide language assistance to Spanish-speaking voters violated Section 208).

146.    In fact, in its report recommending that this protection be added to the Voting Rights Act, the Senate Judiciary Committee noted that state restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" would violate Section 208. S. Rep. No. 97-417, at 63 (1982). By prohibiting a voter who needs assistance completing their absentee ballot application from being helped by anyone who *offers* to help them, the Absentee Assistance Ban also violates Section 208.

147.    The Absentee Assistance Ban affects disproportionately South Carolina citizens with disabilities. According to the CDC, approximately 26.3% of adults in South Carolina suffer from some disability. CDC, Disability & Health U.S. State Profile Data for South Carolina (Adults

18+ years of age), https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/south-carolina.html. In 2012, "close to one-tenth of people with disabilities who voted by mail reported having difficulties in doing so, saying they needed assistance filling out or sending the ballot." Lisa Schur et al., *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election Law J. 60, 63 (2015). The Absentee Assistance Ban makes it harder for those South Carolina citizens to vote because it adds an additional hurdle to even receiving the absentee ballot.

148.    Defendants' enforcement of the Absentee Assistance Ban prevents South Carolina voters with disabilities from receiving the voting assistance that Section 208 of the Voting Rights Act guarantees them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment:

a)    Declaring that the Absentee Ballot Age Restriction, S.C. Code Ann. § 7-15-320(B)(8), facially violates the Twenty-Sixth Amendment to the United States Constitution and, in the context of the coronavirus crisis, is unconstitutional in violation of the First and Fourteenth Amendments;

b)    Declaring that, in the context of the coronavirus crisis, the Witness Requirement, S.C. Code Ann. § 7-15-380; *see also id.* §§ 7-15-220, -385, is unconstitutional in violation of the First and Fourteenth Amendments and violates Section 2 of the Voting Rights Act;

c)    Declaring that the Election Day Cutoff, S.C. Code Ann. § 7-15-230 is unconstitutional in violation of the First and Fourteenth Amendments and violates Section 2 of the Voting Rights Act during the current coronavirus crisis;

d)    Declaring that the Absentee Assistance Ban, S.C. Code Ann. § 7-15-385, is

unconstitutional in violation of the First and Fourteenth Amendments and violates Section 208 of the Voting Rights Act;

e) Enjoining Defendant, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting absentee ballot applications of otherwise qualified South Carolina voters for the reasons set forth in S.C. Code Ann. § 7-15-320(B)(8);

f) Enjoining Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked on or before Election Day and arrive at the county board of registrars or absentee ballot clerk's office within a minimum of ten days after Election Day; Ballots that do not have a postmark or other marking from the USPS shall be presumed to have been mailed by Election Day;

g) Enjoining Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them from the enforcement of the witness requirement in S.C. Code Ann. § 7-15-380; *id.* §§ 7-15-220, -385, until the COVID-19 crisis is over;

h) Enjoining Defendants, and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Absentee Assistance Ban;

i) Awarding Plaintiffs costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

j)      Granting such other and further relief as the Court deems just and proper.

Dated this 21st day of July, 2020.

Respectfully submitted,

/s/ Christopher J. Bryant

Marc E. Elias*
Bruce V. Spiva*
K'Shaani O. Smith*
Christopher J. Bryant, Federal ID 12538
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
bspiva@perkinscoie.com
kshaanismith@perkinscoie.com
cbryant@perkinscoie.com

Sopen B. Shah*
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
sshah@perkinscoie.com

*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*