KYLON MIDDLETON; DEON TEDDER;
AMOS WELLS; CARLYLE DIXON;
TONYA WINBUSH; ERNESTINE MOORE;
SOUTH CAROLINA DEMOCRATIC
PARTY; DNC SERVICES
CORPORATION/DEMOCRATIC
NATIONAL COMMITTEE; and DCCC,

        Plaintiffs,

        v.

MARCI ANDINO, in her official capacity as
Executive Director of the South Carolina State
Election Commission; JOHN WELLS, in his
official capacity as Chair of the South Carolina
State Election Commission; and CLIFFORD J.
EDLER and SCOTT MOSELEY, in their
official capacities as members of the South
Carolina State Election Commission,

        Defendants.

Case No. 3:20-cv-1730-JMC

**PLAINTIFFS' MOTION AND INCORPORATED MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.   The COVID-19 Pandemic ....................................................................................... 3

    B.   Government Orders & Guidance Regarding COVID-19 ....................................... 6

    C.   South Carolina's Elections ..................................................................................... 6

    D.   United States Postal Service Delays and Problems ............................................... 9

    E.   The Challenged Provisions ................................................................................... 10

    F.   Impact of Challenged Provisions on South Carolina Voters .............................. 11

          1.   Declarations from South Carolina voters ..................................................... 12

          2.   Declaration of Dr. Marc Meredith .............................................................. 14

          3.   Declaration of Dr. Joseph F. John, Jr. .......................................................... 17

LEGAL STANDARD ....................................................................................................... 18

ARGUMENT ..................................................................................................................... 19

I.    Plaintiffs are likely to succeed on their claims against the Challenged Provisions ............... 19

    A.   The Absentee Age Restriction violates the Twenty-Sixth Amendment and the First and Fourteenth Amendments ................................................................................ 19

          1.   The Absentee Age Restriction violates the Twenty-Sixth Amendment. .......... 19

          2.   The Age Restriction violates the First and Fourteenth Amendments…......... 23

    B.   The Witness Requirement imposes an undue burden on the right to vote. ....................... 26

    C.   The Election Day Cutoff is unconstitutional. .................................................... 28

    D.   The Election Day Cutoff violates Section 2 of the Voting Rights Act .............................. 34

          1.   The Election Day Cutoff disparately impact African Americans in South Carolina    35

2.     Historical and social conditions in South Carolina disfavor African Americans 36

3.     The Challenged Provisions interact with existing social and historical conditions to disproportionately burden African American voters ......................................................... 40

E.   The Absentee Assistance Ban is unconstitutional. ............................................................ 42

1.     The Absentee Assistance Ban violates the First Amendment. ......................... 42

2.     The Absentee Assistance Ban unduly burdens the right to vote in violation of the First and Fourteenth Amendments. ....................................................................................... 47

II.   Plaintiffs will suffer irreparable harm absent a preliminary injunction. ................................ 47

III.  The balance of hardships and the public interest favor Plaintiffs. ......................................... 48

CONCLUSION ................................................................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Am. Ass'n of People with Disabilities v. Herrera*,
690 F. Supp. 2d 1183 (D.N.M. 2010) ...........................................................20, 43

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)........................................................................................23

*Bernbeck v. City of Moore*,
126 F.3d 1114, 1117 (8th Cir. 1997) ...............................................................6

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016)............................................................................44

*Buckley v. Am. Const'l Law Found. Inc.*,
525 U.S. 182 (1999) ................................................................................. *passim*

*Buckley v. Valeo*,
424 U.S. 1 (1976)............................................................................................43

*Burdick v. Takushi*,
504 U.S. 428 (1992).........................................................................................23

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010).........................................................................................43

*Colleton Cty. Council v. McConnell*,
201 F. Supp. 2d 618 (D.S.C. 2002)..................................................................38

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008) (Stevens, J., controlling op.)...........................................23

*Democratic Nat'l Comm. v. Hobbs*,
948 F.3d 989 (9th Cir. 2020) (en banc) ..........................................................33

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ..........................................................................19

*DNC v. Bostelmann*,
Case No. 3:20-cv-249 (W.D. Wis. filed July 31, 2020)........................................32

*Doe v. Walker*,
746 F. Supp. 2d 667 (D. Md. 2010) ................................................................33

*DSCC v. Simon*,
No.: 62-CV-20-585 (Minn. 2d Judicial Dist. July 28, 2020)...............................45

*Esshaki v. Whitmer*,
   No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) .......................................24

*Ezell v. City of Chi.*,
   651 F.3d 684 (7th Cir. 2011) ..................................................48

*Fla. Democratic Party v. Detzner*,
   No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)............................49

*Fla. Democratic Party v. Scott*,
   215 F. Supp. 3d 1250 (N.D. Fla. 2016)..................................................24

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019) ..................................................23

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
   347 F. Supp. 3d 1251 (N.D. Ga. 2018) ..................................................33, 49

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*,
   214 F. Supp. 3d 1344 (S.D. Ga. 2016)..................................................24

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ..................................................49

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005)..................................................50

*Hadnott v. Amos*,
   394 U.S. 358 (1969)..................................................43

*Heckler v. Mathews*,
   465 U.S. 728 (1984)..................................................21

*Hernandez v. Woodard*,
   714 F. Supp. 963 (N.D. Ill. 1989) ..................................................46

*Irby v. Va. State Bd. of Elections*,
   889 F.2d 1352 (4th Cir. 1989) ..................................................41

*John Doe No. 1 v. Reed*,
   561 U.S. 186 (2010)..................................................43

*Jolicoeur v. Mihaly*,
   5 Cal. 3d 565 (1971) ..................................................20, 22

*League of Women Voters of Fla. v. Browning*,
   863 F. Supp. 2d 1155 (N.D. Fla. 2012)..................................................44, 45

*League of Women Voters of Fla. v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018).......................................................20

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ........................................................ *passim*

*League of Women Voters v. Hargett*,
  400 F. Supp. 3d 706 (M.D. Tenn. 2019)...................................43, 44, 46

*Lee v. Virginia State Bd. of Elections*,
  843 F.3d 592 (4th Cir. 2016) .......................................................20

*Libertarian Party of Ill. v. Pritzker*,
  No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), *stay denied
  pending appeal*, No. 20-1961 (7th Cir. June 21, 2020) ......................................24

*McLaughlin v. N. Carolina Bd. of Elections*,
  65 F.3d 1215 (4th Cir. 1995) .......................................................23, 24

*Mays v. LaRose*,
  951 F.3d 775, 787 (6th Cir. 2020) ...............................................34

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
  722 F.3d 591 (4th Cir. 2013) .......................................................18

*Meyer v. Grant*,
  486 U.S. 414 (1988).......................................................42, 44, 46

*Ne. Ohio Coal. for Homeless v. Husted*,
  696 F.3d 580 (6th Cir. 2012) .......................................................32

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .......................................................33, 48

*Oregon v. Mitchell*,
  400 U.S. 112 (1970).......................................................21

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) .......................................................50

*Priorities USA v. Nessel*,
  No. 19-13341, 2020 WL 2615766 (E.D. Mich. May 22, 2020) ......................................45

*Project Vote v. Blackwell*,
  455 F. Supp. 2d 694 (N.D. Ohio 2006).......................................................43

*Reynolds v. Middleton*,
  779 F.3d 222 (4th Cir. 2015) .......................................................44

- iv -

*Reynolds v. Sims*,
377 U.S. 533 (1964)..................................................................................50

*Rosario v. Rockefeller*,
410 U.S. 752 (1973)..................................................................................30

*Saucedo v. Gardner*,
335 F. Supp. 3d 202 (D.N.H. 2018)..........................................................33

*Smith v. Allwright*,
321 U.S. 649 (1944)..............................................................................20, 21

*Soltysik v. Padilla*,
910 F.3d 438 (9th Cir. 2018) .....................................................................24

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)..................................................................................21

*Symm v. United States*,
439 U.S. 1105 (1979), *sum. aff'd United States v. Texas*, 445 F. Supp. 1245
(S.D. Tex. 1978)..................................................................................20, 22

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986)..................................................................................44

*Taylor v. Louisiana*,
419 U.S. 522 (1975)..................................................................................49

*Thakker v. Doll*,
No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ..........................48

*Thomas v. Andino*,
No. 3:20-cv-1552 (D.S.C. filed Apr. 22, 2020) ........................................7

*Thornburg v. Gingles*,
478 U.S. 30 (1986)..............................................................................37, 40

*United States v. Cecil*,
836 F.2d 1431 (4th Cir. 1988) ...................................................................19

*United States v. Charleston Cty.*,
316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston
Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004) ...............................................37

*United States v. Georgia*,
892 F. Supp. 2d 1367 (N.D. Ga. 2012) .....................................................49

*Walgren v. Howes*,
  482 F.2d 95 (1st Cir. 1973)............................................................22

*Williams v. Rhodes*,
  393 U.S. 23 (1968)....................................................................43

*Wood v. Meadows*,
  207 F.3d 708 (4th Cir. 2000) ......................................................25

*Worden v. Mercer Cnty. Bd. of Elections*,
  294 A.2d 233 (N.J. 1972)........................................................20, 22

## STATUTES

52 U.S.C. § 10301(a) ......................................................................35

Pub. L. No. 91-285, sec. 6, § 302.......................................................21

S.C. Code Ann. § 7-15-20..................................................................50

S.C. Code Ann. § 7-15-220.................................................................50

S.C. Code Ann. § 7-15-230...........................................................1, 11, 50

S.C. Code Ann. § 7-15-310(4)..........................................................26, 50

S.C. Code Ann. § 7-15-320..........................................................*passim*

S.C. Code Ann. § 7-15-330.................................................................11

S.C. Code Ann. § 7-15-385...........................................................1, 2, 51

S.C. Code Ann. § 7-15-420.........................................................11, 12, 50

S.C. Code Ann. § 7-15-700.................................................................34

S.C. Code Ann. § 7-17-20..........................................................11, 34, 50

S.C. Code Ann. § 7-17-30.................................................................34

## OTHER AUTHORITIES

Exec. Order No. 2020-08 (Mar. 13, 2020)..............................................6

Exec. Order No. 2020-09 (Mar. 15, 2020)...........................................6, 7

Exec. Order No. 2020-15 (Mar. 28, 2020)..............................................6

Exec. Order No. 2020-16 (Mar. 30, 2020)..............................................6

Exec. Order No. 2020-21 (Apr. 6, 2020) ...........................................................6

Exec. Order No. 2020-31 (May 3, 2020) ...........................................................6

Exec. Order No. 2020-48 (July 26, 2020) ..........................................................6

Fed. R. Civ. P. 65 ...........................................................................................50

U.S. Const. amend I ................................................................................ *passim*

U.S. Const. amend. XV § 1 ......................................................................20, 21

U.S. Const. amend. XXVI, § 1 ...........................................................19, 20, 21

Plaintiffs, by and through the undersigned attorneys, bring this motion for a preliminary injunction to address the immediate and severe effects that four restrictive requirements that South Carolina has and is imposing on voters in order to vote absentee by mail, the application of which in the COVID-19 pandemic in particular threaten to severely burden and in some cases entirely deny the right to vote of lawful, eligible voters. These restrictions are: (1) the prohibition on all voters under 65 from casting a mail-in absentee ballot unless they fall into narrow and limited categories such as disabled or confined in jail ("Absentee Age Restriction"), S.C. Code Ann. § 7-15-320(B)(8); (2) the requirement that a voter must have another person witness and sign their absentee ballot for the vote to count ("Witness Requirement"), *id.* § 7-15-380; (3) the rejection of all mail-in absentee ballots not received by 7:00 p.m. on Election Day ("Election Day Cutoff"), *id.* § 7-15-230; and (4) the prohibition on candidates and paid campaign staff from assisting any non-immediate family members with returning their ballots, *id.* § 7-15-385 ("Absentee Assistance Ban") (collectively, the "Challenged Provisions").[1]

## **INTRODUCTION**

Absent Court intervention, the Challenged Provisions will force thousands of South Carolinians to choose between their health and their right to vote in November, in violation of the Constitution. The coronavirus is hitting South Carolina hard. In just six months, more than 90,000 people in the State have tested positive, and 1,700 have died. The cases grow at record pace on a daily basis. The only way to prevent the virus's spread is to minimize interactions with individuals

---

[1] Pursuant to Local Rule 7.02, counsel for Plaintiffs consulted with counsel for Defendants prior to filing this motion, who advised Defendants do not consent to the relief requested in this motion.

and shared surfaces outside of the home. There is no end in sight to this crisis, and all evidence indicates that the COVID-19 trend line will only accelerate through November.

Defendants admit that the November election will be disastrous under South Carolina's current election regime. *See* Ex. 77-1, July 17 Letter from Marci Andino to Senator Peeler and Speaker Lucas.[2] Defendants agree that the ***Absentee Age Restriction*** will force thousands upon thousands of voters and pollworkers to "congregate in one place," contrary to all public health guidance. *Id*. at 1. During the June 9 primary, polling places were consolidated because of poll worker shortages, creating long lines. This problem will get worse in November, when turnout is expected to skyrocket from 18% to an estimated 71%. *Id*. As a result, even Defendants recommend that *everyone* (not just those over 65) be permitted to vote by mail to ensure "safe and secure elections in the midst of a pandemic." *Id.* at 3. Defendants also recommend eliminating the ***Witness Requirement***, which the Court enjoined for the primary, finding it unnecessarily burdened the right to vote with no benefit to the State. ECF No. 37 at 36. That Requirement will be even more dangerous in November than it was in June, when the virus was not as widespread in the State and far fewer voters sought to participate in the election. Ex. 77-1 at 1. Persistent problems with mail delivery in South Carolina and elsewhere have made the conclusion now unavoidable that the ***Election Day Cutoff*** will also disenfranchise at least ten thousand lawful voters in November. The State provides no timely, easily accessible guidance about when mail ballots must be requested and returned to count. The disenfranchised will include voters who do absolutely everything in compliance with South Carolina's elections laws, including timely requesting their ballots and

---

[2] In the interest of saving space, all citations to unhyphenated exhibits in this brief are to the exhibits attached to this motion, ECF No. 76. All citations to Ex. 77-X are to exhibits to the Attorney Declaration of Christopher Bryant, ECF No. 77, submitted in support of this motion and concurrently herewith.

mailing them back substantially in advance of election day. Due to the anticipated record number of absentee ballot requests, election officials will unlikely be able to fulfill timely the unprecedented number of absentee-ballot requests. Many ballots mailed well in advance of election day will not arrive on time because of postal delays and other problems. In the June election, with much lower turnout, thousands of voters who timely requested absentee ballots had not received them *by the end of Election Day*. An additional 1,530 ballots arrived too late to be counted, including many mailed well in advance of Election Day. These numbers are likely to balloon in November. Not only will absentee turnout increase, the beleaguered Post Office announced in July *that the mail will get even slower*. In addition, the Election Day Cutoff imposes a disparate burden on Black South Carolinians linked to social and historical discrimination, in violation of Section 2 of the Voting Rights Act. Defendants admit that they have no interest in preserving the one certification deadline that would be affected by an extension. *Id*. Finally, the **Absentee Assistance Ban** infringes upon Plaintiffs' First Amendment rights without preventing voter fraud. *See* ECF No. 37 at 39 ("Defendants have not offered any evidence of voter fraud"). In addition, it forecloses one way to ensure the timely and costless return of absentee ballots at a time when voting in person on election day is risky and mail untrustworthy.

Plaintiffs have made the required showing for a preliminary injunction. They are likely to succeed on the merits of their challenges to these provisions. They will otherwise suffer irreparable harm: either unnecessary exposure to a deadly illness or disenfranchisement. The equities also favor Plaintiffs: the public has an interest in both its health and in allowing as many eligible voters as possible to cast their ballots. There is no meaningful hardship on the other side of the balance.

## **BACKGROUND**

### A.     The COVID-19 Pandemic

COVID-10 has infected around 4.5 million and taken over 150,000 lives in the U.S., which is now the pandemic's epicenter.[3] In a few short months, the country has learned many difficult lessons, including that even those who survive infection can suffer devastating and potentially long-term impacts on their health. Ex. 1, Decl. of Dr. Joseph John ("John Decl.") at ¶¶ 26, 28. A number of common underlying conditions put one at higher risk, including obesity, asthma, high blood pressure, smoking, and pregnancy. Ex. 77-2, CDC Publication. The country is also seeing an uptick in severe cases in younger people, including children. A recent study shows that one in three "young adults" may face "severe" disease from COVID-19. Ex. 77-3; *see* Ex. 77-4. "[W]hile patients over 65 are significantly more likely to be hospitalized than younger people, the gap is narrowing." Ex. 77-3. And the virus continues to impose "a disproportionate burden of illness and death among racial and ethnic minority groups. Ex. 77-5.

COVID-19 hit South Carolina hard and the situation has gotten worse since the State reopened in early May. The virus has dashed Governor McMaster's "hope" that "businesses and activities . . . may be safely resumed and conducted using personal safety precautions" "by late June." Ex. 77-6. As of July 30, there were 87,117 confirmed cases and 1,600 confirmed deaths in the State due to COVID-19. Ex. 77-7. The seven-day moving average positive test rate is around 15 percent,[4] suggesting that "the state is only testing the sickest of the patients who seek medical attention[ ] and is not casting a wide enough net to know how much of the virus is spreading within

---

[3] *Cases in the U.S.*, CDC (Aug. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[4] *Daily State-By-State Testing Trends*, Johns Hopkins Medicine (Aug. 2, 2020), https://coronavirus.jhu.edu/testing/individual-states/south-carolina.

its communities."[5] The elderly are disproportionately adversely affected: individuals over 70 comprise two-thirds of the COVID-19 related deaths in the State.[6] But the virus does not spare the young. As of August 1, South Carolina has reported six cases of "MIS-C, a rare health condition recently recognized to occur in some children and teenagers who have contracted COVID-19 or been in contact with someone infected with the virus." Ex. 77-8; *see* Ex. 77-9. The condition causes organ swelling. Ex. 77-9. The virus has also had a disproportionate impact on South Carolina's African American residents. Although African Americans make up only 27% of the State's population, they represent 34% of reported COVID-19 cases and a staggering 40% of related deaths.[7]

There is no end in sight to the crisis. Despite the accelerated efforts, no one anticipates that a vaccine would be widely available and administered by early November. Exs. 77-10; 77-11.

Every activity that a person engages in can be placed on a spectrum of risk for catching or transmitting COVID-19. *See, e.g.*, Ex. 77-12 (placing various activities on a spectrum compared to their relative risk of catching or transmitting COVID-19). The risk for catching or transmitting COVID-19 increases with each contact an individual has outside of the home. Ex. 1, John Decl. at ¶¶ 37, 39; *see also* Ex. 77-13 ("In general, the more closely you interact with others and the longer that interaction, the higher the risk of COVID-19 spread."). Activities that do not involve in-person interaction with persons outside of one's household or touching shared surfaces are at the low end of the risk spectrum, while going to crowded indoor spaces is on the high end of the risk spectrum.

---

[5] *Which U.S. States Meet WHO Recommended Testing Criteria?*, Johns Hopkins Medicine (Aug. 2, 2020), https://coronavirus.jhu.edu/testing/testing-positivity.
[6] *SC Demographic Data (COVID-19)*, DHEC (July 31, 2020), https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-demographic-data-covid-19.
[7] *QuickFacts South Carolina*, U.S. Census Bureau, https://www.census.gov/quickfacts/SC; *SC Demographic Data (COVID-19)*.

Ex. 77-13. Voting in person, particularly in a high-turnout election, is thus viewed as a high-risk activity. Ex. 1, John Decl. ¶¶ 37, 40-41. As a result, the CDC recommended the use of alternatives to voting in person, such as by mail, during the pandemic. Ex. 77-14. The different methods of voting, like any other activity, can be placed along this risk spectrum. Ex. 1, John Decl. ¶¶ 38-41. In general, voting by mail carries significantly less risk than voting in person. Each step that can be taken to minimize interactions with individuals outside of the house (such as providing pre-paid postage and eliminating the need for a witness) reduces the risk even more. Ex. 1, John Decl. ¶ 40.

B.     **Government Orders & Guidance Regarding COVID-19**

To prevent the spread of the disease, the CDC and DHEC recommend that people stay at home and avoid close contact with others. Consistent with that advice, Governor McMaster declared a state of emergency in early March and issued several executive orders closing schools, bars, restaurants, and other businesses, prohibiting gatherings of 10 or more people, and requiring residents to "remain[ ] at home whenever possible." Exec. Order No. 2020-21 (Apr. 6, 2020); *see also* Exec. Order No. 2020-08 (Mar. 13, 2020); Exec. Order No. 2020-09 (Mar. 15, 2020); Exec. Order No. 2020-15 (Mar. 28, 2020); Exec. Order No. 2020-16 (Mar. 30, 2020).

Governor McMaster lifted these orders on May 4, Exec. Order No. 2020-31 (May 3, 2020), and the number of COVID-19 cases in the state has "skyrocketed." Ex. 77-15. The Governor extended the state of emergency on July 26. Exec. Order No. 2020-48 (July 26, 2020).

C.     **South Carolina's Elections**

Early on in the pandemic, South Carolina officials recognized that conducting elections as normal posed serious public-health risks. In mid-March, Governor McMaster rescheduled all elections for March and April to take place after May 1, based on his "determination that the [outbreak] poses an actual or imminent public health emergency for the State of South Carolina." Exec. Order No. 2020-09 at 1 (Mar. 15, 2020). On March 30, Commission Executive Director,

Defendant Marci Andino, wrote to several elected officials, including the Governor, about the Commission's "concern[ ] about the safe conduct of the June Primaries, November General Election and all other elections scheduled for 2020." ECF No. 1-1 at 2. Andino recommended that the State "[a]llow no excuse absentee voting," a "relatively simple change," *id.* at 5, to avoid having large groups of people congregate in one place. She also recommended "[r]emov[ing] the witness requirement on ballot return envelopes[,]" which "offers no benefit to election officials" because they do not and cannot verify the witness signature. *Id.* at 4.

After Director Andino's March 30 letter, organizational and individual plaintiffs sued to enjoin the Absentee Age Restriction, Witness Requirement, and Election Day Cutoff for the primary election on June 9 and runoff election on June 23 ("June Primaries"). ECF No. 29 at 4 (refencing ECF No. 1); *Thomas v. Andino*, No. 3:20-cv-1552 (D.S.C. filed Apr. 22, 2020) ("*Thomas*"). While the cases were pending, the Legislature eliminated the Absentee Age Restriction on May 12 for the June Primaries only.[8]

After a hearing on the remaining challenges, the Court struck down the Witness Requirement for the Primaries, holding "Plaintiffs have shown a strong likelihood that the burdens placed upon them by the Witness Requirement far outweigh the imprecise, and . . . ineffective, state interests of combating voter fraud and protecting voting integrity." ECF No. 37 at 39. The Court found Defendants "ha[d] not offered any evidence of voter fraud in South Carolina other than SCEC's fleeting mention . . . of a voter-buying scandal from the 1980s." ECF No. 37 at 39. The Court declined to grant the preliminary injunction as to the Election Day Cutoff based on the

---

[8] S. 635, 123d Gen. Assemb., Reg. Sess. (S.C. 2020), https://www.scstatehouse.gov/billsearch.php?billnumbers= 635&session=123&summary=B.

evidence before it. The Court also found that, because run-off elections were scheduled for June 23, a six- or ten-day extension of the ballot-receipt deadline at that time was infeasible. *Id.* at 47.

Although thousands of South Carolinians were able to vote because of the relief granted by the Court, there were major problems in the Primary. As Director Andino predicted, pollworkers—many over 65 years old—dropped out. Exs. 77-16; 77-17. As a result, polling places were closed and consolidated. South Carolina voters had to wait in long lines, risking extended exposure to the virus. *See* Exs. 77-16; 77-17. Almost 5,500 voters did not receive their timely-requested absentee ballots even *by the end of Election Day*, forcing them to risk their lives in the long lines or choose not to vote at all.[9] Over 1,500 ballots arrived after the Election Day Cutoff—totaling 1.4% of all mail-in ballots—and did not count.[10]

On July 17, Director Andino sent a second letter to South Carolina officials outlining the Commission's "serious concerns" about the "safe and efficient conduct of the November General Election," the "greatest challenge to our election system our state has eve[r] seen." Ex. 77-1 at 1, 4. She again recommended the suspension of the Absentee Age Restriction and the Witness Requirement. *Id.* at 3. She further warned that, "success in June does not necessarily translate to success in November." *Id.* at 2. Turnout will increase dramatically: as Andino noted, turnout in non-gubernatorial statewide primaries averages 18%, while turnout in presidential elections averages 71% in South Carolina. *Id.* Also, "[p]rior to the pandemic, 27% of absentee voters voted by mail. In the 2020 Statewide Primaries, 66% voted by mail." *Id.* That could mean over 1 million

---

[9] Fact Sheets, S.C. Election Commission, https://www.scvotes.org/fact-sheets (spreadsheet for 06/09); Ex. 77-18.
[10] Defendants produced files containing information regarding each of the votes cast in the June 9, 2020 primary, as well as the 2016 and 2018 general elections. As explained by Professor Meredith, the data in that file differed from the publicly available numbers for ballots that were rejected for being late. Meredith at ¶ 54.

absentee ballots cast by mail in the November election. "The absentee-by-mail process will be overwhelmed and overrun." *Id.* For all of these reasons, Andino asked that officials "extend the date in which counties must certify the results of the election" or "[p]rovide election officials with more time to process absentee-by-mail ballots." *Id*. at 3. She also asked for drop boxes to facilitate the return of absentee ballots. *Id*. Andino emphasized, social distancing at some polling places will be "impossible." *Id*. at 2. Poll managers shortages will result in polling place consolidation, creating even longer lines and longer wait times. *Id*.

To date, South Carolina has not implemented the Commission's or the CDC's recommendations for the November election.

### D.     United States Postal Service Delays and Problems

Voters in Ohio, Wisconsin, and many other states reported rampant problems with delayed delivery of election mail during their spring primaries. Ex. 2, Expert Decl. of Dr. Marc Meredith ("Meredith Decl.") at ¶¶ 76-84. After Wisconsin's April 7 election, for example, voters reported they did not receive their absentee ballots on time and a Milwaukee postal worker found tubs of undelivered ballots after polls closed on election day. A computer glitch resulted in 2,700 requested ballots not being sent to voters. Both U.S. Senators from Wisconsin and two Congresspeople called on the USPS Office of the Inspector General to investigate reports of delayed delivery of ballots. On July 7, the OIG released a report confirming that states with deadlines for absentee voting like South Carolina's are designed to fail voters by making it impossible for them to return their ballots on time. Ex. 77-19. The USPS warned that "under its procedures for processing and delivering ballots," "[b]allots requested less than seven days before an election are at a high risk of not being delivered, completed by voters, and returned to the election offices in time." *Id*. at 3, 7.

Since that report, the USPS announced "major operational changes" "that could slow down mail delivery" *even further*. Ex. 77-20. USPS will no longer pay overtime and is slashing office hours. Ex. 77-21. Carriers are being directed, for the first time in USPS history, to *leave mail behind at distribution centers* if it would delay them from their routes instead of "making multiple delivery trips to ensure timely distribution of letters and parcels," as they have historically done. Ex. 77-20. Since the announcement, some Americans have gone "upwards of three weeks without packages and letters, leaving them without medication, paychecks, and bills." Ex. 77-21.

### E. The Challenged Provisions

Under South Carolina's elections regime, the vast majority of voters must appear in person at the polls on election day to exercise their right to vote. Through the ***Absentee Age Restriction***, South Carolina categorically prohibits all voters under 65 who are not "absent from their county of residence on election day during the hours the polls are open" from voting by absentee ballot unless they qualify for an enumerated exception: the "physically disabled" or a person attending a sick or physically disabled person, "certified poll watchers, poll managers, county board of voter registration and elections members and staff, county and state election commission members and staff working on election day," "persons admitted to hospitals as emergency patients on the day of an election or within a four-day period before the election," "persons with a death or funeral in the family within a three-day period before the election," persons serving on juries, "persons confined to a jail or pretrial facility pending disposition of arrest or trial," or "members of the Armed Forces and Merchant Marines of the United States, their spouses, and dependents residing with them. S.C. Code Ann. § 7-15-320(B)(8).

Those who qualify to vote by absentee ballot must fulfill additional requirements not imposed on in-person voters. They must return their applications for an absentee ballot "by mail, email, fax, or personal delivery" "before 5:00 p.m. on the fourth day before the day of the election."

S.C. Code Ann. § 7-15-330. A voter can designate another person as an agent to return their absentee ballot, but the ***Absentee Assistance Ban*** prohibits candidates and paid campaign staff from serving as agents for anyone but their immediate family members. *Id.* § 7-15-385.A voter must also satisfy the ***Witness Requirement***, which mandates that the voter must have their ballot envelope "signed and witnessed" by another person. *Id.* § 7-15-220. A ballot that has not been properly signed and witnessed or does not include the witness's address cannot be counted. *Id.* § 7-15-420. South Carolina law does not afford a voter notice or the opportunity to cure a ballot for witness-related defects. Pursuant to the ***Election Day Cutoff***, completed mailed ballots must be received by the county board no later than 7:00 p.m. on election day. S.C. Code Ann. § 7-15-230.

Notwithstanding the Cutoff, officials have time after election day to certify and release results. State law gives county election officials until 12:00 p.m. on the Saturday after the election, November 7, to complete the canvass and certify the count to the Board of State Canvassers, S.C. Code Ann. § 7-17-20. The Board meets on November 11 to canvass and it can adjourn its canvass for five days after that. *Id.* §§ 7-17-220, 7-17-230, 7-17-280. The county's failure to "notify the State Election Commission of the unofficial results of" the election within 24 hours of the "completion of the canvassing and counting of ballots" does not "invalidate the votes cast" within the county. *Id.* § 7-13-1160. State law also does not mandate a time by which officials must release election results. Results of the tabulation of absentee ballots "must not be publicly reported until after the polls are closed." S.C. Code Ann. § 7-15-420.

### F. Impact of Challenged Provisions on South Carolina Voters

Unless the Challenged Provisions are enjoined, Plaintiffs and other South Carolina voters will be faced with (1) an untenable choice between exercising their right to the franchise and keeping themselves and other people in their community safe, as well as (2) disenfranchisement

due to no fault of their own. Plaintiffs provide multiple declarations from South Carolina voters and expert reports from Dr. Marc Meredith and Dr. Joseph F. John, Jr.

### 1. Declarations from South Carolina voters

Plaintiff Deon Tedder is a 30-year-old registered voter who cannot vote absentee under the State's interpretation of S.C. Code Ann. § 7-15-320. He is concerned about voting in person and coming into "close contact with people who could be infected with COVID-19 for a prolonged period of time" and "touch[ing] common objects." Ex. 3, Decl. of Deon Tedder ("Tedder Decl."), ¶ 5. Doing so would risk not only his health but that of his loved ones and community. *Id.* Tedder is also a Democratic candidate for South Carolina State House District 109. *Id.* ¶ 9. This is his first campaign for office and, given his background in advocacy and community engagement, he has "made service a central point of [his] campaign activities." *Id.* ¶ 10. Shortly after his runoff election, Tedder contracted and, fortunately, recovered from COVID-19; thus, he understands voters' fears of exposure while voting in person. *Id.* ¶¶ 12-13. He minimizes in-person contact with voters, and "take[s] extra precautions including wearing a mask, keeping six feet of distance . . . when possible, and having conversations outside" when he does interact with voters face-to-face. *Id.* ¶ 12. He would like to help collect and return voters' absentee ballots to provide a safer alternative for voters but, as a candidate, he is prohibited from doing so. *Id.* ¶¶ 15-18. Tedder has "always been an advocate for voting rights," *id.* ¶ 7, and he views ballot-return assistance as "a way of encouraging people to vote, and to vote absentee as a means of keeping safe and ensuring they are able to cast a ballot." *Id.* ¶ 17. Tedder "would be able to more effectively express this encouragement if [he] and [his] campaign were permitted to collect ballots where people need that assistance." *Id.*

Plaintiff Kylon Middleton, a 45-year-old registered voter, shares Tedder's concerns. Middleton also does not qualify to vote by absentee ballot under state law. He is especially wary

of voting in person because of his prior experiences waiting in long lines "at times for hours." Ex. 4, Declaration of Kylon Middleton ("Middleton Decl."), ¶ 5. "As recently as the Charleston mayoral runoff election in November 2019, [he] waited in a line that wrapped around the building for over an hour only to enter a cramped space, sometimes standing shoulder-to-shoulder with other voters, to check-in and cast my ballot." *Id.* Middleton is aware that many poll workers have refused to work on election day due to the pandemic, so "the number of available polling places will shrink, meaning voters will have to wait in even longer lines." *Id.* As the Black leader of a predominantly Black congregation, he is acutely aware of the disproportionate impact of COVID-19 on the community. If he is required to vote in person, he will be "forced to choose" between protecting his life and the health of his community and his right to vote. *Id.* ¶ 6. Middleton is also a first-time Democratic candidate for Charleston County Council. *Id.* ¶ 8. Since the start of the pandemic, he has taken COVID-19 "very seriously" and has "approached campaigning with great caution, given the health risks to [his] community." *Id.* ¶ 9. In prior elections, Middleton helped voters by returning their absentee ballots, which he considers a way to "advocate for people to get involved and make their voices heard." *Id.* ¶ 10. He would like to continue his practice of returning ballots as a candidate, "as a means of getting out the vote and helping protect voters' health." *Id.* ¶ 11.

Plaintiff Tonya Winbush is a 45-year-old registered voter and combat veteran who now works for the U.S. Department of Veterans Affairs. Ex. 5, Decl. of Tonya Winbush ("Winbush Declaration"), ¶¶ 1-2. Though Winbush has previously voted absentee, she does not anticipate having a qualifying excuse for the 2020 general election. *Id.* ¶ 3. Nevertheless, Winbush would "prefer to vote absentee by mail in November to prevent exposure to COVID-19." *Id.* ¶ 4. Winbush is concerned for good reason; her 83-year-old mother—for whom Winbush regularly provides

assistance—"has underlying health conditions that place her at high risk for serious illness if she were to contract the virus." *Id.* ¶ 5. Winbush "do[es] not want to expose [her] mother, but [she is] worried about doing so if [she is] forced to vote in person." *Id.*

Bobby L. Dukes is a Barnwell County voter whose absentee ballot was not counted in South Carolina's June Primary because it arrived after election day, despite the fact that it was mailed with his three family members' absentee ballots, which all arrived on time and *were* counted. Ex. 6, Decl. of Bobby L. Dukes ("Dukes Decl.").

Rebecca Kirby is a York County voter who was only eligible to vote absentee during the June 2020 primary because of the "State of Emergency" exception. Ex. 7, Decl. of Rebecca Kirby ("Kirby Decl."). She did not find out about her eligibility until June 1, but when she did, she intentionally moved as quickly as possible to request and return her ballot. *Id.* Her ballot was postmarked on June 5 and mailed from within York County, but it did not arrive by June 9 and was not counted. *Id.*

### 2. Declaration of Dr. Marc Meredith

Dr. Marc Meredith, a tenured political science professor at the University of Pennsylvania, analyzed the effect of the Absentee Age Restriction, Witness Requirement, and Election Day Cutoff on South Carolina voters using the widely accepted cost-of-voting framework.

Dr. Meredith determines that the Absentee Age Restriction will prevent lawful voters from casting a ballot in the November election. The risk of getting infected or infecting others with COVID-19 increases the cost of in-person voting relative to mail voting. Meredith Decl. ¶¶ 22-23. For some voters—those over 65, Black individuals, those with underlying conditions that put them at higher risk, or those who live with or treat others in those categories—in-person voting is prohibitively costly. *Id.* ¶¶ 32-34. In addition, some individuals perceive that in-person voting is very risky even if they do not fall into one of the high-risk categories. Given that seemingly healthy

young people have experienced severe illness and/or died from COVID-19, and that medical professionals are unable to predict whether a particular young person will suffer that fate, that perception is reasonable. Many voters in these categories are ineligible to vote absentee by mail under the Absentee Age Restriction. *Id.* ¶ 37. As a result, the enforcement of that restriction in November will disenfranchise them entirely. *Id.*

Dr. Meredith also opines, consistent with this Court's conclusion in June, that the Witness Requirement will disenfranchise lawful voters in November, because they will abstain from voting rather than risk their lives to obtain a witness signature. COVID-19 "makes the cost of getting a mail-ballot envelope witnessed much higher for some potential voters," including many registered in South Carolina. *Id.* ¶ 43. There are South Carolina voters who "rarely come into contact with at least one person who could witness the mail-ballot envelope." *Id.* ¶ 44. This is not surprising given that 590,000 South Carolinians live alone, among them include "potential voters who are self-quarantining because of a positive COVID-19 test or known exposure," and "who are practicing social distancing because they perceive themselves to be at a high risk if they are infected with COVID-19." *Id.* ¶ 47. "COVID-19 makes a witness signature requirement even more burdensome than normal on African American and elderly voters" because they are more likely than average to be the only registered voter at their address. *Id.* ¶ 50. Voters who have the option to vote absentee are likely choosing to do so because of health risks from COVID-19. The Witness Requirement undermines that choice by forcing interaction with others. As a result, the enforcement of the requirement in November will disenfranchise those voters entirely.

Dr. Meredith also concludes that the Election Day Cutoff is likely to disenfranchise voters. During the spring Primaries, many states saw more ballots arriving after election day deadlines than normal, including South Carolina. *Id.* ¶¶ 53-54. "Data from recent elections in Wisconsin

(April 7), Ohio (April 28), and Pennsylvania (June 2)," the three of the four states that appear to have made such data available, "also show that the increase in the number of mail ballots received after Election Day is even higher in places that experienced unprecedented demand for mail ballots during their Spring 2020 election." *Id.* ¶ 56. This is because "election administrators have not been able to fulfill" the higher than normal number of "requests for absentee ballots in a timely manner." *Id.* ¶ 63. This was true in South Carolina, as well, which "was less likely to send out a mail ballot to an applicant on the day that the request in the June 9 primary relative to the 2016 presidential election." *Id.* ¶ 65. USPS also failed to get mail ballots to voters and return them in a timely way. *Id.* ¶¶ 64, 66. As a result, almost 5,500 South Carolina voters had not received their absentee ballots by the end of election day in the Primary.[11]

As Dr. Meredith explains, "[a]ny delays in the distribution of mail ballots or small violations of standard USPS service commitments may make it infeasible for people who are requesting mail ballots at the end of the mail-ballot request period from being able to cast a mail ballot." Meredith Decl. ¶ 73. Black voters and young voters are more likely to request their absentee ballots within one week of election day. *Id.* ¶ 90. Both delays and violations were reported in Wisconsin, Ohio, Georgia, New Jersey, and Louisiana, even before new Postmaster General Louis DeJoy announced operational changes that would further slow the mail. *Id.* ¶¶ 76-82. COVID-19 "increases the harm when" a voter does not receive "a requested mail ballot in a timely manner." *Id.* ¶ 85. For example, the over 5,500 South Carolinians who had not received their absentee ballots by June 9 could have "cast a provisional ballot at a polling place." *Id.* But "people who are using mail ballots because they are socially distancing because of COVID-19 are also

---

[11] *Fact Sheets*, S.C. Election Commission, https://www.scvotes.org/fact-sheets (spreadsheet for 06/09); Ex. 77-18.

more likely to" be disenfranchised altogether, if they do not receive their ballot in time to cast it. *Id.*

Meredith also observed that the South Carolina Election Commission provided insufficient guidance about timely mailing. *Id.* ¶ 75. There was no guidance on the website. *Id.* The Commission mentioned in April and May press releases that "those who qualify are urged to vote absentee as soon as possible." *Id.* Only on *June 3* did the Commission state in a press release that "applying for a by-mail absentee ballot this late in the process is risky" and warned that the voter or their agent might have to return the ballot in person for it to count. *Id.* The press release did not warn voters that they might never receive their absentee ballot.

Finally, Dr. Meredith opines that enjoining these provisions will not increase the non-existent amount of voter fraud in South Carolina. As this Court observed, "voter fraud is an incredibly rare event." *Id.* ¶ 96. Two comprehensive studies uncovered only one instance of mail-ballot fraud in the State since 2000. *Id.* ¶ 97. "Many states use the mail-ballot policies that the plaintiffs are advocating for in this case" without experiencing more voter fraud. *Id.* ¶¶ 94, 100. "South Carolina does not increase the risk of fraud by expanding access to mail ballots to people under the age of 65, not requiring a witness signature, affixing postage, and allowing ballots to be counted if postmarked by Election Day." *Id.* ¶ 104.

### 3. Declaration of Dr. Joseph F. John, Jr.

Dr. Joseph John is an epidemiologist who, among other things, is a Clinical Professor in the Department of Medicine, Division of Infectious Diseases at the Medical University of South Carolina, teaches as an attending physician at the Ralph H. Johnson Department of Veterans Affairs Medical Center in Infectious Diseases and Internal Medicine, and maintains a private practice where he sees patients for outpatient issues with infectious diseases. *See generally* John

Decl. His practices has involved care for patients actively infected with COVID-19 and consultations on the diagnosis, treatment, isolation, and rehabilitation of these patients. *Id.* ¶ 25.

Dr. John outlines the serious health risks that COVID-19 poses in addition to death, *id.* ¶¶ 26, 28, and concludes that these risks are expected to continue through November 2020, ¶¶ 27, 30. In light of these risks, he provides the following opinions regarding the relative risks of voting mthods: "[T]o a reasonable degree of medical certainty, a voter will reduce his or her risk of catching or transmitting COVID-19 by minimizing their contacts with individuals outside of the home. In the context of voting, this means that voting by mail carries less risk than voting in person. For those voters who live alone, casting a ballot without a witness signature carries less risk than casting a ballot with a witness signature. For those voters who must vote in person, the risk of catching or transmitting COVID-19 decreases as the density of individuals in line for voting or the density of people within the polling place decreases. These facts mean that voters who can cast their ballots in uncrowded locations face a lower risk than voters who cast their ballots in polling places occupied with larger crowds." *Id.* ¶ 40.

## LEGAL STANDARD

A preliminary injunction is warranted if plaintiffs show: (1) a likelihood of success on the merits, (2) likelihood of suffering irreparable harm, (3) the balance of hardships favor them, and (4) the injunction serves the public interest. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Court "take[s] judicial notice of official government reports and statistics" including election and voter registration statistics and public health reports from government agencies. *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) (citations omitted). Plaintiffs

"need not establish a 'certainty of success,'" just "make a clear showing" that they are likely to succeed. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

<u>**ARGUMENT**</u>

I.    **Plaintiffs are likely to succeed on their claims against the Challenged Provisions.**

A.    **The Absentee Age Restriction violates the Twenty-Sixth Amendment and the First and Fourteenth Amendments.**

*First*, Plaintiffs are likely to succeed on their challenges to South Carolina's Absentee Age Restriction. Indeed, this restriction would be unconstitutional under any circumstances as prohibited by the Twenty-Sixth Amendment, but it is plainly unsustainable under the present circumstances, where forcing voters under 65 to vote en masse in person at the polls will not only threaten the health of countless of those voters and the poll workers who attend to them, but also their fellow voters, the family members who they return home to, and their broader community. As a result, as applied today, the Absentee Age Restriction also violates the First and Fourteenth Amendments.

1.    **The Absentee Age Restriction violates the Twenty-Sixth Amendment.**

The Absentee Age Restriction violates the plain text of the Twenty-Sixth Amendment. Which prohibits the decision to parcel out voting rights "on account of age." It states that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." U.S. Const. amend. XXVI, § 1. The amendment's goal "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. 1972); *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 575 (1971); *see also infra* at n.12. Thus, courts have routinely found that

the Amendment protects not only against the denial but also the abridgement of the right to vote. *See Symm v. United States*, 439 U.S. 1105 (1979), *sum. aff'd United States v. Texas*, 445 F. Supp. 1245, 1261-62 (S.D. Tex. 1978) (finding unconstutional a voter registration practice that made it more difficult for students to register); *League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018) ("[T]he Amendment must protect those blatant and 'unnecessary burdens and barriers' on young voters' rights.").

The Fourth Circuit analyzes Twenty-Sixth Amendment claims under a framework similar to that used in Fifteenth Amendment race discrimination cases. *See Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016); *see also League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (citing cases and noting "[a] consensus . . . emerging" among courts that have recently considered Twenty-Sixth Amendment challenges that they should be evaluated using the same standards as those used in to consider Fifteenth Amendment challenges); ECF No. 61 at 12-15. The language of the Amendments are virtually indistinguishable, with the sole substantive difference being that the former prohibits denial or abridgement of the right to vote "on account of race, color, or previous condition of servitude," while the latter does the same "on account of age." *Compare* U.S. Const. amend. XV § 1, *with* U.S. Const. amend. XXVI § 1. As a result, just as a law that facially discriminates based on race violates the Fifteenth Amendment, a law that facially denies or abridges the right to vote on account of age—which South Carolina's Absentee Age Restriction does on its face, making access to voting by mail contingent expressly on a voter's age—is unconstitutional. *See Smith v. Allwright*, 321 U.S. 649, 665 (1944). The proper remedy is to remove the age-based restriction. When the Supreme Court held that the White Primary violated the Fifteenth Amendment, it did not end the practice of holding primaries; it ordered the primary to be opened to all voters, regardless of race. *Smith*, 321 U.S. at 665; *see*

*generally Heckler v. Mathews*, 465 U.S. 728, 739 n.5 (1984) (even in Equal Protection context courts should ordinarily remedy the unconstitutional denial of a benefit by extending it to the class that is discriminated against, not by denying it to the favored class).

Defendants' assertion that the 26th Amendment was "intended" to allow only 18- to 20-year olds to vote is belied by the plain language of the Amendment that prohibits denial or *abridgment* "based on age," and its unique history. The Congress which passed the Twenty-Sixth Amendment understood the use of the word "abridged" to broadly protect voters against any means by which a state sought to intentionally differentiate between access to the franchise based on a voter's age. This is evidenced by the way the Amendment tracks the Fifteenth Amendment, which was already understood in that way, an understanding that was affirmed by all sitting members of the Supreme Court in 1966. *See South Carolina v. Katzenbach*, 383 U.S. 301 (1966); *see also id.* at 355 (finding Fifteenth Amendment's language gave Congress broad power to protect against "any method of abridgement no matter how subtle") (Black, J. dissenting). Had Congress intended to simply lower the voting age, it had a model in legislation that it had enacted in 1970, when it sought to amend the VRA by adding a new provision (Title III) that prohibited merely the "denial" of the right to vote "on account of age if [a] citizen is eighteen years of age or older," but no protections against abridgements of the right to vote. *See* VRA Amendments of 1970, Pub. L. No. 91-285, sec. 6, § 302. The Supreme Court found that Title III extended beyond Congress's power as enshrined in *Oregon v. Mitchell*, 400 U.S. 112 (1970), and the introduction and swift ratification of the much broader protections found in the Twenty-Sixth Amendment in 1971 followed.

There is overwhelming evidence that the intention was not only to broadly protect against age-based discrimination in voting, but to encourage young voters to exercise their political dissent at the ballot box, and not simply in the streets. As the California Supreme Court explained the year

the Amendment was ratified, "America's youth entreated, pleaded for, demanded a voice in the governance of this nation. . . . And in the land of Vietnam they lie as proof that death accords youth no protected status." *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 575 (1971).[12] The Amendment's backers argued "that the frustration of politically unemancipated young persons, which had manifested itself in serious mass disturbances, occurring for the most part on college campuses, would be alleviated and energies channeled constructively through the exercise of the right to vote." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (footnote omitted). Accordingly, "[t]he goal was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden*, 61 N.J. at 345; *accord Jolicoeur*, 5 Cal. 3d at 575 (Senate Report for SJR 7, later enacted as the Twenty-Sixth Amendment, "indicates that Congress . . . disapproved of . . . treatment . . . that it [feared] would give youth 'less of a sense of participation in the election system' and 'might . . . dissuade them from participating . . . ,' a result inconsistent with the goal of encouraging 'greater political participation on the part of the young'") (quoting S. Rep. 92-26, 1971 U.S.C.C.A.N. 362).

The Absentee Age Restriction violates the Twenty-Sixth Amendment. As discussed above, the analysis is simple: on the face of the statute, everyone over age 65 can vote by absentee ballot, whereas those under age 65 can if do so if they fall into narrow, enumerated (non-age-based) exceptions. This is a flat restriction on the right to vote based on age. This is so under any context, but in the current pandemic, where for many voters (even those age 64 and below) access to mail voting will be crucial in order to enable them to vote *at all*, the application of the Absentee Age

---

[12] *Jolicoeur* was cited extensively in *Symm v. United States*, 439 U.S. 1105 (1979), a decision that was summarily affirmed by the Supreme Court, 439 U.S. 1105.

Restriction becomes even less defensible. Not only will it effectively *deny* (and not just abridge) the right to vote of countless South Carolinians who are unlucky enough to have not yet had their 64th birthday by election day, but we are presently experiencing another moment in history in which young Americans are again taking to the streets in large numbers to express their broad political dissatisfaction, this time protesting against institutional racism, including, in particular, police brutality against Black and Brown Americans. The Twenty-Sixth Amendment was meant to ensure that these citizens had a free and clear path to expressing their activism not only in the public square, but through the ballot. The Age Restriction stands in the way.

### 2. The Age Restriction violates the First and Fourteenth Amendments.

In the pandemic, there is an additional independent reason to enjoin the Absentee Age Restriction, because it also violates the protections provided against undue burdens on the right to vote by the First and Fourteenth Amendments. Courts considering such challenges must carefully balance the character and magnitude of injury to the rights that a plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) ("ad hoc balancing"). "However slight th[e] burden [on the right to vote] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). Thus, even "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995). Moreover, a court need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review

wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018); *see McLaughlin*, 65 F.3d at 1221 n.6.

This Court and others have taken external circumstances into account when determining whether the application of an elections law may impose an unconstitutional burden on voting rights. *See, e.g.*, ECF No. 37; *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) (applying *Anderson-Burdick* balancing in light of pandemic, and alleviating signature and witnessing requirements for candidates running for office), *stay denied pending appeal*, No. 20-1961 (7th Cir. June 21, 2020); *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) (affirming conclusion that enforcement of signature requirement for candidates was "not narrowly tailored to the present circumstances" involving pandemic); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that, because a hurricane "foreclosed the only methods of registering to vote" in the final week of registration, the statutory deadline "severe[ly] burden[ed] the right to vote"); *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) (similar).

The Age Restriction imposes a severe burden on the right to vote for those under 65 years of age. It forces the vast majority of voters under 65 to go to the polls on election day. A trip to the polls requires a voter to come into close proximity with other voters, sometimes for a long time in long lines, increasing the likelihood or exposure to (or unwitting spread of) COVID-19. Many individuals under 65 in South Carolina have underlying conditions, such as asthma and obesity, that put them at higher risk for severe complications from the virus. *See* Meredith Decl. ¶¶ 35-36 ("age alone does not capture someone's risk of death from COVID-19"). And as Americans are rapidly learning, COVID-19 can affect anyone. *Id.* ("[M]edia reports highlight that '[COVID-19] remains a highly infectious disease that for everybody over about 40 is significantly deadlier than

anything else they're likely to encounter during the course of a normal year.'"). Some otherwise healthy young people, including children, have been severely affected and some have died. Fourteen percent of the COVID-19 related deaths in South Carolina have been people under age 60, and 52% of the reported cases in South Carolina are people under age 40. *See supra* at n.6. To date, there is no way to predict whether any particular person will survive the virus or do so without persistent health issues. That is why public health officials have told *everyone* to keep a distance from *everyone else*. All available evidence indicates that COVID-19 will remain a huge problem in November. There is currently no cure or vaccine, and although recent reports have suggested that there have been some promising developments, no vaccine is expected to be deployed at a mass scale before the November election. Consistent with this expectation, the CDC just renewed its guidance about using alternatives to in-person voting. Ex. 77-14.

Requiring voters under 65 to risk contracting a potentially deadly disease from voting in person in November imposes a severe burden on the right to vote and triggers strict scrutiny, requiring the Court to rigorously examine the state's interest and the "means [chosen] to achieve those interests, to ensure that . . . requirements are 'narrowly drawn' . . . ." *Wood v. Meadows*, 207 F.3d 708, 714 (4th Cir. 2000). The experience of the June Primaries and Defendant Andino's letter demonstrate that the State has no interest in the Absentee Age Restriction. In the Primary, the Legislature and Governor determined they should allow all people the option to vote by absentee ballot. As a result, all people, including those under 65, could vote by absentee ballot during the June Primaries and the State did not report any problems. In fact, Commission Director Andino asked again for the elimination of the Age Restriction for the November election. Ex. 77-1. Given the rapid spread of COVID-19 in South Carolina, the State has an interest in keeping people in their homes, *not* sending them out to congregate for long periods of time. The State's interest in

the health of its citizens is evidenced by S.C. Code Ann. § 7-15-310(4), which allows persons to vote absentee by mail if, "because of injury or illness, [they] cannot be present in person at [their] voting place on election day." S.C. Code Ann. § 7-15-310(4). In other words, the Legislature gave voters the option to cast a ballot by mail if an illness or ailment keeps them at home on Election Day. Presumably, the intention behind this provision is at least in part to halt the spread of infectious diseases at the polling place.

Even if the State had an interest in the Age Restriction, it is not "narrowly drawn." The Restriction does not burden only those who face no risk of catching COVID-19 from in-person voting. *See* Meredith Decl. ¶¶ 35-36. It burdens the vast majority of South Carolina voters under age 65, including those who have underlying conditions like asthma, obesity, smoking, or pregnancy, which put them at higher risk of severe complications from COVID-19. Plaintiffs Middleton and Tedder are two voters faced with the untenable choice created by the State's interpretation of the statute. If they want to vote in the November election, they must go to a polling place in person on the same day as all other registered voters under the age of 65 who lack an additional qualifying excuse. Middleton has recently experienced long lines when voting in South Carolina and has every reason to expect he will do so again in November. Standing in close proximity to hundreds of other people during a pandemic is a risky proposition for anyone, let alone members of the Black community who are more likely to contract and suffer severe complications from the virus. Absent a preliminary injunction, these Plaintiffs will be subject to an unconscionable choice, simply to exercise their fundamental right to vote.

**B.      The Witness Requirement imposes an undue burden on the right to vote.**

Plaintiffs are also likely to succeed on their challenge to the Witness Requirement—indeed, this Court concluded as much in the first round of preliminary injunction motions when it enjoined the Requirement for the Primary. *See* ECF No. 37. The law requires a voter to get another adult to

(1) watch them fill out the ballot and (2) sign and provide an address on the ballot envelope before the voter returns the absentee ballot.

This Court previously found Plaintiffs made a clear showing that the Witness Requirement is likely unconstitutional because the law "requires [voters] to expose themselves to other people in contravention of maintaining safe social distancing practices." ECF No. 37 at 24. It is thus especially dangerous for voters who have "individual characteristics or conditions that are regarded by the CDC as placing them at a higher risk for contracting COVID-19, including being over 65 years of age, having underlying medical conditions (including scleroderma, interstitial lung disease, hypertension, gout, history of breast cancer, emphysema, infection), being disabled, and/or being African-American." *Id.* It is also particularly burdensome for those voters who are among the almost 559,000 South Carolinians, including more than 222,000 age 65 and over, who live alone or those who are self-quarantining. *Id.*; *see also* Meredith Decl. ¶ 47.[13] Some of the Plaintiffs here and thousands among Plaintiffs' memberships and constituencies fall into these categories. Defendants admitted that the State had no interest in the Requirement when they themselves asked to remove it. *Id.* at 38-39. Moreover, as this Court found, the State has been unable to offer any evidence of voter fraud in South Carolina save for "fleeting mention" of "a voter-buying scandal from the 1980s." *Id.* 39. As a result, Plaintiffs have a strong likelihood of prevailing on their claim "that the burdens placed upon them by the Witness Requirement far outweigh the imprecise, and (as admitted by SCEC Defendants) ineffective, state interests of combating voter fraud and protecting voting integrity." ECF No. 37 at 39.

---

[13] *See also* U.S. Census Bureau, American Community Survey Results (2018), https://data.census.gov/cedsci/table?q=south%20carolina%20single%20person%20households&g=0400000US45&hidePreview=false&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E.

The only thing that has changed since the Court's order is that the COVID-19 situation in South Carolina has gotten worse. Ex. 77-1. Coming into close proximity with others or touching common objects is equally, if not more, dangerous as the virus has become much more prevalent among the population. It is impossible to know who is carrying COVID-19. Even before COVID-19, voters who were the only voter registered at their address were more likely to have their ballots rejected because of the Witness Requirement. *See generally* Meredith Decl. ¶ 50 (using number of registered voters at an address as a proxy for voters living alone). That problem is likely to only get worse, not better. Moreover, the experience of the June 9 election bolsters this Court's conclusion and Defendants' admission that the Witness Requirement is not needed to combat voter fraud. Even without the Requirement, Defendants have produced no evidence of fraud during the June 9 election. *See* Meredith Decl. ¶¶ 94-102. And Andino again recommends elimination of the Requirement for the November election. Ex. 77-1.

### C. The Election Day Cutoff is unconstitutional.

Plaintiffs are also likely to succeed on their claim that the rejection of mailed absentee ballots not received by Election Day is unconstitutional under the circumstances under which the November election will be held. The evidence now proves that the Cutoff disenfranchised over 1,534 South Carolinians in the Primary, including voters who "took timely steps" and received and mailed their ballots well in advance of election day. This is in addition to thousands of others who timely requested, but never received, a ballot. The number of late-arriving ballots will only increase in November, when turnout is projected to exponentially increase and mail delivery slow even more. A six-day extension would have captured 88% of the ballots that arrived after June 9.

This Court previously denied Plaintiffs' request to enjoin the Election Day Cutoff for the June 9 primary, based on the evidence before it at the time and because it found the State had an interest in maintaining the June deadline "because it ensures that the Secretary of State and his

staff have sufficient time to canvass votes in a timely fashion and meet the ballot certification deadline [of June 13], which triggers final preparations for ballot preparation for the June 23, 2020 run-off elections." ECF No. 65 at 47 (citing *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)). That interest no longer applies for November, however. Already, Defendants have suggested that State officials should move the county certification deadline for the general election. Ex. 77-1 at 3. As a result, the State's interest in maintaining the county certification deadline in November can no longer justify the Election Day Cutoff's severe burden on the right to vote.[14]

Moreover, the Court now has the benefit of the evidence of how the Cutoff impacted voters and elections administrators in the Primary and it proves that even that much smaller election proved too much for election officials and USPS to avoid disenfranchisement of thousands of lawful voters. The evidence now proves that the "influx of [absentee ballot] requests" for the June 9 primary "create[d] [a] scenario[ ]" where clerk's offices were delayed in mailing out absentee ballots to voters. ECF No. 13 at 20; Meredith Decl. ¶ 65. But the reality was even worse than anticipated. At the *end of election day* on June 9, clerk's offices *had not even issued* almost 5,500 timely requested absentee ballots.[15] At least 1,534 absentee ballots (a full 1.4% of all mail in ballots), many of which were postmarked on or before Election Day were rejected because they arrived after 7 p.m. on election day. If that number persists in November (and, if anything, the good money is on it *increasing*) we can anticipate that the Cutoff will disenfranchise at least 14,000 South Carolina voters. Extending the deadline by a mere six days, will likely ensure that at least

---

[14] Granting Plaintiffs' motion would not require moving any other state deadlines.

[15] S.C. Elections Comm'n, Historical Absentee Reports, 2020 Statewide Primaries (Final), https://www.scvotes.gov/sites/default/files/Absentee%20Stats%202020-07-09%20(Statewide%20Primaries).xlsx.

12,320 of them do not have their ballots tossed, in most cases for reasons entirely out of their control.[16]

Indeed, the evidence now proves that, during the June Primaries, the Cutoff disenfranchised even voters who "t[ook] timely steps," *Rosario*, 410 U.S. at 758, to ensure that their ballots were counted. Elizabeth Milledge, Rebecca Kirby, and James S. Cotter are all South Carolina voters who mailed their absentee ballots from within the state several days to more than one week before the election: on June 6, June 5, and June 1, respectively. Ex. 77-22; Ex. 7, Kirby Decl. But their ballots all arrived after Election Day (June 10, 12, and 12, respectively) and were rejected as a result. Another voter disenfranchised by the deadline was Bobby Dukes, a voter who was only able to vote absentee because of the time-limited COVID-19 excuse authorized by the legislature in that election. Ex. 6, Dukes Decl. ¶¶ 4, 5. On June 8, he took his absentee ballot, along with the absentee ballots of his wife and two adult children to the Williston, South Carolina post office on June 8. Ex. 6, Dukes Decl. ¶ 6. He wanted to make sure that they would reach the Barnwell County Board of Elections by the next day, so he asked the postal worker to confirm that they would. *Id.* ¶ 7. The postal worker confirmed they would, so he mailed the ballots. *Id.* The absentee ballots of Dukes' wife and adult children arrived at Barnwell County at 3:47 PM on June 9 and were counted. *Id.* ¶ 8.[17] But, Duke's ballot did not arrive until June 11 and it was not counted. *Id.* at ¶ 8. Notably all of Bobby Dukes' relatives' absentee ballots were postmarked *after* the ballots of Milledge,

---

[16] These numbers are based on Defendants' assumptions that there will be more than 1 million mailed-in absentee ballots in November, Ex. 77-1 at 2. The numbers also conservatively assume mail delivery is operating at the same level as in June (as discussed, the evidence is that the situation will likely be worse). Many of these people will be voting absentee for the first time and thus be unfamiliar with the process.

[17] Defendants produced the voter file for the June primary through discovery, which contains, among other things, the dates and, in most instances, times at which absentee ballots were returned to county offices. At the Court's request, Plaintiffs will provide this file directly to the Court.

Kirby, and Cotter's ballots (one day before the election, as compared to 3, 4, and 8 days before), but the latter were all disenfranchised. Dukes and Kirby both live in areas of South Carolina (zip codes beginning in 297 and 298) that are serviced by mail facilities in states outside of South Carolina (Charlotte and Augusta, respectively), which means that it can take longer for mail to travel within the county in those zip codes. Ex. 2, Meredith Decl. ¶ 72; *see also id.* ¶ 92. Though this does not explain why Dukes' family members' ballots all arrived long before the others. Simply put, the evidence is now plain that the treatment of voters by the Cutoff is arbitrary and inequitable.

USPS has since admitted that voters in South Carolina who follow the laws governing absentee voting by mail will risk disenfranchisement through no fault of their own, and that mail *will only get slower* between now and November. *See* Ex. 2, Meredith Decl. ¶ 72, 77-78, 82. Even those who apply early for an absentee ballot will face this serious and severe risk. In July, a report from the USPS Office of the Inspector General admitted that, in South Carolina, ballots are at "high risk of *not [even] being delivered to voters before*" *election day*. Ex. 17-19 at 6 (emphasis added). USPS does not intend to do anything about this problem; instead, one week after that report, the Postmaster General announced changes that would slow down the mail even further. Ex. 17-20; Ex. 2, Meredith Decl. ¶ 77. For example, USPS will no longer pay overtime and has slashed office hours. *See* Ex. 2, Meredith Decl. ¶ 77. The new policies require carriers to leave mail behind to speed up their workdays. *Id.* ¶ 79. Former Deputy Postmaster General Ron Stroman, who resigned just two months ago, averred in similar litigation in another state with *more* time between deadlines that, "in the November General Election, the absentee ballots of at least tens of thousands of voters will arrive at election offices after Election Day and will not be counted unless

the Ballot Receipt Deadline is extended." *See* Dkt. No. 484 at ¶ 10, *DNC v. Bostelmann*, Case No. 3:20-cv-249 (W.D. Wis. filed July 31, 2020).

Perhaps because it is impossible to predict when a voter must request or mail a ballot in order to ensure that it arrives in time for the Cutoff, the Commission provides almost no guidance to voters on when to mail an absentee ballot. "No guidance about when mail ballots should be requested or returned to ensure that they will be received by Election Day is provided on the website on which a potential voter initiates their absentee ballot application. Nothing on the subject was posted to the voter FAQ either." Ex. 2, Meredith Decl. ¶ 75. The Commission issued two press releases in April and May with vague language urging those who qualify to vote absentee as soon as possible, but it was not until *June 3*, two days before the deadline to request an absentee ballot, that the Commission stated—again in a press release—that "applying for a by-mail absentee ballot this late in the process is risky" and warned that the voter or their agent might have to return the ballot in person for it to count. *Id.* ¶ 75. The press release did not warn voters that they might *never* receive their absentee ballot, but that happened to almost 5,500 South Carolinians.

In sum, unless the Cutoff is extended, the system will fail voters, not the other way around. The result will be the broad disenfranchisement of tens of thousands of voters in November through no fault of their own. Ex. 77-1. The disenfranchisement of thousands qualifies as a severe burden. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (disqualified provisional ballots that constituted less than 0.3% of total votes inflicted "substantial" burden on voters); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (severe burden existed where 3,141 individuals were ineligible to register); *cf. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1015 (9th Cir. 2020) (en banc) (claim under Voting Rights Act) (rejecting notion that disenfranchisement of 3,709 voters, .15 percent of all ballots cast, is minimal

or trivial); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("*LOWV*") (claim under VRA) (noting "basic truth that even one disenfranchised voter—let alone several thousand—is too many").

USPS's challenges affect the Court's inquiry. *Cf.* ECF No. 37 at 47 n.25. The State appropriately affirmatively encouraged South Carolinians to vote by absentee ballot and advocated for expansion of that option to all. ECF No. 1-1 (Andino March 30, 2020 Letter); Exs. 77-1; 77-23; 77-24. Having done so, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted. *See Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 681 (D. Md. 2010); *Obama for Am.*, 697 F.3d at 430-31. We do not fault voters who, because of work schedules, family obligations, or other reasons, get in line at the polling place right at 8 p.m. Even if that individual receives and casts their ballot *after* 8 p.m., his vote still counts. This is an eminently sensible rule: in-person voters who show up to their polling place ready to vote should not be disenfranchised because a line caused by unanticipated administrative bottlenecks or voter enthusiasm prevents them from casting their ballot by 8 p.m., even though the voter could have taken into account the possibility of such issues and arrived earlier to avoid them. The same principle applies with equal force to voters who have placed their ballots into the custody of USPS prior to the close of polling places. They have effectively "joined the line" to vote, and it is of no moment that—for whatever reason— their ballots happen to be delivered by the postal service to their elections officials after polls have closed.

Not only is the burden on the right to vote severe, but the State's interest in the Cutoff is even smaller than it was in June because there is no subsequent run-off election in November. The State's only conceivable interest is in maintaining its certification deadlines. *See* ECF No. 37 at

48-49. The State asserted in June that the Court could not move the certification deadlines because officials needed time to print ballots before the June 23 runoff election. For November, however, there is no runoff election, and Andino has already recommended *an extension of the county certification deadline*. Ex. 77-1. Extending that deadline from noon on November 7, S.C. Code Ann. § 7-17-20, to November 10 would accommodate a modest six-day extension of the Election Day Cutoff from November 3 to November 9. A November 9 ballot-receipt deadline will serve just as easily the "state's generalized interest in the orderly administration of elections." *Mays*, 951 F.3d at 787.[18] The Board of State Canvassers can meet at the regularly scheduled time at 10 a.m. on November 11 to "canvass votes, certify results and order any necessary recounts for state-level offices."[19] The November 11 protest deadline for county-level offices, S.C. Code Ann. § 7-17-30, remains intact, as do all other deadlines after that point. As a result, a modest six-day extension of the Election Day Cutoff would enfranchise thousands of South Carolinians without disrupting any election procedures.

### D.    The Election Day Cutoff violates Section 2 of the Voting Rights Act.

Plaintiffs are likely to succeed in their claim that the Election Day Cutoff violates Section 2 of the Voting Rights Act. Section 2 of the VRA prohibits a state from ""impos[ing] or appl[ying]" any electoral practice which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a Section 2 VRA vote-denial or abridgement claim, Plaintiffs must demonstrate two elements: (1) that the

---

[18] The State already counts some ballots after election day, as the deadline for absentee ballots from military and overseas voters may be received and counted until two days after election day. S.C. Code Ann. § 7-15-700.

[19] S.C. Elections Comm'n, 2020 Election Calendar, https://www.scvotes.gov/sites/default/files/2020%20Election%20Calendar%20(scVOTES)%202 019-08-06_0.pdf.

challenged standards, practices, or procedures impose a discriminatory burden on members of a protected class, and (2) that the discriminatory burden is in part "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *LOWV*, 769 F.3d at 240. Courts must "consider the totality of circumstances" when analyzing both elements, *id.* (quotation marks omitted). That analysis requires not only an "intensely local appraisal of the design and impact of electoral administration in the light of past and present reality," *id.* at 241, but also an analysis of the Challenged Provisions' "cumulative effect on minority access to the ballot box," *id.* at 242. Of note, Plaintiffs need not demonstrate intentional discrimination; "a Section 2 violation can "be established by proof of discriminatory results alone." *Id.* at 238 (quoting *Chisom v. Roemer*, 501 U.S. 380, 404 (1991)). In other words, Plaintiffs must show that the Challenged Provisions make voting disproportionately more burdensome for African American voters.

The Election Day Cutoff imposes a discriminatory burden on African American South Carolina voters that is caused by or linked to social or historical conditions that have produced discrimination against African American South Carolinians. Conditions during the COVID-19 pandemic exacerbate the discriminatory impact of the Election Day Cutoff. Comprehensive and complementary analyses by Drs. Allan Lichtman and Marc Meredith show that the Election Day Cutoff has a substantial disparate impact on African Americans in South Carolina.

1.      **The Election Day Cutoff disparately impacts African Americans in South Carolina**

The Election Day Cutoff disproportionately impacts African American voters. Voters who request their absentee ballots within one week before Election Day, as permitted by South Carolina law, are at a particularly high risk of being disenfranchised due to the Election Day Cutoff. Ex. 2, Meredith Decl. at ¶ 89. African American voters are more likely to request their ballots within a

week of Election Day than white voters, and are, therefore, at a higher risk of being disenfranchised by the Election Day Cutoff. *Id.* at ¶ 90.

2. **Historical and social conditions in South Carolina disfavor African Americans**

Because the Election Day Cutoff has a disproportionate impact on African Americans, Section 2 requires the Court to identify the relevant historical and social conditions in South Carolina and then determine whether the Challenged provisions interact with those conditions to impose a disproportionate burden on the ability of African Americans to vote. To evaluate the social and historical conditions relevant to a Section 2 claim courts look to a nonexclusive list of factors found in the Senate Report that accompanied the VRA's 1982 amendments:

1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6) whether political campaigns have been characterized by overt or subtle racial appeals;

7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg v. Gingles*, 478 U.S. 30, 37 (1986) (citing S. Rpt. No. 97-417, at 28-29 (1982)). Here, all of the factors besides Factor 4 are present (South Carolina does not have a candidate slating process).

Dr. Allan Lichtman has prepared a thorough report addressing each of the remaining factors. Ex. 8, Expert Decl. of Allan J. Lichtman ("Lichtman Decl."). Key points with respect to each factor are summarized below.

**Factor 1:** The longstanding history of racial discrimination, including in voting, in South Carolina has been recognized by this Court. *United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 282 (D.S.C. 2003), *aff'd sub nom. United States v. Charleston Cty., S.C.*, 365 F.3d 341 (4th Cir. 2004) ("It is plain that African Americans have suffered a pronounced and protracted history of past discrimination."); *id.* 282–89 (recounting the longstanding history of discrimination from Jim Crow through segregation, African American exclusion from bar associations, and tracing present inequalities to historical discrimination). That discrimination has taken place across many realms, including voting, education, law enforcement, and housing. Ex. 8, Lichtman Decl. at 7. South Carolina's racially discriminatory practices related to voting date are a nearly unbroken chain stretching from the state's founding back to now. *Id.* at 7–16 (summarizing voting discrimination in South Carolina from before 1800 to 2020, including the poll tax, the white primary, voter registration, and voter ID laws).

Similarly, racial discrimination in education has led to disparate outcomes that linger today. *Id.* at 17–28 (tracing discrimination in South Carolina education from *Brown v. Board of Education* to current segregation in public and private schools and disparate educational outcomes). Black students in South Carolina experience *de facto* segregation, *id.* at 18–20, and are disproportionately "concentrated in the poorly performing as opposed to well performing schools," *id.* at 19.

African American South Carolinians have and continue to face discrimination with respect to law enforcement and the justice system. In the context of civil asset forfeiture, African American South Carolinians have been disproportionately impacted by asset seizure. *Id.* at 28–30 (noting that African Americans, and African American men in particular, have been disproportionately impacted by asset forfeiture). Similarly, South Carolina state courts have meted out sentences for minor and major crimes in a racially disparate manner. *Id.* at 30–33 (noting that racial disparities in sentencing exist for low-level crimes and death penalty imposition). African Americans are also underrepresented on South Carolina's police forces and the judiciary, as well as on juries. *Id.* at 34-39.

Finally, there is a history of discrimination related to housing, namely denial of loans to African American applicants and racially restrictive covenants. Impediments to fair housing remain today; there is a 26 percent gap in home ownership rates, African Americans are more likely to live in multifamily housing, and neighborhoods are still largely segregated. *Id.* at 41–48.

**Factor 2:** This Court has recognized that voting in South Carolina is racially polarized. *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 640 (D.S.C. 2002) ("The history of racially polarized voting in South Carolina is long and well-documented—so much so that in 1992, the parties in *Burton* [*v. Sheheen*] stipulated that since 1984 there is evidence of racially polarized voting in South Carolina.").

**Factor 3:** South Carolina has a history of employing election practices that discriminate against African Americans that continues from the state's inception to the present. Ex. 8, Lichtman Decl. at 7-16 (tracing discriminatory election practices in South Carolina from pre-1800 to 2020).

**Factor 5:** African Americans in South Carolina continue to bear the effects of past discrimination in education, employment, and health, as borne out in the lower socioeconomic

position on average for African American residents as compared to white residents. *See generally id.* at 65–74 (discussing Factor 5). African Americans in South Carolina experience disparities in income, employment, poverty, education, and health linked to historical and ongoing discrimination that impact their ability to participate effectively in the political process. *Id.* at 65–67 (highlighting employment, transportation, childcare, and education systems that make it more difficult to "navigate the voting process generally").

**Factor 6:** Racial appeals, both subtle and overt, have been used in political campaigns in South Carolina. *Id.* at 74–78 (discussing specific racial appeals). These appeals are not relegated to days gone by. In the run up to the 2016 presidential election race, then-potential-presidential-candidate Ted Cruz launched a veiled racial appeal against Donald Trump that suggested that he was in favor of removing the Confederate Flag, which is viewed by many as a symbol of white supremacy. *Id.* at 77-78. This message was intended to appeal to white voters who were against removing the Confederate Flag.

**Factor 7:** African Americans in South Carolina have historically been underrepresented in public office. In perhaps one of the most glaring examples found in the United States, until Tim Scott was elected to the Senate in 2014, no African American had been elected to statewide office since Reconstruction.[20] No African American has ever served as Governor of the State or as Attorney General. *Id.* at 79. And although African Americans have been elected to local office in recent years, their representation in local office still falls short of parity. *Id.* at 78-81.

**Factor 8:** There is a historical and current lack of responsiveness on the part of elected officials to the needs of African American constituents. This is currently evinced through obvious

---

[20] And even though Tim Scott is an African American elected to statewide office, he is overwhelmingly disfavored by South Carolina's African American voters. Lichtman at 78.

and unmet needs in healthcare, *id.* at 82 (highlighting the failure to expand Medicaid, which is disproportionately relied upon by African American South Carolinians), as well as public education, *id.* at 83–86 (highlighting African American public school enrollment and elected officials' failure to use their power to address issues). In an especially relevant example, African Americans in South Carolina report much greater disapproval than whites to the State's response to COVID-19. *Id.* at 83. Governor McMaster has failed to take steps that many in the African American community have called for, such as a statewide mask mandate, and the elected officials in the General Assembly have been nonresponsive to African American constituents such as the individual Plaintiffs in this action who have sought legislative solutions to issues such as voting during a pandemic. *Id.* at 83.

**Factor 9:** One key factor in evaluating a Section 2 claim is "whether the policy underlying the [S]tate['s] . . . use of [the challenged] practice or procedure is tenuous." *Gingles*, 478 U.S. at 37. As discussed above, the main rationale Defendants used to support the Election Day Cutoff for the June primary is so tenuous that it no longer exists; there are no runoffs.

If the Election Day Cutoff were instead a postmark + 6 days cutoff (accepting all ballots postmarked on or before election day and received within 6 days of the election), thousands of voters will be enfranchised and only one deadline (the county canvass) would be moved. Using the June 9, 2020 data as an example, 88% of the 1,534 South Carolina voters whose ballots were rejected as late would have had their votes counted including Bobby L. Dukes.

> **3.    The Challenged Provisions interact with existing social and historical conditions to disproportionately burden African American voters**

Against the backdrop of South Carolina's social and historical conditions, the Election Day Cutoff works to disproportionately burden African American voters. There is a clear connection between the Election Day Cutoff and the abridgement of African American South Carolina voters'

"opportunity . . . to participate in the political process." *LOWV*, 769 F.3d at 238; *see also Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1358 (4th Cir. 1989). "Under Section 2 as it exists today, showing intentional discrimination is unnecessary." *LOWV,* 769 F.3d at 238. "In other words, the essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *LOWV*, 769 F.3d at 238–39 (quoting *Gingles*, 478 U.S. at 47 (quotation mark and alterations omitted)).

The various moving pieces that are involved with requesting and returning an absentee ballot all interact with the historical and societal conditions that African Americans experience in South Carolina today. African Americans in South Carolina experience disparities in income, employment, poverty, education, and health linked to historical and ongoing discrimination that impact their ability to participate effectively in the political process. Lichtman at 65–67 (highlighting employment, transportation, childcare, and education systems that make it more difficult to "navigate the voting process generally"). African Americans, who have historically used absentee voting at a lower rate than white voters in South Carolina, are forced to navigate the absentee voting process in the context of these disparities. They must also navigate it without any prominent or meaningful guidance from the State Election Commission regarding when ballots need to be requested and returned in order to ensure that they count. Ex. 2, Meredith Decl. at ¶ 75 (noting that the website for requesting an absentee ballot and associated FAQ contained no such information); *id.* ¶ 74 (highlighting the guidance provided by other states regarding ballot return timing).

The disparities in employment, poverty, education, and health, along with their real-world ramifications, result in African American voters being more likely to request and return their

absentee ballots in the week before the election, and, in turn, have their ballots rejected due to the Election Day Cutoff. *Id.* ¶¶ 89-90 (finding that voters who request their ballots less than a week before Election Day are at "particularly high risk" of having their vote rejected due to the Election Day Cutoff and noting that African American voters disproportionately request their absentee ballots in the week before the elections).

The impact of the Election Day Cutoff is significant and substantial. The state established a voting law that permits counties to send out mail-in ballots within a week of the election, and the State should not be able to enforce a law—the Election Day Cutoff—that has the effect of disparately disenfranchising African American voters simply request a mail-in ballot as allowed. Such disproportionate disenfranchisement is the hallmark of a Section 2 violation.

### E. The Absentee Assistance Ban is unconstitutional.

#### 1. The Absentee Assistance Ban violates the First Amendment.

Plaintiffs are also likely to succeed on their claim that the Absentee Assistance Ban is an overbroad restriction on political speech and organizing that infringes Plaintiffs Tedder and Middleton's First Amendment rights. *See* ECF No. 1 at ¶¶ 152-154.

Election-related speech and associational activities aimed at encouraging voters to participate in the political process are protected by the First Amendment. *See Buckley v. Am. Const'l Law Found. Inc.*, 525 U.S. 182, 186 (1999); *Meyer v. Grant*, 486 U.S. 414, 421 (1988); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006).[21] These rights are held by voters and

---

[21] *See also Hadnott v. Amos*, 394 U.S. 358, 364 (1969) ("First Amendment rights . . . include the right to band together for the advancement of political beliefs."); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)) ("An organization's attempt to broaden the base of

organizers. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (describing "overlapping" rights "of individuals to associate for the advancement of political beliefs" and of voters "to cast their votes effectively"); *Project Vote*, 455 F. Supp. at 700 ("participation in voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked by" voters and "third parties who encourage participation in the political process"). "[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'" *Hargett*, 400 F. Supp. 3d at 722 (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). The First Amendment "requires [courts] to be vigilant when such activities are regulated, to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192. Thus, "[l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *see also* ECF No. 56-1 at 24. Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley*, 525 U.S. at 192; *see Hargett*, 400 F. Supp. 3d at 722. The State must "present *actual evidence* supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice

---

public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'"); *see also Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (noting precedent has "made clear that the First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas.") (quotation marks omitted)).

to carry the government's burden." *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (emphasis added); *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 372 (3d Cir. 2016) (noting Supreme Court's clarification of the "rigorous and fact-intensive nature" of the "narrow-tailoring analysis").

Along with depriving voters of crucial assistance that would facilitate their political participation, the Ban infringes on core political speech and associational activities of Plaintiffs working to mobilize and turnout voters. Encouraging and assisting voters to vote and to vote by mail is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422-23. Assisting voters in returning their ballots, like circulating a petition, "necess[arily] involves . . . the expression of a desire for political change." *Id.* at 421. Just as "[r]egistering to vote is not a politically neutral act, and neither is declining to," *Hargett*, 400 F. Supp. 3d at 724, the decision of whether to vote is hardly neutral. Helping eligible voters vote is "central to shared political life" because "a change in the composition of the electorate can lead to the change of any law." *Id.* at 723-24. A candidate or campaign's "attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). Where plaintiffs "wish to speak and act collectively with others," including with the "process of registering and thus, in due course, voting," "the First Amendment right of association" is implicated. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158-59 (N.D. Fla. 2012). Arguments to the contrary are "plainly wrong." *Id.* at 1158; *see also Priorities USA v. Nessel*, No. 19-13341, 2020 WL 2615766, at *13 (E.D. Mich. May 22, 2020) (holding First Amendment speech and associational claim regarding restrictions on who may assist voters with returning absentee ballot applications survived motion to dismiss). As

a result, ballot collection laws, which "[r]educe the number of individuals who could potentially provide assistance to potential voters" and "make it more difficult and more expensive for political organizations to speak," "diminish[ ] the speech and associational rights of political organizations like both the Democratic Committees and the Republican Committees." Order & Mem. at 52, *DSCC v. Simon*, No.: 62-CV-20-585 (Minn. 2d Judicial Dist. July 28, 2020).

Here, the Ban prevents political candidates such as Tedder and Middleton and their campaign staff from assisting voters in returning their ballots, diminishing their First Amendment rights. Absent the ban, Tedder and Middleton would assist voters in returning ballots as part of their GOTV activities. Ex. 3, Tedder Decl. ¶¶ 15-18; Ex. 4, Middleton Decl. ¶ 11. Prior to his candidacy, Middleton helped return voters' absentee ballots to "advocate for people to get involved and make their voices heard." Ex. 4, Middleton Decl., ¶ 10. As a candidate, he would continue to collect absentee ballots both "as a means of getting out the vote and helping protect voters' health," and "to express [his] commitment to the community." *Id.* ¶ 11. Tedder similarly views absentee ballot collection as way to encourage individuals to vote and to do so safely. Ex. 3, Tedder Decl., ¶ 17. Further, providing ballot collection assistance is an expression his campaign's "core focus on service." *Id.* The Ban restricts their ability to engage in this core political speech.

This is a clear case of "speech diminution," which "limit[s] the number of voices who will convey [Plaintiffs'] message and, consequently, cut[s] down the size of the audience [proponents] can reach." *Buckley*, 525 U.S. at 194-95 (citations omitted). The Supreme Court has consistently held that diminished opportunities for political expression are unconstitutional. In *Meyer*, the Court struck down a law that made it a felony to pay circulators of initiative petitions. 486 U.S. at 416. In *Buckley*, it struck down a law that only allowed registered voters to circulate initiative petitions. 525 U.S. at 193. In both cases, the Court reasoned that the challenged laws would diminish political

expression by restricting the quantity of speech. *Id.* at 194; *Meyer*, 486 U.S. at 423. That reasoning applies equally here, as the Ban curtails the number of people campaigns and candidates can reach and the effectiveness of their outreach as they cannot encourage people to vote absentee and then offer to take the ballot for them if they need help. *See Hargett*, 400 F. Supp. 3d at 723 ("the same speech diminution rationale can easily be applied to the Act's restrictions on voter registration drives"). The Ban also targets those with the greatest incentive to assist voters—candidates and campaign staff—making it less likely that anyone assists voters to return their ballots. As a result, organizational Plaintiffs must find other volunteers to conduct these activities. At a systemic level, these restrictions burden voters' ability to join together to support a candidate or participate in GOTV drives with campaigns collecting ballots and giving them to the chosen candidate—to associate with each other, in other words. *See Hernandez v. Woodard*, 714 F. Supp. 963, at 973 (N.D. Ill. 1989).

The Ban is not appropriately tailored to any state interest. Indeed, the Ban cannot withstand strict scrutiny—or any level of scrutiny at all—because it does not bear a sufficient relation to a legitimate government interest. South Carolina may assert that it has a compelling interest in preventing individuals from submitting fraudulent ballots, failing to return voters' absentee ballots, or exerting undue influence when a voter casts a ballot. But other statutes already prevent all of those things. As a result, South Carolina could and does employ less restrictive means than the Absentee Assistance Ban to serve any such interests. *See Bernbeck*,126 F.3d at 1117 (finding law "requiring petition circulators to be registered voters in Nebraska violates the First Amendment because it restricts core political speech and the statutory requirement is not the least restrictive means available for satisfying Nebraska's interests in preventing signature fraud and maintaining the integrity of its initiative process").

## 2. The Absentee Assistance Ban unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

The Absentee Assistance Ban also imposes an undue burden on voters who need assistance returning their absentee ballots. Many voters cannot return their ballots in a timely fashion due to work schedules, family care responsibilities, lack of transportation, disabilities, or distance to polling places or mail. Over 26% of South Carolina adults have some type of disability.[22] Almost 15% have "serious difficulty walking or climbing stairs," and over 7% have "difficulty doing errands alone." *Id.* Other voters might not want to return their ballots in person given the risk of COVID-19 transmission and might distrust (correctly) USPS's ability to return their ballot on time, especially if they receive it close to election day. *See* Ex. 3, Tedder Decl. ¶ 13 (noting voters' concerns with health risks of in-person voting). Tedder and Middleton both wish to provide absentee ballot collection assistance as a safer alternative to in-person voting, and would take safety precautions when doing so, including wearing masks, maintaining social distancing for as much of the interaction as possible, having conversations outside, and frequently washing their hands. *Id.* ¶¶ 12, 15-16; Ex.4, Middleton Decl. ¶ 11. At-risk voters could benefit from their (and other candidates') assistance if not for the Ban. And, as discussed above, the Ban does not serve the State's interest in preventing absentee voter fraud.

## II. Plaintiffs will suffer irreparable harm absent a preliminary injunction.

"Courts routinely deem restrictions on fundamental voting rights irreparable injury." *LOWV*, 769 F.3d at 247 (collecting cases); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011). "[O]nce the election occurs, there can be no do-over and no redress," so the injury to "voters is real and completely irreparable

---

[22] *Disability & Health U.S. State Profile Data for South Carolina*, CDC (Sept. 12, 2019), https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/south-carolina.html.

if nothing is done to enjoin [the challenged] law." *LOWV*, 769 F.3d at 247. "[S]erious, lasting illness or death" is also irreparable injury. *Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).

Plaintiffs and tens of thousands of other South Carolina voters will suffer irreparable injury absent a preliminary injunction. Given the Absentee Age Restriction, *almost all* voters under 65 must either risk serious, lasting illness, and even death, or forego their exercise of their most fundamental right. Due to the Witness Requirement, voters who live alone must either risk serious, lasting illness or not have their votes counted. Many of those who live alone are age 65 and over and/or Black and would be risking death by voting in person at the polls. The Election Day Cutoff will disenfranchise tens of thousands of lawful voters through no fault of their own and for no justifiable reason. In addition to those impacted by the vagaries of the USPS, those who do not receive their ballots on time to mail them back will be faced with the same untenable choice. Finally, the Absentee Assistance Ban will make it more difficult for many to cast their ballots.

This harm is concrete and it is imminent. The election is less than 100 days away, and COVID-19 continues to spread at alarming rates. All evidence points to the threat increasing by November. *See* Exs. 77-10; 77-11; *see also* Ex. 1, John Decl. at ¶¶ 30, 37 (noting that there is no reasonable expectation of a vaccine by November).

III.     **The balance of hardships and the public interest favor Plaintiffs.**

The weight of the equities tips entirely to Plaintiffs' side. An injunction would protect the lives and health of hundreds of thousands of South Carolinians *and* prevent disenfranchisement by removing barriers to voting during an unprecedented public health crisis. The Commission, by its own admission, can manage the extension of absentee voting to everyone and dispensing with the Witness Requirement. The Commission also *recommended* that officials extend the county certification deadline. Doing so would allow for a six-day extension of the Cutoff, enfranchising

tens of thousands of South Carolinians. Finally, allowing candidates and their campaign staff to return completed ballots would ease burdens on voters without any cost to the State.

But, in any event, any administrative burden imposed by granting the injunction here cannot justify the increased burden on voters, up to and including disenfranchisement. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975) (holding "administrative convenience" cannot justify practices that impinge upon fundamental rights); *see also Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 (holding increased administrative burden of "disseminating information" and "training poll managers. . . is minimal compared to the potential loss of a right to vote"); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) ("The potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy."); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *8 (N.D. Fla. Oct. 16, 2016) ("Any potential hardship [to the state] imposed by providing the same opportunity . . . for [ ] voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote and to have their votes counted."). "A state is not harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks omitted)).

Simply put, the public interest is served when "as many qualified voters as possible" can vote. *LOWV*, 769 F.3d at 247-48; *see also* S.C. Code Ann. § 7-15-20 (absentee registration and voting laws "shall be liberally construed"). The public interest is also plainly served when the public can avoid risking serious illness or death. *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005)

(referring to "public health" as a "significant public interest"). The Challenged Provisions do not meaningfully advance the State's interests in orderly elections and combating voter fraud, and any advancement is far outweighed by the burden on the right to vote in these unprecedented times.

## CONCLUSION

As the Supreme Court recognized long ago, "[t]here is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted). For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction:

1) prohibiting Defendants from enforcing S.C. Code Ann. § 7-15-320 and § 7-15-310, the Absentee Age Restriction, to prevent any eligible voter, regardless of age, to request, receive, and have counted an absentee ballot for the November 3 general election;

2) prohibiting Defendants from enforcing the Witness Requirement, S.C. Code Ann. § 7-15-220 and § 7-15-420, for all voters for South Carolina's November election;

3) prohibiting Defendants from enforcing the requirement under S.C. Code Ann. § 7-15-230 that absentee ballots must be received by 7:00 p.m. on Election Day, November 3, to be counted and extending the deadline to November 9, provided that the ballots were postmarked or mailed on or before November 3;

4) giving county election officials until November 10 to complete the canvass and certify the results to the State Board of Canvassers, *id.* § 7-17-20;

5) prohibiting election officials from releasing results until after 7:00 p.m. on November 9, *see* Fed. R. Civ. P. 65;

6) enjoining the enforcement of S.C. Code Ann. § 7-15-385, which prevents candidates and paid campaign staff from returning ballots for any non-immediate family members;

7) ordering Defendants to publicly inform all South Carolina voters about the elimination of these requirements in coordination with city and county election officials; and

8) granting such other and further relief as the Court deems just and proper.

Dated this 3rd day of August, 2020.

Respectfully submitted,

/s/ Christopher J. Bryant

Marc E. Elias*
Bruce V. Spiva*
Christopher J. Bryant, Federal ID 12538
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
cbryant@perkinscoie.com

Sopen B. Shah*
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
sshah@perkinscoie.com

*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*