**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Kylon Middleton; Deon Tedder; Amos Wells; Carylye Dixon; Tonya Winbush; Ernestine Moore; South Carolina Democratic Party; DNC Services Corporation/Democratic National Committee, and DCCC, | ) ) ) ) ) ) | Civil Action No.: 3:20-cv-01730-JMC |
| | ) | |
| Plaintiffs, | ) ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER AND OPINION GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) ) | |
| Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission; John Wells, in his official capacity as Chair of South Carolina State Election Commission; and Clifford J. Edler and Scott Moseley, in their official capacities as members of the South Carolina State Election Commission, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| v. | ) ) | |
| South Carolina Republican Party; James H. Lucas, in his capacity as Speaker of the South Carolina House of Representatives; and Harvey Peeler, in his capacity as President of the South Carolina Senate, | ) ) ) ) ) ) | |
| Intervenors. | ) ) | |

Plaintiffs Kylon Middleton, Deon Tedder, Amos Wells, Carylye Dixon, Tonya Winbush,

Ernestine Moore, the South Carolina Democratic Party ("SCDP"), DNC Services

Corporation/Democratic National Committee ("DNC"), and DCCC (collectively, "Plaintiffs")

filed this action seeking declaratory and injunctive relief from certain voting requirements

promulgated by the State of South Carolina. (ECF Nos. 1, 69.)

1

Currently before the court is Plaintiffs' Motion for Preliminary Injunction. (ECF No. 77.) Defendants Marci Andino, John Wells, Clifford J. Edler, and Scott Moseley (collectively, "Defendants") filed a response in opposition to the Motion for Preliminary Injunction. (ECF No. 93.) Intervenors South Carolina Republican Party ("SCGOP"), Speaker of the South Carolina House of Representatives James H. Lucas ("Speaker Lucas"), and President of the South Carolina Senate Harvey Peeler ("President Peeler") (collectively, "Intervenors") also filed briefing in opposition to the Motion. (ECF Nos. 94, 100, 101.) Plaintiffs filed reply briefing to Defendants' and Intervenors' responses. (ECF Nos. 98, 104.)

For the reasons below, the court **GRANTS IN PART AND DENIES IN PART** the Motion for Preliminary Injunction. (ECF No. 77.)

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

1.      The instant Motion seeks to enjoin four provisions related to absentee voting in South Carolina. Plaintiffs allege that the application of three of these provisions during the COVID-19 pandemic violates the United States Constitution and federal law and seek injunctive relief solely for the upcoming November 2020 General Election. The three provisions at issue include: the requirement that another individual must witness a voter's signature on an absentee

---

[1] Rule 52 of the Federal Rules of Civil Procedure requires the court to "state the findings and conclusions that support" the "granting or refusing [of] an interlocutory injunction." Fed. R. Civ. P. 52(a)(2). In further adherence to Rule 52(a)(1), this Order "finds [] facts specially and state[s] its conclusions of law separately" in numbered paragraphs. The court observes that Rule 52 does not require a discussion of every issue argued and/or presented. *E.g.*, *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) ("But Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness. It simply require[s] findings that are explicit and detailed enough to enable us to review them under the applicable standard." (internal and external citations and quotation marks omitted)). *See also Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 34–35 (D.D.C. 2016), *aff'd*, 743 F. App'x 457 (D.C. Cir. 2018)("[t]he Court is neither "require[d]" nor "encourage[d]" "to assert the negative of each rejected contention as well as the affirmative of [all] those which they find to be correct.").

ballot envelope for the ballot to be counted ("Witness Requirement");[2] the requirement that absentee ballots must be received by 7:00 p.m. on Election Day to be counted ("Election Day Cutoff"); and the restriction that bars those under sixty-five from voting absentee without another qualifying excuse, while authorizing those sixty-five and over to vote absentee based solely on their age ("Absentee Age Restriction"). Plaintiffs bring a facial constitutional challenge against the fourth provision—which bans political candidates or paid campaign staff from collecting and returning completed absentee ballots ("Candidate Collection Ban")—and request injunctive relief on this provision beyond the November 2020 General Election.

A.     The Coronavirus Pandemic and Highly Contagious Nature of COVID-19

2.     "The COVID-19 pandemic, also known as the coronavirus pandemic, is an ongoing pandemic of coronavirus disease ('COVID-19') caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)." *COVID-19 pandemic*, https://en.wikipedia.org/wiki/COVID-19_pandemic (last visited Aug. 20, 2020).[3]

3.     Persons with COVID-19 may exhibit the following symptoms: cough; shortness of breath or difficulty breathing; fever; chills; muscle pain; fatigue; congestion or runny nose; sore throat; new loss of taste or smell; nausea; vomiting; or diarrhea. *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html?CDC_AA_refVa

---

[2] On May 25, 2020, the court enjoined the Witness Requirement solely for South Carolina's June 2020 Primaries. (ECF No. 37.)

[3] Under the Federal Rules of Evidence, the court is permitted to "take judicial notice on its own[.]" Fed. R. Evid. 201(c). Moreover, the court may take judicial notice of a fact "that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). The court has taken judicial notice of several facts and statistics throughout the order from the Center for Disease Control and Prevention's ("CDC") website, the South Carolina Department of Health and Environmental Control's ("DHEC") website, the South Carolina Election Commission's ("SCEC") website, and other websites that the court deems pertinent to the matters before the court.

l=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fsymptoms.htm

l (last visited Aug. 28, 2020).[4] "Anyone can have mild to severe symptoms." *Id.*

4.     The COVID-19 virus is spread by "direct, indirect (through contaminated objects

or surfaces), or close contact with infected people via mouth and nose secretions. These include

saliva, respiratory secretions or secretion droplets." *Q&A: How is COVID:19 transmitted?*, https:

//www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-det

ail/q-a-how-is-covid-19-transmitted (last visited Aug. 20, 2020).

> There have been reported outbreaks of COVID-19 in some closed settings, such as
> restaurants, nightclubs, places of worship or places of work where people may be
> shouting, talking, or singing.  In these outbreaks, aerosol transmission, particularly
> in these indoor locations where there are crowded and inadequately ventilated
> spaces where infected persons spend long periods of time with others, cannot be
> ruled out. More studies are urgently needed to investigate such instances and assess
> their significance for transmission of COVID-19.

*Id.* Additionally, "[i]t may be possible that a person can get COVID-19 by touching a surface or

object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. This

is not thought to be the main way the virus spreads, but we are still learning more about how this

virus spreads." *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-ge

tting-sick/how-covid-spreads.html (last visited Sept. 8, 2020).

5.     Although it appears COVID-19 transmission primarily occurs through individuals

who already exhibit symptoms, transmission can occur "just before they develop symptoms."

*Q&A: How is COVID:19 transmitted?*, https://www.who.int/emergencies/diseases/novel-corona

virus-2019/question-and-answers-hub/q-a-detail/q-a-how-is-covid-19-transmitted   (last   visited

---

[4] The court observes that for purposes of document formatting, the links to internet websites cited
throughout the Order may have space(s) in the website URL where there should not be a space(s).
To this point, if the link is copied and pasted in a website browser, an error may result from the
space(s) in the website URL.

Aug. 20, 2020). Transmission is also possible by individuals who become infected yet never develop symptoms. *Id.*

6.      Individuals with an increased risk of severe illness due to COVID-19 include older adults, as well as people with medical conditions, disabilities, or developmental and behavioral disorders. *People at Increased Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Sept. 17, 2020). "Severe illness means that the person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die." *Id.*

7.      Racial and ethnic minority groups also appear to have an "increased risk of getting sick and dying from COVID-19." *Health Equity Considerations and Racial and Ethnic Minority Groups*,   https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-cov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html (last visited Aug. 28, 2020). "There is increasing evidence that some racial and ethnic minority groups are being disproportionately affected by COVID-19. Inequities in the social determinants of health, such as poverty and healthcare access, affecting these groups are interrelated and influence a wide range of health and quality-of-life outcomes and risks." *Id.* (citations omitted).

8.      In its suggestions for slowing the spread of COVID-19, the CDC recommends that people should: "[k]now how [COVID-19] spreads[,]" "[w]ash [their] hands often[,]" "[a]void close contact[,]" "[c]over [their] mouth and nose with a mask[,]" "[c]over coughs and sneezes[,]" "[c]lean [and] disinfect . . . frequently touched surfaces daily[,]" and "[m]onitor [their] daily health." *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Aug. 28, 2020). The CDC notes that a "mask is not a

substitute for social distancing." *Id.*

B.    National/International Response

9.    On January 30, 2020, the World Health Organization ("WHO") declared that an outbreak of COVID-19 was a Public Health Emergency of International Concern. *Statement on the second meeting of the International Health Regulations (2005 Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)*, https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov)    (last    visited Sept. 8, 2020). It subsequently declared the outbreak a pandemic on March 11, 2020. *WHO Director-General's opening remarks at the media briefing on COVID-19*, https://www .who.int/ dg/speeches/detail/w ho-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Sept. 17, 2020).

10.    On March 13, 2020, the President of the United States pronounced "the ongoing Coronavirus Disease 2019 (COVID-19) pandemic is of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207." *FEMA COVID-19 Emergency Declaration*, https://www.fema.gov / news-release/2020/03/13/covid-19-emergency-declaration (last visited Sept. 13, 2020). The President further declared the pandemic a national emergency, pursuant to § 201 and § 301 of the National Emergencies Act, 50 U.S.C. §§ 1601-1651, and consistent with § 1135 of the Social Security Act, 42 U.S.C. § 1320b-5, retroactive to March 1, 2020. *White House Proclamations*, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Sept. 13, 2020).

6

11.     On March 27, 2020, the President approved a major disaster declaration for the State of South Carolina. *President Donald J. Trump Approves South Carolina Disaster Declaration*, https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-south-carolina-disaster-declaration-5/ (last visited Sept. 11, 2020).

12.     Although the forecasts for new COVID-19 cases vary greatly among individual national models, cases are generally expected to trend downward at a slow pace. *COVID-19 Forecasts: Cases*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/forecasts-cases.html (last visited Sept. 15, 2020). Despite these projections, the number of new daily cases remains significantly high nationwide and globally. For example, there were only 1.6 million reported cases in the U.S. and 5.38 million cases worldwide when the court considered Plaintiffs' first consolidated Motion for Preliminary Injunction (ECF No. 13) in May 2020. *Middleton v. Andino*, No. 3:20-CV-01730-JMC, at *4 (D.S.C. May 25, 2020); *Thomas v. Andino*, No. 3:20-CV-01552-JMC, 2020 WL 2617329, at *4 (D.S.C. May 25, 2020).[5]

13.     As of September 17, 2020, the United States had reported more than 6.6 million cases resulting in 196,277 deaths. *United States COVID-19 Cases and Deaths by State*, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Sept. 17, 2020). Cases worldwide stood at over 29.3 million with over 930,000 deaths. *COVID-19 Dashboard by the Ctr. for Syss. Sci. & Eng'g at Johns Hopkins Univ.*, https://gisanddata.maps.arcgis.com/apps/opsdash board/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited Sept. 17, 2020).

14.     There is currently no vaccine to prevent COVID-19. *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last

---

[5] The court previously issued a consolidated preliminary injunction Order in both cases, with the *Thomas* parties appearing first in the caption. (ECF No. 37.) Thus, the citation to this Order appears as *Thomas v. Andino*, despite applying to both *Middleton* and *Thomas*. (*Id.*)

visited Aug. 28, 2020).

C.    South Carolina Response

15.    As early as January 29, 2020, DHEC began monitoring "developments concerning cases of the 2019 novel coronavirus." *DHEC News Releases*, https://scdhec.gov/news-releases/dhec-statement-2019-novel-coronavirus-preparations-activities-south-carolina (last visited Sept. 7, 2020).

16.    On or about March 6, 2020, DHEC learned of its first two possible cases of coronavirus, which were later confirmed as positive. *Id.* at https://scdhec.gov/news-releases/dhec-investigating-two-possible-cases-2019-novel-coronavirus-south-carolina (last visited Aug. 29, 2020).

17.    On March 13, 2020, Governor McMaster issued Executive Order No. 2020-08, declaring a state of emergency for South Carolina based on a determination that COVID-19 posed an imminent public health emergency. *See Executive Order No. 2020-08* (Mar. 13, 2020).

18.    Two days later, Governor McMaster issued an executive order closing public schools, postponing certain elections, and urging rescheduling and cancellation of public events with over 100 persons. *See Executive Order No. 2020-09* (Mar. 15, 2020).

19.    The State of South Carolina reported its first COVID-19 related death on March 16, 2020. *DHEC News Release*, https://scdhec.gov/news-releases/state-south-carolina-reports-first-covid-19-related-death (last visited Sept. 1, 2020).

20.    On April 6, 2020, Governor McMaster issued Executive Order No. 2020-21, a mandatory statewide "Home or Work" order requiring "[a]ll South Carolinians [to] remain at home or work unless visiting family, exercising, or obtaining goods or services." *Executive Order No. 2020-21* (Apr. 6, 2020). Executive Order No. 2020-21 further instructs residents of the State to

"limit social interaction, practice 'social distancing' . . . and take every possible precaution to avoid potential exposure to" viral infection." *Id.*

21.    On May 21, 2020, Governor McMaster issued an executive order authorizing certain businesses "previously deemed 'non-essential'" to re-open with conditions, including arcades, selected tourist attractions, bingo halls, public playgrounds, and sports activities that "involve interaction in close proximity to and within less than six (6) feet of another person." *See Executive Order 2020-37* (May 21, 2020).

22.    A week later, Governor McMaster issued an executive order that in part restricted visitation to nursing homes and assisted living facilities and urged school districts to adopt a hybrid in-person/online instruction model for summer instruction programs. *See Executive Order No. 2020-38* (May 27, 2020)*.*

23.    On July 11, 2020 Governor McMaster issued an executive order prohibiting the sale of alcoholic beverages at restaurants, bars, and other establishments after 11:00 p.m. *See Executive Order 2020-45* (July 11, 2020).

24.    On August 2, 2020, Governor McMaster issued an executive order announcing, among other restrictions, that all previously recommended guidelines for restaurants and other certain establishments were now mandatory. *See Executive Order No. 2020-50* (Aug. 2, 2020) (requiring individuals to wear a mask in state government facilities, imposing restrictions on restaurant services, permitting certain inside gatherings if capacity is capped at fifty percent "of the location's occupancy limit," and renewing the restriction on the sale of alcoholic beverages after 11:00 pm).

25.    Since Governor McMaster's first declaration of a state of emergency on March 13, 2020, the state of emergency has been renewed twelve times, or approximately every two weeks,

based on a determination that COVID-19 poses an imminent public health emergency.[6] *See Executive Order Nos. 2020-08* (Mar. 13, 2020); *2020-15* (Mar. 28, 2020); *2020-23* (Apr. 12, 2020); *2020-29* (Apr. 27, 2020); *2020-35* (May 12, 2020); *2020-38* (May 27, 2020); *2020-40* (June 11, 2020); *2020-42* (June 26, 2020); *2020-44* (July 11, 2020); *2020-48* (July 26, 2020); *2020-53* (Aug. 10, 2020); *2020-56* (Aug. 25, 2020); *2020-59* (Sept. 9, 2020). The most recent renewal occurred on September 9, 2020. *Executive Order 2020-59* (September 9, 2020).

26.     South Carolina currently does not have a statewide law mandating the use of a face covering. Relatedly, only approximately 24% of counties and 23% of municipalities in South

---

[6] Beyond those previously outlined, the court notes Governor McMaster has issued numerous other executive orders related to COVID-19, which underscores the seriousness and severity of the pandemic. *See Executive Order No. 2020-10* (Mar. 17, 2020) (prohibiting restaurants from providing certain on-premises consumption); *Executive Order No. 2020-12* (Mar. 20, 2020) (facilitating "social distancing" measures); *Executive Order No. 2020-13* (Mar. 23, 2020) (prohibiting or dispersing gatherings of three or more unless authorized or in the home); *Executive Order No. 2020-17,* (Mar. 31, 2020) (closure of non-essential businesses, venues, facilities, services and activities for public use directing that non-essential businesses be closed); *Executive Order No. 2020-18* (Apr. 3, 2020) (closure of additional non-essential businesses); *Executive Order No. 2020-30* (May 1, 2020) (rescinding mandatory self-quarantine requirements and lodging and travel restrictions for individuals entering South Carolina from "area[s] with substantial community spread of COVID-19"); *Executive Order No. 2020-31* (May 3, 2020) (permitting restaurants to provide outdoor customer dining services in addition to off-premises consumption services); *Executive Order No. 2020-33* (May 8, 2020) (postponing enumerated elections until July 14, 2020); *Executive Order No. 2020-34* (May 8, 2020) (authorizing limited indoor dining services and rescinding previously imposed boating restrictions); *Executive Order No. 2020-35* (May 12, 2020) (authorizing state correctional institutions and local detention facilities to suspend visitation processes, closing all public schools to in-person instruction for the remainder of the 2019-2020 academic year, requiring 911 call-center dispatchers to ask whether any individual of the requesting household has tested positive for COVID-19, and suspending "certain rules and regulations . . . for commercial vehicles and operators of commercial vehicles" to "facilitate the prompt . . . delivery of [ ] critical resources, supplies, and personnel"); *Executive Order No. 2020-36* (May 15, 2020) (authorizing select businesses "previously deemed 'non-essential'" to re-open with enumerated restrictions including gyms, spas, pools, spin studios, barber shops, nail salons, and tattoo parlors); *Executive Order No. 2020-40* (June 11, 2020) (declaring a state of emergency, permitting previously prohibited organized gatherings of fifty or more people in a single room or outdoor space so long as they abide by federal- and state-issued health guidelines, authorizing the re-opening of all retail stores so long as they abide by the aforementioned health guidelines, and permitting the re-opening of bowling alleys).

Carolina have ordinances requiring the use of a face covering in public. *See* S.C. EMERGENCY MANAGEMENT DIV., https://scemd.maps.arcgis.com/apps/opsdashboard/index.html#/83d7888fef 084a89b7677e76e35cf928 (last visited Sept. 10, 2020) (outlining mask mandates in eleven counties and sixty-one municipalities); MUN. ASS'N OF S.C., https://www.masc.sc/about/sc-muni cipalities/municipal-online-directory/by-cog (last visited Sept. 15, 2020) (listing a total of 46 counties and 270 municipalities in South Carolina).

27.    As of September 17, 2020, African Americans accounted for 26.4% of all cases and 35.0% of all deaths related to COVID-19 in South Carolina. *South Carolina County-Level Data for COVID-19*, https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-co vid-19/south-carolina-county-level-data-covid-19 (last visited Sept. 17, 2020).

28.    South Carolina has reported more than 134,000 cases and 3,132 deaths due to COVID-19. *Cases and Deaths in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-upd ates/us-cases-deaths.html (last visited Sept. 15, 2020). When the court issued its prior injunction in May, 10,096 cases and 435 deaths had been reported in South Carolina. *Thomas*, 2020 WL 2617329, at *7.

D.    Changes to South Carolina Voting Procedures

29.    On March 30, 2020, Defendant Andino, in her capacity as the Executive Director of the South Carolina Election Commission ("SCEC"), wrote to several elected officials, including Governor McMaster, to relay the SCEC's "concern[ ] about the safe conduct of the June Primaries, November General Election and all other elections scheduled for 2020." (ECF No. 1-1 at 2.) As a result, the SCEC urged consideration of "emergency changes to [the] election process" to protect the "more than three million voters and election workers during or following a pandemic." (*Id.* at 3.) Defendant Andino suggested certain options that represent "proven methods used in other states

11

3:20-cv-01730-JMC    Date Filed 09/18/20    Entry Number 109    Page 12 of 71

to conduct elections[,]" including removing the requirement that an individual witness an absentee voter's signature on a ballot envelope. (*Id.*) In her letter, Defendant Andino also recommended "no excuse absentee voting." (*Id.*)

30.    On May 12, 2020, the South Carolina General Assembly passed legislation allowing all qualified voters to vote by absentee ballot for the June 9, 2020 primary and the June 23, 2020 runoff election due to the current state of emergency. S. 635, 123rd Gen. Assemb. (S.C. 2020). The pertinent portion of the bill states, as follows, in Section 2(A):

> **Elections, absentee ballots, during the state of emergency, expiring on July 1, 2020**. Section 2. A. A qualified elector must be permitted to vote by absentee ballot if the qualified elector's place of residence or polling place is located in an area subject to a state of emergency and there are fewer than forty-six days remaining until the date of the election.

*Id.* (emphasis in original).

31.    On June 9, 2020, South Carolina held its primary elections. However, some poll workers failed to show for the elections, resulting in polling place closures and consolidations, and in turn voters forming longer lines. (ECF Nos. 78-16, 78-17.) Additionally, "[o]ver 1,500 [absentee] ballots arrived after the Election Day Cutoff . . . and did not count." (ECF No. 77 at 17.) *Historical Absentee Reports*, S.C. ELECTION COMM'N, https://www.scvotes.gov/historical-absentee-reports (last visited Sept. 14, 2020) (navigate to "2020 Statewide Primaries (Final)" link). Such problems arose despite Defendants previously informing the court that federal and state authorities would award Defendants $7.6 million to assist with additional voting precautions during this pandemic. *Thomas*, 2020 WL 2617329, at *7.

32.    On June 22, 2020, the CDC updated its guidance for voters in advance of election day to include washing hands after voting, wearing a mask, social distancing with at least six feet, "consider[ing] voting alternatives . . . that minimize contact[,]" and "avoid[ing] crowds . . . ."

*Considerations for Election Polling Locations and Voters*, https://www.cdc.gov/coronavirus/201

9-ncov/community/election-polling-locations.html (last visited Aug. 28, 2020). Likewise, the

CDC recommends election officials and poll workers wear masks, encourage voters to do the

same, social distance, ensure adequate supplies to support healthy hygiene, clean and disinfect

surfaces, manage lines and crowds, ensure ventilation, modify layouts to adhere to social

distancing, and erect physical barriers and floor decals for guidance. *Id.* Further, the CDC suggests

that election officials should "offer alternative voting methods that minimize direct contact and

reduce crowd size at polling locations," where available. *Id.*

33.    On July 17, 2020, Defendant Andino again wrote to elected officials to relay the

SCEC's concerns about the upcoming November 2020 General Election. (ECF No. 94-1.) She

explained that "[v]oter turnout and absentee voting in a General Election are significantly higher

than in primaries." (*Id.*) Such voter turnout means "social distancing at polling places will be far

more difficult, and in some places, will be impossible." (*Id.*) Exacerbating the problem is that

"[p]oll manager shortages are expected to be more extreme." (*Id.*) Defendant Andino concluded

by making various recommendations to address these problems, including removal of the Witness

Requirement. (*Id.*)

34.    On September 15, 2020, the South Carolina General Assembly passed legislation

allowing all qualified voters to vote by absentee ballot for the November 2020 General Election

due to the current state of emergency. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020). The bill

specified that absentee ballot applications must be received "before: (a) 5:00 p.m. on Saturday,

October 24, 2020, if submitted by mail; (b) 5:00 p.m. on Friday, October 30, 2020, if submitted

in-person, or by the qualified elector's authorized representative; or (c) 5:00 p.m. on Monday,

November 2, 2020, for a qualified elector who appears in person." *Id.* at § 3. The next day,

Governor McMaster signed H.B. 5305 into law. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

E.    South Carolina Absentee Voting Procedures Generally

35.    Before receiving an absentee ballot, an individual must complete an application that provides a reason for the request to vote absentee.[7] S.C. Code Ann. § 7-15-340 (2004). Voters, under penalty of a misdemeanor, must swear and affirm they have provided accurate information in their absentee ballot applications. *Id.*

36.    Upon receipt of the application, election officials confirm the voter "validly completed" their application, S.C. Code Ann. § 7-15-370 (1996), by ensuring the application includes the voter's name, registration certification number, address, absentee address, election or ballot request, election date, runoff preference, party preferences, reason for request, signed oath, and signature. S.C. Code Ann. § 7-15-340. Election officials then send a blank absentee ballot to the voter. S.C. Code Ann. § 7-15-370.

37.    After receiving an absentee ballot, the voter fills out the ballot, seals it within a previously provided envelope, and affirms and signs an oath on the outside of the envelope. S.C. Code Ann. § 7-15-220 (2011). Specifically, the voter must swear and affirm they are qualified to vote, have not yet voted, are returning their ballot in the designated envelope, signed the envelope, and received no improper assistance. S.C. Code Ann. § 7-15-380 (2014). An additional space is provided on the envelope for a witness to sign. S.C. Code Ann. § 7-15-380 (2011). "A ballot may not be counted unless the oath is properly signed and witnessed." S.C. Code Ann. § 7-15-420 (2006).

38.    The SCEC begins sending absentee ballots to voters thirty days before an election.

---

[7] As noted above, on September 15, 2020, the General Assembly authorized all South Carolinians to vote absentee in the upcoming election, regardless of whether voters have a qualifying excuse. *See* H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

*Absentee Voting*, https://www.scvotes.gov/absentee-voting (last visited Sept. 15, 2020). The deadline to request an absentee ballot is ten days before an election. S.C. Code Ann. § 7-15-330 (2020).

39.     By state law, candidates or paid campaign staff are prohibited from returning voters' completed absentee ballots to election officials. S.C. Code Ann. § 7-15-385 (1996). A violation of the Candidate Collection Ban is subject to a felony conviction. *Id.*

40.     South Carolina's general election is scheduled for November 3, 2020. *Schedule of Elections*, https://www.scvotes.gov/schedule-elections (last visited Sept. 15, 2020) (follow "2020 Elections" link). All mail-in absentee ballots must be received by the county by 7:00 p.m. on election day in order to be counted. S.C. Code Ann. § 7-15-230 (1976).

F.     The Lawsuit Generally

41.     Plaintiffs Tedder, Middleton, Wells, Dixon, Winbush, and Moore are all persons allegedly registered to vote in the State of South Carolina. (*See* ECF Nos. 69 at 5–8 ¶¶ 11–17; 77 at 21–23.)

42.     Plaintiffs allege that Plaintiffs Tedder and Middleton are candidates in the upcoming November 2020 General Election who would like to assist voters with returning absentee ballots. (ECF No. 69 at 5–6 ¶¶ 11–13.)

43.     Plaintiffs allege that Plaintiff Wells is African American and over 65 years of age, thereby in the category of persons at a high risk for contracting COVID-19. (*Id.* at 6–7 ¶ 14.)

44.     Plaintiffs allege that Plaintiff Dixon is at a high risk for contracting COVID-19 because he is African American, over sixty-five years of age, and has underlying medical conditions. (*Id.* at 7 ¶ 15.)

45.     Plaintiffs allege that Plaintiff Winbush is African American and has expressed

concern about herself and other voters being able to practice social distancing in the upcoming elections. (*Id.* at 7–8 ¶ 16.)

46.     Plaintiffs allege that Plaintiff Moore is in a high-risk category for COVID-19 because she is African American, over sixty-five years of age, and lives alone. (*Id.* at 8 ¶ 17.)

47.     Plaintiff SCDP is allegedly a political party within the meaning of S.C. Code Ann. § 7-1-20 (2020) and is the South Carolina state party committee of the national Democratic Party. (ECF No. 69 at 8–9 ¶ 18.) The SCDP allegedly acts on behalf of itself and its members, is a political party that actively supports candidates, and mobilizes and assists voters during election cycles. (*Id.*)

48.     Plaintiff DNC is allegedly the national committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). (ECF No. 69 at 10 ¶ 19.) The DNC allegedly assists with the election of candidates of its party to public office, including candidates in South Carolina, and mobilizes voters to vote for its candidates and causes. (*Id.*)

49.     Plaintiff DCCC is allegedly the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). (ECF No. 69 at 10–11 ¶ 20.) The DCCC allegedly assists with the election of candidates of its party to the U.S. House of Representatives, including candidates from South Carolina, and mobilizes and registers voters to support their candidates. (*Id.*)

50.     On May 1, 2020, Plaintiffs filed their Complaint for Injunctive and Declaratory Relief. (ECF No. 1.) In their Complaint, Plaintiffs pleaded claims for Denial or Abridgement of the Right to Vote on Account of Age under the Twenty-Sixth Amendment of the United States Constitution and 42 U.S.C. § 1983 (Absentee Ballot Age Restriction); Undue Burden on the Right to Vote under the First Amendment and Equal Protection Clause of the United States Constitution

and 42 U.S.C. § 1983 (Absentee Ballot Age Restriction, Postage Tax, Witness Requirement, Absentee Assistance Ban); Imposition of a Poll Tax under the Fourteenth Amendment and Twenty-Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983; Vote Denial under § 2 of the Voting Rights Act, 52 U.S.C. § 10301 (Postage Tax, Witness Requirement, Election Day Cutoff, Absentee Ballot Age Restriction, and Absentee Assistance Ban); Freedom of Speech and Infringement of Speech under the First Amendment and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 (Absentee Assistance Ban); and Violation of Section 208 of the Voting Rights Act of 1965, 52 U.S.C. § 10508 Preemption (Absentee Assistance Ban). (ECF No. 1 at 31–44.)

51.     On May 7, 2020, Plaintiffs filed their first Motion for Preliminary Injunction (ECF No. 13), pursuant to Federal Rule of Civil Procedure 65, to address, *inter alia*, the immediate and severe effects that the coronavirus pandemic had on the primary election on June 9, 2020, and the run-off election thereafter. Plaintiffs focused their Motion on three requirements that allegedly threatened South Carolinians' right to vote during the COVID-19 pandemic: (1) the Witness Requirement; (2) the Election Day Cutoff; and (3) the Absentee Age Restriction. (ECF No. 13 at 7.)

52.     The court subsequently issued an Order enjoining enforcement of the Witness Requirement solely for the June 2020 Primaries, and denying Plaintiffs' other requested relief. (ECF No. 37.) The court further ordered Defendants to immediately and publicly inform South Carolina about the elimination of the Witness Requirement for absentee voting in the June 2020 Primaries. (*Id.*)

53.     No party appealed the court's preliminary injunction for the Witness Requirement. As a consequence, the Witness Requirement was not in effect for the June 2020 Primaries.

54.    On July 8, 2020, Defendants filed a Motion for Judgment on the Pleadings (ECF No. 56), which the court thereafter denied in its entirety (ECF No. 71).

55.    On July 21, 2020, Plaintiffs filed an Amended Complaint, which removed their Postage Tax claims but otherwise pleaded claims substantively identical to those in the initial Complaint. (ECF No. 69.)

56.    Plaintiffs filed their second Motion for Preliminary Injunction on August 3, 2020. (ECF No. 77.) Plaintiffs seek a preliminary injunction that: (1) prohibits Defendants from enforcing the Absentee Age Restriction for the November 2020 General Election; (2) prohibits Defendants from enforcing the Witness Requirement for all voters for the November 2020 General Election; (3) prohibits Defendants from enforcing the requirement that absentee ballots must be received by 7:00 p.m. on election day to be counted and extending the deadline to November 9, provided that the ballots were postmarked or mailed on or before November 3; (4) gives county election officials until November 10 to complete the canvass and certify the results to the State Board of Canvassers; (5) prohibits election officials from releasing results until after 7:00 p.m. on November 9, *see* Fed. R. Civ. P. 65; (6) enjoins the Candidate Collection Ban; (7) orders Defendants to publicly inform all South Carolina voters about the elimination of these requirements in coordination with city and county election officials; and (8) grants such other and further relief as the court finds necessary. (ECF No. 77 at 60.)

57.    In support of their Motion for Preliminary Injunction, Plaintiffs primarily rely on their Memorandum of Law (ECF No. 77), reply briefing (ECF Nos. 98, 104), and various attachments (*see* ECF Nos. 77-1 through 77-8, 78-1 through 78-24, 98-1 through 98-3)).

58.    Given the passage of H.B. 5305, which authorizes all South Carolinians to vote absentee, Plaintiffs' challenge to the Absentee Age Restriction for the November 2020 General

Election is moot. (*See* ECF No. 31 (admitting that, for the June 2020 Primaries, the Absentee Age Restriction was moot after the General Assembly took action to allow all voters to vote absentee).)

59.    On August 17, 2020, Defendants and SCGOP respectively filed Responses in Opposition to the Motion for Preliminary Injunction. (ECF Nos. 93, 94.)

60.    In opposing Plaintiffs' Motion for Preliminary Injunction, Defendants rely on their Memorandum of Law (ECF No. 93) and supporting attachments (ECF Nos. 93-1 through 93-8).

61.    In opposing Plaintiffs' Motion for Preliminary Injunction, SCGOP relies on its Memorandum of Law (ECF No. 94) and supporting attachments (ECF Nos. 94-1, 94-2).

62.    On August 21, 2020, the court entered an Order allowing President Peeler and Speaker Lucas to intervene. (ECF No. 96.)

63.    On August 31, 2020, President Peeler and Speaker Lucas respectively filed Responses in Opposition to the Motion for Preliminary Injunction. (ECF Nos. 100, 101.)

64.    In opposing Plaintiffs' Motion for Preliminary Injunction, President Peeler relies on his Memorandum of Law. (ECF No. 100.)

65.    In opposing Plaintiffs' Motion for Preliminary Injunction, Speaker Lucas relies on his Memorandum of Law (ECF No. 101) and supporting attachment (ECF No. 101-1).

G.    Motion Hearing on Preliminary Injunction

66.    The instant matter before the court for review is Plaintiffs' Motion for a Preliminary Injunction filed on August 3, 2020. (ECF No. 77.)

67.    On September 11, 2020, the court held a hearing on the pending Motion for Preliminary Injunction. (*See* ECF No. 107.) In addition to reviewing the parties' submissions, the court heard oral argument from the parties' counsel. (*Id.*)

68.    Because the South Carolina Senate had already passed legislation related to

absentee voting procedures, the court informed the parties at the hearing that it would wait for the South Carolina House of Representatives to meet during its scheduled September 15, 2020 Special Session before issuing a decision.

## II.    FINDINGS OF FACT[8]

1.    The court reiterates that the mission of the SCEC is "to ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count." *SCEC About Us*, https://www.scvotes.org/about-sec (last visited Sept. 17, 2020).

2.    As the Executive Director of the SCEC, Defendant Andino is the Chief Administrative Officer for the State Election Commission. S.C. Code Ann. § 7-3-20 (A) (2014). She is required to supervise the conduct of elections and the voter registration process by all persons involved in the election process and conduct post-election analysis of such activities. S.C. Code Ann. § 7-3-20 (C)(1) and (2) (2014).

3.    The declaration of Dr. Joseph F. John, Jr., an epidemiologist and Clinical Professor at the Department of Medicine, Division of Infectious Diseases at the Medical University of South Carolina, stated that,

> to a reasonable degree of medical certainty, a voter will reduce his or her risk of catching or transmitting COVID-19 by minimizing their contacts with individuals outside of the home. In the context of voting, this means that voting by mail carries less risk than voting in person. For those voters who live alone, casting a ballot without a witness signature carries less risk than casting a ballot with a witness signature

---

[8] To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted. Moreover, as this is a preliminary injunction, any facts identified "are not final determinations of disputed matters." *EZ Gard Indus., Inc. v. XO Athletic Co.*, No. 07-CV-4769-JMR/FLN, 2008 WL 1827490, at *1 n.1 (D. Minn. Apr. 23, 2008).

(ECF No. 77-1 at 9 ¶ 40.)

4.      Dr. Marc Meredith, a tenured political science professor at the University of

Pennsylvania, opined by declaration

> that COVID-19 will increase the number of South Carolinians who are
> disenfranchised by the witness requirement on mail-ballot envelopes. COVID-19
> increases difficulty of getting a mail-ballot envelope properly witnessed for those
> potential voters who rarely come into contact with at least one person who could
> witness the mail-ballot envelope. Getting a mail-ballot envelope properly witnessed
> is particularly burdensome for potential voters who live by themselves, particularly
> if they are practicing vigilante [sic] social distancing because they perceive
> themselves to be at a high risk if they are infected with COVID-19.

(ECF No. 77-2 at 27–28 ¶ 47.) Dr. Meredith further "conclude[d] that COVID-19 makes a witness

signature requirement even more burdensome than normal on African American and elderly

voters[,]" due to a higher probability that individuals within these demographics live alone. (*Id.* at

29 ¶ 50.)

5.      Additionally, Lieutenant Pete Logan, a longtime member of the State Law

Enforcement Division ("SLED"), asserted by declaration that "[t]he witness requirement for

absentee ballots provides SLED, and all criminal investigators, with a significant investigative lead

to pursue in these cases because it provides another potential witness to interview." (ECF No. 94-

2 at ¶ 6.)

## III.    CONCLUSIONS OF LAW

1.      The parties make numerous arguments regarding the meritorious value of

Plaintiffs' claims. The court finds that Plaintiffs have met their burden under the standard the

United States Supreme Court set out in *Winter*[9] and reiterated by the Fourth Circuit in *Real Truth*[10]

---

[9] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).
[10] *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

for a preliminary injunction as to the Witness Requirement. The court begins by examining threshold issues related to Plaintiffs' claims, including jurisdiction, standing, abstention, and non-justiciability, before turning to the requirements set forth in *Winters* and *Real Truth* for a preliminary injunction.

A.     Jurisdiction

2.     The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Plaintiffs assert claims against Defendants under 42 U.S.C. § 1983, which permits an injured party to bring a civil action against a person who, acting under color of state law, ordinance, regulation, or custom, causes the injured party to be deprived of "any rights, privileges, or immunities secured by the Constitution and laws." Specifically, Plaintiffs allege violations of their rights based on the First, Fourteenth, and Twenty-Sixth Amendments of the United States Constitution; the Voting Rights Act of 1965, 52 U.S.C. § 10301, 10508; and 42 U.S.C. § 1983. (ECF No. 69 at 30, 31, 34, 36, 38.)

B.     Standing

3.     Standing implicates the court's subject matter jurisdiction and is governed by Federal Rule of Civil Procedure 12(b)(1). *See Crumbling v. Miyabi Murrells Inlet*, LLC, 192 F. Supp. 3d 640, 643 (D.S.C. 2016). "It is well established that standing is a threshold jurisdictional issue that must be determined first because '[w]ithout jurisdiction the court cannot proceed at all in any cause.'" *Covenant Media of N.C., LLC v. City of Monroe, N.C.*, 285 F. App'x 30, 34 (4th Cir. 2008) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

> To possess the constitutional component of standing, a party must meet three requirements: (1) [the party] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

4.    "The party attempting to invoke federal jurisdiction bears the burden of establishing standing." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citation omitted).

5.    "To establish Article III standing, an injury must be 'concrete, particularized and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). To be particularized, an injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). "There must be some connection between the plaintiff and the defendant that '[ ]differentiate[s]' the plaintiff so that his injury is not 'common to all members of the public.'" *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance," as long as "each individual suffers a particularized harm." *Spokeo, Inc.*, 136 S. Ct. at 1548 n.7.

6.    "[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Baker v. Carr*, 369 U.S. 186, 206 (1962).

7.    Moreover, "[i]n multi-plaintiff cases, '[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.'" *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *11 (M.D.N.C. Aug. 4, 2020) (quoting *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017)). So long as one Plaintiff "'has demonstrated standing to assert these rights as his own,' the court 'need not consider whether the

other individual and corporate plaintiffs have standing to maintain the suit.'" *Democracy N.C.*, 2020 WL 4484063, at *11 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977)); *see Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (noting "that a case is justiciable if some, but not necessarily all, of the plaintiffs have standing as to a particular defendant") (citation omitted); *cf. United States v. Students Challenging Reg. Agency Proc. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (noting an alleged injury need not be substantial because an "identifiable trifle is enough for standing") .

8.      Relatedly, "an organization has organizational standing (1) when a defendant's actions impede its efforts to carry out its mission, and (2) forcing the organization to divert its resources in order to address the defendant's actions." *Democracy N.C.*, 2020 WL 4484063, at *12 (internal marks omitted) (citing *Lane v. Holder*, 703 F.3d 668, 674–75 (4th Cir. 2012)). The court examines each of Plaintiffs' claims for standing in turn.[11]

    *i.   Witness Requirement*

9.      Accepting as true the allegations in Plaintiffs' Amended Complaint, Plaintiff Moore has standing to challenge the Witness Requirement. Plaintiff Moore is a registered voter in South Carolina and/or integrally connected to the electoral process, and has alleged a "concrete, particularized, and actual or imminent" injury. *Clapper*, 568 U.S. at 409. (*See* ECF No. 69 at 8 ¶ 17.) Specifically, "Plaintiff Moore is eligible to vote absentee, but lives alone and must necessarily come into contact with an individual outside of her home to fulfill the Witness Requirement." (ECF No. 98 at 12 n.1.)

---

[11] The court previously found that all Plaintiffs had standing to bring their lawsuit. *Thomas v. Andino*, No. 3:20-CV-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020). Due to further discovery since the court's prior Order, as well as the filing of an Amended Complaint, the court reexamines the issue of standing.

10.    In terms of the alleged injury, this court finds "that requiring absentee voters to seek out contact with another person, even [while] adhering to social distancing requirements, still places the voters at sufficient risk to constitute a cognizable injury for standing purposes." *Democracy N.C.*, 2020 WL 4484063, at \*14 (finding standing for the plaintiffs' challenge to North Carolina's one witness requirement for absentee voting) (citing *People First of Ala. v. Merrill*, Civil Action No. 2:20-cv-00619-AKK, 2020 WL 3207824, at \*6 (N.D. Ala. June 15, 2020) (finding standing for plaintiffs' challenge to Alabama's two witness requirement for absentee voting and observing that "a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote")); *cf. Students Challenging Reg. Agency Proc. (SCRAP)*, 412 U.S. at 690 fn.14 (noting an alleged injury need not be substantial; an "identifiable trifle is enough for standing").

11.    Moreover, even assuming Plaintiff Moore had a possible witness who could sign an absentee ballot envelope while adhering to social distancing protocols, she would nonetheless have alleged an injury sufficient for standing. At this stage Plaintiffs simply are not required to prove an inability to procure a witness in order to have standing to challenge the Witness Requirement. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667–68 (1966) (inability of a voter to pay a poll tax is not required to challenge the statute imposing such tax); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (reasoning "the lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification to vote in person"); *Lewis v. Hughs*, Civil Action No. 5:20-cv-00577-OLG, 2020 WL 4344432, at \*9 (W.D. Tex. July 28, 2020) ("Indeed, courts find standing for voters challenging state [mail-in] voting requirements such as the challenged restrictions at issue here, even in situations where those voters could still vote.") (citations omitted).

25

12.     Plaintiffs have likewise met the remaining elements of standing. The alleged injury is fairly traceable to Defendants and Intervenors, who represent the SCEC and legislative branch of South Carolina and are collectively charged with administering elections in a fair and impartial manner. S.C. Const. art. II, § 10. Moreover, the alleged injury could be judicially redressed by the requested relief. Accordingly, the individual Plaintiffs have standing to challenge the Witness Requirement.

13.     Lastly, because at least one Plaintiff has standing for the Witness Requirement, the court need not address whether any other Plaintiffs have standing to challenge this issue. *Democracy N.C.*, 2020 WL 4484063, at *14 (citing *Bostic*, 760 F.3d at 370-71).

ii.     *Election Day Cutoff*

14.     Defendants claim Plaintiffs lack standing to challenge the Election Day Cutoff simply because "[n]ot a single individual Plaintiff claims to have had a problem with returning an absentee ballot by the deadline. Thus, they don't have an injury this Court can redress." (ECF No. 93 at 51.)

15.     Here, the individual Plaintiffs have standing to challenge the Election Day Cutoff. Specifically, Plaintiffs Wells and Dixon have both alleged that, due to delays receiving and then sending an absentee ballot by mail, they are concerned their votes will not be counted. (ECF No. 98 at 13 n.1.) This injury is further solidified by the recent disenfranchisement of absentee voters in the prior June 2020 Primaries. Specifically, it is uncontested that over 1,500 absentee ballots, submitted in a timely manner by voters, were not received before the cutoff on election day and thus were not counted. *See New Ga. Project v. Raffensperger*, No. 1:20-CV-01986-ELR, 2020 WL 5200930, at *8 (N.D. Ga. Aug. 31, 2020) (finding standing for challenge to absentee ballot deadline and noting that, "while voters have no judicially enforceable interest in the outcome of

an election, they do have an interest in their ability to vote and in their vote being given the same weight as any other.") (internal marks omitted) (citing *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1202 (11th Cir. 2020) *vacated and rev'd on other grounds*, No. 19-14552, 2020 WL 5289377 (11th Cir. Sept. 3, 2020)).

16.     Moreover, the alleged injury is fairly traceable to Defendants and Intervenors, who represent the SCEC and legislative branch of South Carolina and are collectively charged with administering elections in a fair and impartial manner. S.C. Const. art. II, § 10. And the alleged injury can be judicially redressed by the requested relief. Plaintiffs thus have standing to challenge the Election Day Cutoff. *Democracy N.C.*, 2020 WL 4484063, at *11 (explaining that if one Plaintiff has standing for a claim, "the court need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit") (citation and internal marks omitted).

*iii.     Candidate Collection Ban*

17.     Defendants claim the organizational Plaintiffs lack standing to challenge the Candidate Collection Ban because "the organizational Plaintiffs do not identify a single member who claims to be burdened by this prohibition." (ECF No. 93 at 69.) It does not appear Defendants challenge standing for the individual Plaintiffs. Nonetheless, the court finds Plaintiffs Middleton and Tedder, each a political candidate in the upcoming November 2020 General Election, have alleged they would assist voters with absentee ballot voting but for the assistance ban on candidate assistance. (ECF No. 98 at 13 n.1.) Moreover, Plaintiffs Middleton and Tedder alleged the Candidate Collection Ban curtails the ability for their campaigns to communicate their respective messages. (*Id.*) This alleged injury, however slight, is sufficient for standing.

18.     The alleged injury is fairly traceable to Defendants and Intervenors, who represent the SCEC and legislative branch of South Carolina and are collectively charged with administering

27

elections in a fair and impartial manner. S.C. Const. art. II, § 10. The alleged injury likewise may be redressed through judicial remedy. Plaintiffs thus have standing to challenge the Candidate Collection Ban.[12] *Democracy N.C.*, 2020 WL 4484063, at *11 (explaining that if one Plaintiff has standing for a claim, "the court need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit") (citation and internal marks omitted).

C.    Abstention

19.    Defendants and Intervenors argue the court should abstain due to a pending suit before the Supreme Court of South Carolina.[13] (ECF Nos. 93 at 82; 94 at 18–19; 100 at 7–8; 101 at 9–10.) Intervenors further contend the court should abstain from the issues arising from this case due to a pending special session scheduled by the South Carolina General Assembly[14] and the principle that the state legislature has broad deference to administer elections. (ECF No. 100 at 6-7.) Speaker Lucas and President Peeler further stress voting requirements surrounding COVID-19 amount to policy questions reserved to the South Carolina General Assembly. (*Id.* at 3–4, 101 at 4–9.) For support, Intervenors look to courts in other circuits that purportedly support abstention

---

[12] Although the Absentee Ballot Restriction claim has been mooted for the November 2020 General Election, Plaintiffs appear to seek relief on this claim beyond the upcoming election. (ECF No. 69 at 41.) The court finds Plaintiffs Middleton, Tedder, and Winbush have standing to challenge the Absentee Ballot Restriction. Each Plaintiff is under the age of sixty-five, and each alleges they will be injured by being unable to vote absentee in future elections during the pandemic simply because of their respective ages. (*Id.* at ¶¶ 11–12, 16.) The alleged injury is fairly traceable to Defendants and Intervenors, who represent the SCEC and legislative branch of South Carolina and are collectively charged with administering elections in a fair and impartial manner, S.C. Const. art. II, § 10, and may be redressed through judicial remedy.

[13] As of September 18, 2020, it appears the Supreme Court of South Carolina has cancelled the hearing scheduled for *Duggins v. Lucas*, the state action at issue here, with no indication of whether the hearing will be rescheduled. *Supreme Court - Roster of Cases for Hearing*, https://www.sccourts.org/supremeRosters/dspSupRosterMenu.cfm (last visited Sept. 18, 2020).

[14] The General Assembly has since met and passed legislation allowing all voters to participate in absentee voting for the November 2020 General Election, which the Governor later signed. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

28

in the instant case. (ECF Nos. 100 at 2; 101 at 11–13.)

20.     A federal court abstaining from its "exercise of federal jurisdiction is the exception, not the rule[,]" amounting to "an extraordinary and narrow exception." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Accordingly, the court's "task is not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, . . . to justify the surrender of that jurisdiction." *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 208 (4th Cir. 2006) (citations and internal marks omitted). Before examining whether to abstain under *Colorado River*, the court must first determine the threshold issue of whether the present action is parallel to the state proceeding. *Id.*; *vonRosenberg v. Lawrence*, 849 F.3d 163, 168 (4th Cir. 2017) (citations omitted).

21.     Generally, "[s]uits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Great Am. Ins. Co.*, 468 F.3d at 207 (strictly construing the requirement "that the parties involved be almost identical"). Yet "even state and federal claims arising out of the same factual circumstances do not qualify as parallel if they differ in scope or involve different remedies." *vonRosenberg*, 849 F.3d at 168. The court may invoke *Colorado River* abstention "only if it concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Id.* (citation and internal marks omitted). "If there is any serious doubt that the state action would resolve *all* of the claims, 'it would be a serious abuse of discretion' to abstain." *Id.* (citation and internal marks omitted) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)).

22.     If the suits are found to be parallel, the court must then carefully weigh several factors before deciding to abstain:

(1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights . . . . A court must look at these factors holistically, with the balance heavily weighted in favor of the exercise of jurisdiction.

*vonRosenberg*, 849 F.3d at 168 (citations and internal marks omitted).

23.     Here, the state and federal court actions are not sufficiently parallel to justify invoking the "exceptional circumstance[]" of abstention.[15] For one, the parties are not identical. While the SCEC, Speaker Lucas, and President Peeler are named defendants in the state action,[16] none of Plaintiffs are parties in the lawsuit.[17] (ECF No. 94-4 at 1.) Abstention in favor of the state proceeding would thus deny Plaintiffs the ability to litigate their claims. *Great Am. Ins. Co.*, 468 F.3d at 208 (declining abstention and noting that "to abstain in favor of the Alabama state court actions would deprive [the plaintiff] of the opportunity to litigate its claim."). Accordingly, the lack of identical parties between the state and federal actions is sufficient to decline to abstain under *Colorado River*. *See Great Am. Ins. Co.*, 468 F.3d at 207 (strictly construing the requirement "that the parties involved be almost identical").

24.     Additionally, while overlap does exist between the state and federal actions, the state action differs by bringing diverse claims and seeking more varied and specific relief in response to South Carolina's voting requirements. (ECF No. 94-1 at 37–39.) Particularly, the state

---

[15] In support of abstention, SCGOP attached a petition to the Supreme Court of South Carolina that in part sought leave to file a complaint and expedite the litigation process. (ECF No. 94-1.)

[16] Speaker Lucas and President Peeler did not intervene in this case until August 21, 2020. (ECF No. 96.)

[17] Even if one of SCDP's "employees is counsel of record for the petitioner in" the state action (ECF No. 93 at 82), the court finds this connection insufficient to amount to substantially identical parties.

action requests the Supreme Court of South Carolina to

> implement and execute the following procedures: (1) no-excuse absenteeism, (2) online absentee applications, (3) eliminating the absentee witness requirement for return envelopes, (4) drop box absentee returns, (5) additional time for election officials to count absentee ballots, (6) designated curbside voting polling locations, (7) electronic ballot delivery (like the one used for military voters) to disabled voters and first responders, (8) early voting, and (9) vote-by-mail.

(*Id.*) Such relief differs from the instant case in certain respects. The state action does not challenge the Candidate Collection Ban, and requests several specific types of relief not sought in the instant case. (*Id.*) The state action also appears to request "additional time" for *counting* ballots, while Plaintiffs go further and explicitly seek a six-day extension for absentee ballots to *arrive* to be counted. (ECF No. 69 at 42.) Moreover, the two suits concern different types of claims, as Plaintiffs bring claims under the Constitution and federal law, while the state action invokes South Carolina's constitution. (ECF Nos. 69, 94-1.)

25. It also appears the state action seeks relief for only the upcoming November 2020 General Election, while here the requested relief extends to future elections in which COVID-19 potentially remains a risk. (*Compare* ECF No. 94-1 at 37–39 (asking the Supreme Court of South Carolina to implement Defendant Andino's requested plan, which relates to the November 2020 General Election), *with* ECF No. 69 at 41–42 (seeking certain relief "in the context of the coronavirus").) *See also New Beckley Mining Corp. v. Int'l Union*, 946 F.2d 1072 (4th Cir. 1991) (finding a state and federal action were not parallel because the remedies sought and issues presented were not the same); *cf. S.C. Green Party v. S.C. State Election Comm'n*, 647 F. Supp. 2d 602, 611 (D.S.C. 2009), *aff'd*, 612 F.3d 752 (4th Cir. 2010) ("[W]hile there is some overlap in parties and issues, the difference in the scope of issues presented in the state and federal cases suggests that the cases are not parallel.").

26. Although the state action's challenges to the Witness Requirement and absentee

31

excuse requirements could moot Plaintiffs' related challenges for the November 2020 General Election, the resolution of the state action would not "resolve *all* of [Plaintiffs' remaining] claims[.]" *vonRosenberg*, 849 F.3d at 168 (citation and internal marks omitted). Nor would it resolve Plaintiffs' claims that extend beyond the November 2020 General Election. As a consequence, "it would be a serious abuse of discretion to abstain," because the state and federal cases do not ride parallel tracks. *Id.* (citation and internal marks omitted).

27.    Yet even going further and assuming the two suits are parallel, the court finds the balance of factors under *Colorado River* weighs in favor of declining to abstain. *See vonRosenberg*, 849 F.3d at 168 (citations and internal marks omitted). First, the instant case's subject matter does not involve *in rem* jurisdiction over real property. Second, the federal forum is not inconvenient in large part because the South Carolina Supreme Court sits only one mile away from this court. Third, piecemeal litigation would likely not result, as the two suits' claims and relief are dissimilar in certain respects (as discussed above). To the extent piecemeal litigation could result, the court finds this factor outweighed by the others. Fourth, the order of filing favors the federal court, as Plaintiffs filed the instant case on May 1, 2020 (ECF No. 1), while the state action was filed on July 31, 2020 (ECF No. 94-1). Fifth, federal, as opposed to state, law is the relevant authority when deciding the merits of this case. Sixth and finally, the state proceedings likely would not protect Plaintiffs' rights because the claims and relief sought in the two cases differ. After a "holistic[]" review of the above factors, "with the balance heavily weighted in favor of the exercise of jurisdiction," the court finds abstention unwarranted. *vonRosenberg*, 849 F.3d at 168 (citations and internal marks omitted).

28.    Intervenors' arguments for abstention under *Pullman* likewise fall flat. The *Pullman* abstention doctrine applies in cases presenting a federal constitutional issue which might

be mooted or presented in a different posture by a state court determination of pertinent law. *Colo. River Water Conservation Dist.*, 424 U.S. at 814 (noting the need to evaluate the *adequacy of the state proceeding* to protect the parties' rights) (emphasis added). Specifically, the Fourth Circuit has found that *Pullman* abstention requires "(1) an unclear issue of state law presented for decision, (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Md. Chapter of Am. Massage Therapy Ass'n, Inc. v. State of Md.*, 928 F.2d 399 (4th Cir. 1991) (examining an unclear issue of state law on the definition of "therapeutic massage") (citing *Edu. Servs. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170 (4th Cir. 1983); *Shell Island Inv. v. Town of Wrightsville Beach, N.C.*, 900 F.2d 255 (4th Cir. 1990) (finding that "'abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction'") (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 (1984)).

29.    Here, no party argues the state statutes challenged by Plaintiffs are unclear or uncertain in their terms. Indeed, the statutes at issue clearly limit one class of eligible absentee voters to those over sixty-five, require an individual be present to witness an absentee ballot signature, set the deadline to receive absentee ballots for the November 2020 General Election, and ban candidates from collecting and returning voters' absentee ballots. Rather than ambiguity with the statutes themselves, the essential contention appears to be whether such statutes violate the United States Constitution and federal law during the pandemic. *Pullman* abstention is thus unwarranted.

30.    *Burford* abstention is also cursorily cited in Intervenors' briefing. (ECF No. 100 at 8–9.) The court finds the narrow and exceptional circumstances of this doctrine are not present in the instant case. *See Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007) (explaining that "*Burford*

permits abstention when federal adjudication would 'unduly intrude' upon 'complex state administrative processes' because either: (1) 'there are difficult questions of state law . . . whose importance transcends the result in the case then at bar'; or (2) federal review would disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern'") (citation omitted).

31.     Examples of *Burford* abstention in the Fourth Circuit include "when federal adjudication would interfere with state receivership proceedings and disrupt the state's efforts to provide a unified method for liquidation of debtor's assets," as well as "when federal adjudication would require federal court to answer disputed questions of state gaming law that . . . powerfully impact the welfare of state citizens and requested relief would effectively establish parallel federal and state oversight of the state video poker industry." *Id.* at 365 (citations and internal marks omitted). The court does not believe the statutory voting scheme in South Carolina amounts to a "complex state administrative process[]," nor would the court's ruling, which implicates the fundamental right to vote, amount to an undue intrusion.[18] *Id.* at 364.

32.     Intervenors also argue that, "[w]hile perhaps not phrased through reference to the traditional abstention categories, the appellate system has repeatedly frozen district court orders that have attempted to rewrite state absentee-voting procedures in response to purported COVID-19 concerns with a common theme: Stay out of these disputes." (ECF No. 100 at 10–11.)

33.     The United States Supreme Court has explained that courts must weigh,

> in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an

---

[18] Likewise, the court notes that abstention under *Younger* is inapplicable because the instant case does not involve any of the "exceptional circumstances" outlined by the Supreme Court that would warrant such abstention. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).

election draws closer, that risk will increase.

*Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006); *accord Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (compiling cases in which the Supreme Court stayed injunctions on voting requirements that were issued fifty-two, forty, and thirty-three days before the election, respectively, and observing "[w]hile the Supreme Court has not explained its reasons for issuing these stays, the common thread is clearly that the decision of the Court of Appeals would change the rules of the election too soon before the election date").

34.    Intervenors are correct that, more recently, the Supreme Court has stayed a number of challenges related to voting laws during the pandemic. Several of these opinions provide no reasoning for support. *Clarno v. People Not Politicians*, No. 20A21, 2020 WL 4589742, at *1 (U.S. Aug. 11, 2020) (staying without discussion the Ninth Circuit's injunction that required the state to reduce the number of signatures necessary to place an initiative on the November election ballot); *Tex. Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020) (denying without discussion a motion to vacate the Fifth Circuit's stay after lower court enjoined certain voting laws fifty-six days before election); *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049, at *1 (U.S. July 2, 2020) (staying without discussion the district court's ruling enjoining certain voting laws approximately one month before the election).

35.    However, the Supreme Court has offered some explanation as to why it stayed a recent injunction that sought to extend the deadline to receive absentee ballots in Wisconsin. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020). In *Republican National Committee*, the parties consented to extending the deadline to receive absentee ballots for an upcoming election from April 7 to April 13. *Id.* at 1206. The district court issued an injunction to this effect, but went a step further and allowed all absentee ballots post-marked by April 13 to

be counted, despite the fact the plaintiffs never asked for this relief in their motion. *Id.* After issuing the order, the district court "issue[d] a subsequent order enjoining the public release of any election results for six days after election day."[19] *Id.* at 1207. In its ruling, the Supreme Court found that, "[b]y changing the election rules so close to the election date and by affording relief that the plaintiffs themselves did not ask for in their preliminary injunction motions, the District Court contravened this Court's precedents and erred by ordering such relief." *Id.* The Supreme Court further observed it was "highly questionable . . . that [the district court's] attempt to suppress disclosure of the election results for six days after election day would work. And if any information were released during that time, that would gravely affect the integrity of the election process." *Id.* The Supreme Court ultimately stayed the injunction in part. *Id.* at 1208.

36.     By contrast, the Supreme Court has declined to stay at least one consent decree that changed voting laws near an upcoming election. In *Common Cause R.I. v. Gorbea*, the First Circuit reasoned that two unique circumstances set the case before it apart from other cases in which the Supreme Court stayed or declined to lift stays on injunctions. 970 F.3d 11, 16 (1st Cir. 2020). First, the parties, including "the elected constitutional officers charged with ensuring free and fair elections[,]" consented to the changes to voting laws.[20] *Id.* And,

> [s]econd, Rhode Island just conducted an election without any attestation requirement, in which 150,000 mail-in ballots were requested. **So the status quo (indeed the only experience) for most recent voters is that no witnesses are required**. Instructions omitting the two-witness or notary requirement have been on the state's website since at least mid-July. *See* Rhode Island Department of State, Vote from Home with a Mail Ballot, https://vote.sos.ri.gov/Voter/VotebyMail. And to the extent certain voters expect the two-witness or notary requirement, we cannot imagine that it will pose any difficulty not to

---

[19] The district court issued its first order nine days before the election and its second order four days before the election.

[20] Only the intervenor, a political party, opposed the consent decree. On appeal, the Supreme Court noted that a political party "lack[s] a cognizable interest in the State's ability to 'enforce its duly enacted' laws." *Republican Nat. Comm. v. Common Cause R.I.*, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)).

have to comply with it. For this reason, the consent judgment and decree poses no conflict with the sort of expectations that concerned the court in *Purcell* and no substantial specter of confusion that might deter voters from voting. To the contrary, in the absence of the consent decree, it is likely that many voters will be surprised when they receive ballots, and far fewer will vote. Perhaps as a result, the Republicans make no claim that the decree will cause a decrease in election participation.

*Id.* at 16–17 (emphasis added).

37.    Thereafter, the Supreme Court agreed, declining to stay the order and explaining that

[u]nlike *Merrill v. People First of Alabama*, 591 U.S. —— (2020), . . ., and other similar cases where a State defends its own law, here the state election officials support the challenged decree, and no state official has expressed opposition . . . . The status quo is one in which the challenged requirement has not been in effect, given the rules used in Rhode Island's last election, and many Rhode Island voters may well hold that belief.

*Republican Nat'l Comm. v. Common Cause R.I.*, 2020 WL 4680151, at *1; *see also League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 4927524, at *14 (W.D. Va. Aug. 21, 2020) (explaining a prior consent decree set a new status quo in Virginia that "the witness signature requirement is not enforced during the pandemic").

38.    In short, out of several recent decisions examining pandemic-related injunctions on certain voting requirements, the Supreme Court has offered little to no reasoning in its opinions. In the two decisions in which it offered reasoning, the Supreme Court focused on whether a court altered the status quo of election rules near an election and observed that no state official offered opposition. *Republican Nat'l Comm.*, 140 S. Ct. at 1206-07; *Republican Nat'l Comm.*, 2020 WL 4680151, at *1.

39.    Here, the court declines to enjoin the Election Day Cutoff claim based on concerns outlined in *Purcell* and *Republican National Committee*. The court does so primarily because, since the court's May Order issuing a preliminary injunction, the Supreme Court has stayed several

cases in which a lower court previously enjoined certain voting requirements weeks before an election. *See also Republican Nat'l Comm.*, 140 S. Ct. at 1207 (chastising the lower court for "changing the election rules so close to the election date"). South Carolina's November 2020 General Election is close enough in time to warrant concern, as it stands only forty-seven days away. Within this limited timeframe, Plaintiffs seek to require Defendants to extend the receipt of absentee ballots by six days and conceal the election results during the extension, including the Presidential election. Such an extension at this stage would create uncertainty in part by shortening deadlines connected to election day. For instance, Defendants point to numerous deadlines tied to the November 2020 General Election, including deadlines to canvass votes, certify election results at the county and state levels, and order potential recounts; the number of days in which voters have to protest an election; and the deadline to meet and resolve disputes among electors regarding the presidential election in the United States. (ECF No. 93 at 59–61.) An extension to receive absentee ballots would in turn shorten the timeframe in which the state could complete the above tasks. At this point, an injunction changing election rules to effectively delay proceedings by six days could impact the state's ability to efficiently administer the November 2020 General Election.

40.    In the same vein, Plaintiffs seek a remedy that the Supreme Court has described as "highly questionable," because an "attempt to suppress disclosure of the election results for six days after election day would [likely not] work. And if any information were released during that time, that would gravely affect the integrity of the election process." *Republican Nat'l Comm.*, 140 S. Ct. at 1207. Accordingly, the court declines to enjoin the Election Day Cutoff.[21]

---

[21] The court previously declined to enjoin the Election Day Cutoff in its May 2020 Order. *Thomas*, 2020 WL 2617329, at *30. While Plaintiffs now point to issues with mail delivery by the United States Postal Service, as well as evidence of absentee ballots sent but not received before the election deadline in the June 2020 Primaries, the court notes the reasoning in its prior Order remains applicable. (*Id.* at 25-26 (explaining an election deadline extension is likely a "significant

41.    Next, however, *Purcell* and *Republican National Committee* do not implicate the Witness Requirement in South Carolina. The Supreme Court has repeatedly noted "that lower federal courts should ordinarily not *alter* the election rules on the eve of an election. *Id.* (emphasis added) (first citing *Purcell*, 549 U.S. at 127; then citing *Frank v. Walker*, 574 U.S. 929 (2014); & then citing *Veasey v. Perry*, 135 S. Ct. 9 (2014)). South Carolina recently held the June 2020 Primaries without the Excuse Requirement (due to legislative action) and the Witness Requirement (by this court's order). By not contesting the decision on appeal, the parties allowed a new status quo to be set in South Carolina for voting requirements. "So the status quo (indeed the only experience) for most recent voters is that" the Witness Requirement is not required. *Common Cause R.I.*, 970 F.3d at 16 (explaining the state election commission's suspension of Rhode Island's two witness requirement for its June 2020 Primaries set a new status quo for the September and November 2020 elections); *see League of Women Voters of Va.*, 2020 WL 4927524, at \*14 ("Indeed, the previous consent decree [for the June 23, 2020 primaries] has set a new status quo in Virginia—one in which the witness signature requirement is not enforced during the pandemic.") (citing *Republican Nat'l Comm. v. Common Cause R.I.*, 2020 WL 4680151, at \*1).

42.    Moreover, the South Carolina General Assembly has again suspended the Excuse Requirement for the November 2020 General Election. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020). Just as in the last election, voters will likely expect the same restrictions to be suspended

---

debate-worthy policy consideration[]" but concluding that, "[u]nlike the Witness Requirement, the most significant obstacles to . . . Plaintiffs' ability to meet the June 9, 2020 deadline are principally unrelated to the COVID-19 pandemic's health risks and the burdens, if any, imposed by the deadline are minimal").) Moreover, it appears that in response to such concerns, the General Assembly recently moved the deadline in which to request absentee ballots by mail to October 24, 2020. *See* H.B. 5305, 123rd Gen. Assemb. (S.C. 2020). Thus, particularly when viewed through the lens of repeated stays of the Supreme Court, this court declines to enjoin the Election Day Cutoff.

for the November 2020 General Election, including the Witness Requirement. And "to the extent certain voters expect the [Witness Requirement, the court] cannot imagine that it will pose any difficulty not to have to comply with it." *Common Cause R.I.*, 970 F.3d at 16. At this stage, "[t]o change the status quo set by the June election by [enforcing the Witness Requirement] would likely do more to confuse and deter voters."[22] *League of Women Voters of Va.*, 2020 WL 4927524, at *14.

43.     It is true no consent decree exists in this case, and, similar to the cases recently stayed by the Supreme Court, state officials contest the Witness Requirement. Yet the court believes such opposition does not foreclose the court's review of the Witness Requirement, particularly because the requirement was suspended during the prior election. Moreover, at least one election official, Defendant Andino, has expressed her support for suspending the Witness Requirement and believes it will not be difficult or costly. (ECF Nos. 1-1; 78-1.)

44.     As Executive Director of the SCEC, Defendant Andino is charged with supervising the conduct of elections and the voter registration process. S.C. Code Ann. § 7-3-20 (C)(1) (2020). The mission of the SCEC is "to ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count." *SCEC About Us*, https://www.scvotes.org/about-sec (last visited Sept. 13, 2020).

45.     Although certainly not binding, Defendant Andino's recommendations outlining

---

[22] Indeed, it appears the SCEC has done little up to this point to inform absentee voters about the status of the Witness Requirement since the June 2020 primaries. The SCEC's website appears to contain only one sentence that states "July 1, 2020 - All Recent Absentee Changes No Longer in Effect." *Coronavirus (COVID-19) Updates*, S.C. ELECTION COMM'N, https://www.scvotes.gov/coronavirus-covid-19-updates (last visited Sept. 12, 2020). Such a bare explanation is next to meaningless to the public without further explanation as to what changes occurred and what is no longer in effect, including the changes concerning the Witness Requirement. Moreover, the site includes no reference to any pending litigation that could impact voting requirements.

what she believes are necessary changes to election procedures are relevant to the court's analysis. *See also Harding v. Edwards*, Civil Action 20-495-SDD-RLB, 2020 WL 5371350, at *3 (M.D. La. Sept. 7, 2020) (noting that while Louisiana's Secretary of State's "public comments are not binding legal analysis," the Secretary's decision to "repeatedly declare that [an emergency voting pandemic plan] will have to be decided in court" was relevant to the court's political question analysis) (internal marks omitted); *League of Women Voters of Va.*, 2020 WL 4927524, at *14 (explaining that the Virginia State Board of Elections, which sought to suspend the witness requirement, "actually has experience in enforcing Virginia's absentee ballot scheme and investigating Virginia election fraud"). Defendant Andino, perhaps one of the most qualified individuals to speak on election procedures in South Carolina, has consistently supported the Witness Requirement's suspension throughout the COVID-19 pandemic. (ECF Nos. 1-1, 78-1.) Thus, the court will further examine whether the Witness Requirement should be enjoined below.

46.     Lastly, the court assumes without deciding that the Candidate Collection Ban does not implicate concerns raised in *Purcell* and *Republican National Committee*. For the reasons discussed below, the court finds the Candidate Collection Ban is not likely to succeed on the merits and therefore should not be enjoined.

47.     In sum, the court declines to enjoin the Election Day Cutoff and the Candidate Collection Ban. But given the unique circumstances surrounding the Witness Requirement, which distinguish this case from those recently stayed by the Supreme Court, the court does not believe the concerns raised in *Purcell* and *Republican National Committee* implicate South Carolina's Witness Requirement at this time.[23]

---

[23] Similarly, SCGOP argues Plaintiffs' claims are barred by the doctrine of *laches* primarily because "[t]hese laws have been on the books for years, and the plaintiffs have followed them in prior elections." (ECF No. 94 at 22.) The doctrine of *laches* is an affirmative defense to equitable

D.    Political Question

48.    Next, Intervenors posit the issues raised in this case amount to non-justiciable political questions. (ECF Nos. 94 at 4–5, 16–21; 100 at 2–6; 101 at 4–9.) Intervenors contend that the court has no judicially discoverable and manageable standard with which to resolve the instant claims.[24] (ECF Nos. 94 at 17–18; 100 at 4–5.) Moreover, related to their arguments above, Intervenors point to the upcoming November 2020 General Election and warn "that lower federal courts should ordinarily not alter the election rules on the eve of an election." (ECF No. 94 at 35 (citing *Republican Nat'l Comm.*, 140 S. Ct. at 1207).)

49.    While the Supreme Court has enumerated a number of situations that may raise political questions, Intervenors focus primarily on whether there exists a "lack of judicially discoverable and manageable standards for resolving" Plaintiffs' challenges.[25] *Baker*, 369 U.S. at 217.

50.    At least two district courts have dismissed challenges to voter laws during the pandemic based on non-justiciable political questions. *Coalition for Good Governance v.*

---

relief, and Defendants must prove a "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012) (citing *Costello v. United States*, 365 U.S. 265, 282, 81 (1961)). Defendants have not shown a lack of diligence by Plaintiffs because the initial Complaint was filed on May 1, 2020, shortly after the onset of the COVID-19 pandemic. (ECF No. 1.) Regarding Plaintiffs' facial challenge to the Candidate Collection Ban, Defendants have not sufficiently met their burden and shown Plaintiffs Middleton and Tedder, two candidates in the upcoming November 2020 General Election, lacked diligence in pursuing their claim.

[24] Defendants likewise briefly make this claim. (ECF No. 93 at 80–81.)

[25] SCGOP further claims that South Carolina has a "textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker*, 369 U.S. at 217, evinced by the Constitution's grant of authority to the states to administer elections (ECF No. 94 at 16–17). Tellingly, SCGOP cites to no precedent, either within or outside of the Fourth Circuit, to support this specific proposition. (*Id.*) The court is consequently unconvinced that a political question arises here simply because the Elections Clause of the Constitution broadly grants the states authority to administer elections.

*Raffensperger*, No. 1:20-CV-1677-TCB, 2020 WL 2509092, at *3–4 (N.D. Ga. May 14, 2020) (dismissing plaintiffs' claims as nonjusticiable political questions because "ordering [d]efendants to adopt [p]laintiffs' laundry list of so-called "Pandemic Voting Safety Measures" would require the Court to micromanage the State's election process"); *Mi Familia Vota v. Abbott*, No. SA-20-CV-00830-JKP, 2020 WL 5366291, at *9 (W.D. Tex. Sept. 7, 2020) (relying on *Coalition* to conclude the plaintiffs' claims in essence amounted to political questions that "challenge[d] the prudence of Texas' policies, plans and procedures for combating the COVID-19 virus within the 2020 election").

51.     Even so, the Fifth Circuit declined to dismiss claims related to absentee voting as non-justiciable in *Texas Democratic Party v. Abbott*, 961 F.3d 389, 398–99 (5th Cir. 2020), and instead distinguished the circumstances in *Coalition*. Specifically, the Fifth Circuit explained that *Coalition* "challenged the *wisdom* of Georgia's policy choices" by attacking specific voting procedures, "such as whether to use electronic voting machines or paper ballots," rather than raising substantive constitutional issues. *Id.* at 398 (emphasis in original). By contrast, the claim before the Fifth Circuit sought to allow all Texans to vote absentee by interpreting the term "disability" to include those without immunity to COVID-19. *Id.* at 394. The Fifth Circuit explained that "[t]he standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights."[26] *Id.* at 399. Thereafter, the Fifth Circuit again found no political question prevented judicial review in a claim involving a Twenty-Sixth

---

[26] The Fifth Circuit ultimately granted a stay on the lower court's preliminary injunction. The Supreme Court thereafter issued a short opinion denying a motion to vacate the Fifth Circuit's stay, and did not raise the issue of non-justiciable political questions. *Tex. Democratic Party*, 140 S. Ct. 2015. In fact, Justice Sotomayor noted the "application raises weighty but seemingly novel questions regarding the Twenty-Sixth Amendment . . . . I hope that the Court of Appeals will consider the merits of the legal issues in this case well in advance of the November Election." *Id.*

Amendment challenge to Texas' absentee voting requirements. *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *7–8 (5th Cir. Sept. 10, 2020).

52.    Several district courts have followed the Fifth Circuit's reasoning. *New Ga. Project*, 2020 WL 5200930, at *10 n.18 (relying on *Texas Democratic Party* and finding plaintiffs' challenges to voting laws during the pandemic were justiciable); *Democracy N.C.*, 2020 WL 4484063, at *21 (similar); *People First of Ala.*, 2020 WL 3207824, at *12 (similar); *see Harding*, 2020 WL 5371350, at *3 (observing the "judicially discoverable and manageable standards" to resolve voting law challenges included the court's longstanding power to enforce the fundamental right to vote).

53.    Other courts, including the Supreme Court in several instances, have examined whether to stay recent injunctions enjoining certain voting requirements without raising the issue of non-justiciable political questions. *See Tex. Democratic Party*, 140 S. Ct. 2015; *Merrill*, 2020 WL 3604049, at *1; *Republican Nat'l Comm.*, 140 S. Ct. at 1208; *People First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505 (11th Cir. 2020); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *1–2 (7th Cir. Apr. 3, 2020). At bottom, it appears in numerous instances federal courts—including the Supreme Court and the Fifth, Seventh, and Eleventh Circuits—have either rejected or not raised the issue of non-justiciability when examining voting claims during the COVID-19 pandemic.

54.    By contrast, the Supreme Court of South Carolina recently found non-justiciable political questions stemming from absentee voting requirements. *Bailey v. S.C. State Election Comm'n*, 430 S.C. 268, 271 (S.C. 2020). In *Bailey*, plaintiffs essentially sought universal absentee voting, and asked the Supreme Court of South Carolina "to construe the term 'physically disabled person'"—which was one category of persons qualified to vote absentee—to extend "to those

practicing social distancing to avoid contracting or spreading the illness COVID-19." *Id.* at 273. In its analysis, the Court first noted that plaintiffs' claim did not bring a constitutional challenge, yet nonetheless implicated the fundamental right to vote. *Id.* at 271. The Court then explained that recent activity by the state legislature, which authorized all South Carolinians to vote absentee, mooted plaintiffs' request for universal absentee voting for the June 2020 Primaries. *Id.* at 273–74. For elections afterwards, the Court observed the legislature's recent acts were "a clear indication the absentee voting statutes did not already permit" plaintiffs' broad construction of a "physically disabled person." *Id.* at 274. The Court thus declined to interpret such definition broadly "because the Legislature answered the question of statutory interpretation with absolute clarity when it changed the law to permit all voters to vote absentee, and then sunset the new law for elections held after July 1." *Id.* at 275. Lastly, the Court declined to change the law simply because of plaintiffs' remaining "implicit argument as to what the law should be," and instead dismissed the claims as non-justiciable political questions. *Id.*

55.     Here, the court finds Plaintiffs' instant claims do not present non-justiciable political questions. Plaintiffs have raised substantive issues under the Constitution and federal law. These substantive issues are distinguished from the claims in *Coalition* that challenged the wisdom of the state's policy choices by targeting specific voting procedures. Additionally, the Supreme Court; Fifth, Seventh, and Eleventh Circuits; and several other district courts have examined issues similar to the instant claims without raising non-justiciability.[27]

56.     Moreover, the instant case is distinguished from the Supreme Court of South

---

[27] And as discussed above, the limited guidance accompanying the Supreme Court's recent stays has emphasized the perils of altering the status quo for voting requirements near an election. That is not the case here, as the court enjoined the Witness Requirement for the last election and the parties did not appeal the decision. Thus, the status quo for recent voters is that the Witness Requirement is not in effect.

Carolina's decision in *Bailey*, as Plaintiffs bring constitutional and federal law claims, and do not attempt to reinterpret an already-clear state statute. Rather than an "implicit argument as to what the law should be," Plaintiffs moor their claims to constitutional standards. Lastly, the court notes that the "judicially discoverable and manageable standards" to resolve voting law challenges include the court's longstanding power to enforce the fundamental right to vote. *Harding*, 2020 WL 5371350, at *3. Accordingly, the court finds Plaintiffs' claims do not implicate non-justiciable political questions.

E.    Voting

57.    The right to vote and have that vote counted is "a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). In this regard, "[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote and to have their votes counted." *Id.* at 554 (internal citations and marks omitted).

F.    Preliminary Injunctions

58.    A preliminary injunction[28] arises from Federal Rule of Civil Procedure 65, but "is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. To obtain a

---

[28] Rather than a mandatory preliminary injunction, Plaintiffs argue they seek a prohibitory preliminary injunction, because in essence they look to "maintain the status quo" of the "last uncontested status between the parties which preceded the controversy," which is South Carolina's last pre-pandemic election. (ECF No. 98 at 15 n.2 (citing *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)).) *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014) ("A preliminary injunction may be characterized as being either prohibitory or mandatory . . . . [w]hereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.") (internal marks and citations omitted); *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances.") (citations omitted); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (citation omitted) ("The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."). Plaintiffs argue

preliminary injunction, Plaintiffs must establish all four of the following elements: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.*; *Real Truth*, 575 F.3d at 346–47.

59.     For the first element, "plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." *Pashby*, 709 F.3d at 321 (citing *Winter*, 555 U.S. at 20). "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, *Real Truth*, 575 F.3d at 345, plaintiffs need not show a certainty of success[.]" *Id.* (citing 11A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2948.3 (2d ed. 1995).

60.     Second, *Winter* requires that the party requesting injunctive relief demonstrates it is likely to suffer irreparable harm absent the preliminary injunction. 555 U.S. at 22–23. The harm to be prevented must be of an immediate nature and not simply a remote possibility. *Am. Whitewater v. Tidwell*, No. 8:09-cv-02665-JMC, 2010 WL 5019879, at *11 (D.S.C. Dec. 2, 2010) (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).

61.     The third and fourth elements of the preliminary injunction test require Plaintiffs to clearly establish that the balance of equities tips in their favor and that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

62.     In cases involving significant public interest, courts may "consider the balance of

---

their requested relief would maintain the status quo of a pre-pandemic election because in essence voters would be able to cast their ballots without increased health risks. Defendants counter that Plaintiffs seek a mandatory injunction because the Witness Requirement was in effect at the most recent pre-pandemic election. The court finds it unnecessary to address the type of injunction sought because, under either standard, the extraordinary circumstances of the pandemic require the Witness Requirement be enjoined.

the equities and the public interest factors together." As the Fourth Circuit has explained:

> Even if Plaintiffs are likely to suffer irreparable harm in the absence of a
> preliminary injunction, we still must determine that the balance of the equities tips
> in their favor, "pay[ing] particular regard for the public consequences in employing
> the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S.
> 305, 312, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982). This is because "courts of equity
> may go to greater lengths to give 'relief in furtherance of the public interest than
> they are accustomed to go when only private interests are involved.'" *E. Tenn. Nat.
> Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry. Co. v.
> Sys. Fed'n* No. 40, 300 U.S. 515, 552, 57 S. Ct. 592, 81 L. Ed. 789 (1937)).

*Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017).

63.    A court considering whether to grant a preliminary injunction must therefore
"balance the competing claims of injury and must consider the effect on each party of the granting
or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill.
of Gambell*, 480 U.S. 531, 542 (1987)). "The court must also consider the balance of hardships
between the litigants and the impact on the public at large prior to issuing an injunction." *Uhlig,
LLC v. Shirley*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).

64.    The Fourth Circuit no longer recognizes a "flexible interplay among the four
criteria for a preliminary injunction." *De la Fuente v. S.C. Dem. Party*, 164 F. Supp. 3d 794, 798
(D.S.C. 2016) (citing *Real Truth*, 575 F.3d at 347). Each of these requirements "must be fulfilled
as articulated." *Id.*

65.    "The traditional purpose of a preliminary injunction is to 'protect the status quo and
to prevent irreparable harm during the pendency of the lawsuit ultimately to preserve the court's
ability to render a meaningful judgment on the merits.'" *Id.* (quoting *In re Microsoft Corp.
Antitrust Litig.*, 333 F.3d  at 525).

66.    Plaintiffs' remaining claims include an as-applied challenge to the Witness
Requirement only during the COVID-19 pandemic and a facial challenge to the Candidate

Collection Ban.[29] The court begins by examining the Witness Requirement.

G.    Witness Requirement

      i.    *Clear Showing of Likely Success on the Merits*

      67.    Plaintiffs contend they are substantially likely to succeed on the merits of their claim that Defendants' enforcement of the Witness Requirement, combined with the unique risks presented by the COVID-19 pandemic, violates the First and Fourteenth Amendment as applied to Plaintiffs during this state of emergency. (ECF No. 77 at 35–37.)

      68.    The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. CONST. amend. I.

      69.    The United States Constitution also "provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, and the Supreme Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

      70.    The Supreme Court has articulated a "flexible standard" to address "a [First and Fourteenth Amendment] challenge to a state election law." *Burdick*, 504 U.S. at 434. As the Supreme Court first explained in *Anderson v. Celebrezze*, the practical need for "substantial regulation of elections" means that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test[.]'" 460 U.S. 780, 788–89 (1983)

---

[29] As previously discussed, recent legislative action mooted Plaintiffs' Age Restriction claim, and the court declined to enjoin the Election Day Cutoff due to concerns raised in *Purcell* and *Republican National Committee*.

(quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

71.    Instead, to properly accommodate the "state's important regulatory interests" while vindicate individual constitutional rights, *Anderson* instructed the courts to carefully balance those interests:

> [A Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

460 U.S. at 789. The Supreme Court refined that test in *Burdick v. Takushi*, explaining that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *See* 504 U.S. at 434. Thus, a "severe" restriction on those rights triggers strict scrutiny. *Id.* But if the challenged election law "imposes only 'reasonable, non-discriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788).

72.    The Fourth Circuit has summarized the combined *Anderson-Burdick* inquiry as follows:

> In short, election laws are usually, but not always, subject to *ad hoc* balancing. When facing any constitutional challenge to a state's election laws, **a court must first determine whether protected rights are severely burdened**. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes."

*Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)) (emphasis added).

73.     Inherent in the rule is that the challenge only applies to protected rights. Plaintiffs and Defendants vigorously debate whether absentee voting is a right or a privilege. Intervenors are correct that under South Carolina law, absentee voting is a "privilege," not a right to vote itself. (ECF No. 94 at 26 (citing *State ex rel. McLeod v. Ellisor*, 192 S.E.2d 188 (S.C. 1972); *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809 (1969)).)

74.     However, simply because a right to absentee voting is not guaranteed by the First Amendment does not mean absentee voting is *per se* unprotected. For example, much like absentee voting, there is "no fundamental right to run for elective office." *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. April 20, 2020). Yet the Supreme Court has recognized laws restricting candidates' access to the ballot implicate the First Amendment because they "'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Id.*[30] (quoting *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968)); *see Democracy N.C.*, 2020 WL 4484063, at *23 (applying *Anderson-Burdick* test to absentee ballot requirement and citing this court's prior decision to apply *Anderson-Burdick* favorably); *League of Women Voters of Va. v. Va. State Bd. of Elections*, Case No. 6:20-CV-00024, —— F. Supp. 3d —— 2020 WL 2158249, at *7–9 (W.D. Va. May 5, 2020) (using the *Anderson-Burdick* framework to analyze a settlement related to Virginia's witness requirement for absentee voting).

---

[30] The Sixth Circuit later upheld the core of the district court's preliminary injunction enjoining Michigan from enforcing the statutory ballot-access provisions for political candidates in advance of Michigan's upcoming primary election under the framework established in *Anderson-Burdick*. *Esshaki v. Whitmer*, 813 F. App'x 170 (6th Cir. 2020).

51

75.    "While no court should lightly or carelessly enjoin enforcement of a statute, even temporarily, it is equally true that it is right and proper to do so when it appears that there is no other available method by which the rights of a citizen may be protected. One of such rights is the opportunity to litigate his rights in the courts." *Pocahontas Fuel Co. v. Early*, 13 F. Supp. 605, 608 (W.D. Va. 1935).

76.    Furthermore, akin to the court in *Price v. N.Y. State Bd. of Elections*, this court is faced with an unusual fact pattern resulting from unusual times:

> The fact pattern here is unusual, and our holding in this case is necessarily narrow. We do not hold that there is a general constitutional right to obtain absentee ballots. Nor do we hold that there is a constitutional right to obtain absentee ballots in all county committee races in New York State. Instead, after applying a deferential standard of review, and after examining the record in this as-applied challenge, we conclude that the arguments proffered by the State are so extraordinarily weak that they cannot justify the burdens imposed by [the restriction].

540 F.3d 101, 112 (2d Cir. 2008). Plaintiffs' Amended Complaint specifies they seek the relief on the Absentee Age Restriction, Witness Requirement, and Election Day Cutoff "during the current coronavirus crisis." (ECF No. 69 at 41.) More specifically, in their Motion for Preliminary Injunction Plaintiffs seek relief on these claims for the November 2020 General Election. (ECF No. 77 at 59.) Accordingly, Plaintiffs' claims amount to as-applied constitutional challenges based on the ongoing COVID-19 pandemic.[31]

77.    Here, the court finds the as-applied challenge to the Witness Requirement, when coupled with the ongoing COVID-19 pandemic, concerns a privilege that implicates a purportedly unconstitutional burden on the fundamental right to vote. As a consequence, the court finds that

---

[31] Numerous other courts have allowed challenges similar to the instant claims to proceed on the merits as applied to the COVID-19 pandemic. To name a few: *Tex. Democratic Party*, 961 F.3d 389; *People First of Ala.*, 815 F. App'x 505; *Democratic Nat'l Comm.*, 2020 WL 3619499; *New Ga. Project*, 2020 WL 5200930; *League of Women Voters of Va.*, 2020 WL 4927524; *Democracy N.C.*, 2020 WL 4484063; *People First of Ala.*, 2020 WL 3207824.

3:20-cv-01730-JMC    Date Filed 09/18/20    Entry Number 109    Page 53 of 71

the *Anderson-Burdick* framework applies to review the Witness Requirement.[32]

78.    Thus, under *Anderson-Burdick*, the court determines that, at this juncture, Plaintiffs have identified burdens inflicted by the Witness Requirement, which are at least of sufficient magnitude to warrant the injunction. *Anderson*, 460 U.S. at 789 (instructing that courts must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate").

79.    Plaintiffs' burdens include the risk of contracting COVID-19 when complying with the Witness Requirement. Transmission occurs through individuals showing symptoms of COVID-19 as well as, crucially, those who are asymptomatic. *Q&A: How is COVID-19 transmitted?*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-how-is-covid-19-transmitted (last visited Aug. 20, 2020). Thus, any witness or absentee voter runs the risk of unwittingly transmitting the virus when complying with the Witness Requirement. Relatedly, the CDC's most recent guidance explains COVID-19 may be transmitted by "touching a surface or object that has the virus on it," *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Sept. 8, 2020), which implicates further risk when physically handling a ballot. Thus, the potential for COVID-19 infection, either through a witness or other contact, amplifies Plaintiffs' burden of complying with the Witness Requirement.

80.    Additionally, such dangers are higher for those with certain conditions that make

---

[32] The court is not convinced the rational basis review test outlined by the Supreme Court in *McDonald v. Bd. of Election Comm'rs of Chicago* is the appropriate standard to apply here, particularly when viewed through the lens of the ongoing COVID-19 pandemic. 394 U.S. at 807-08. Instead, as discussed above and consistent with the Court's May 2020 Order, it appears the instant challenges fall within the Supreme Court's subsequently decided cases that formulate the *Anderson-Burdick* framework.

them more susceptible to severe illness, who live alone, or are self-quarantining. *Id.* Plaintiffs have characteristics or conditions that put themselves or immediate family at a higher risk of developing severe health complications due to COVID-19. For instance, each of the individual Plaintiffs are African American; Plaintiffs Wells, Dixon, and Moore are over sixty-five years of age; Plaintiff Dixon has underlying health conditions; and Plaintiff Winbush cares for her eighty-six-year-old mother. (ECF No. 69 at 6-8 ¶¶ 14–17.) As a result of these characteristics or conditions, many have expressed concerns with risking their health by encountering others while voting. (*Id.*)

81.    Plaintiffs have also offered the expert declaration of Dr. Marc Meredith, who opined

> that COVID-19 will increase the number of South Carolinians who are disenfranchised by the witness requirement on mail-ballot envelopes. COVID-19 increases difficulty of getting a mail-ballot envelope properly witnessed for those potential voters who rarely come into contact with at least one person who could witness the mail-ballot envelope. Getting a mail-ballot envelope properly witnessed is particularly burdensome for potential voters who live by themselves, particularly if they are practicing vigilante [sic] social distancing because they perceive themselves to be at a high risk if they are infected with COVID-19.

(ECF No. 77-2 27 at ¶ 47.) Dr. Meredith further "conclude[d] that COVID-19 makes a witness signature requirement even more burdensome than normal on African American and elderly voters[,]" due to a higher probability that individuals within these demographics live alone. (*Id.* at 29 ¶ 50.)

82.    Similarly, Plaintiffs offer the expert declaration of Dr. Joseph John, who states that,

> to a reasonable degree of medical certainty, a voter will reduce his or her risk of catching or transmitting COVID-19 by minimizing their contacts with individuals outside of the home. In the context of voting, this means that voting by mail carries less risk than voting in person. For those voters who live alone, casting a ballot without a witness signature carries less risk than casting a ballot with a witness signature.

(ECF No. 77-1 9 at ¶ 40.)

83.    In recognition of this threat, the Governor has repeatedly taken action in response to the pandemic, including the recent renewal of a state of emergency in South Carolina. *Executive Order 2020-59* (Sept. 9, 2020). Moreover, as noted above, the General Assembly recognized the continuing magnitude of the COVID-19 threat by again allowing all voters to vote absentee. H.B. 5305, 123rd Gen. Assemb. (S.C. 2020).

84.    At the September 11, 2020 hearing, Defendants and Intervenors stated that cases were trending downward in South Carolina, implying the pandemic, and in turn the Witness Requirement, was not as burdensome on Plaintiffs. Yet it is significant that even with a purported "downward trend" of cases, the current seven-day moving average of new infections remains significantly higher than the daily infection rate leading up to the court's injunction last May. *COVID-19 in South Carolina*, https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/south-carolina-county-level-data-covid-19 (last visited Sept. 15, 2020). For instance, the court previously noted DHEC's announcements of 125, 199, 245, 248, and 209 new daily cases, respectively, in the days leading up to the court's prior Order. *Thomas* 2020 WL 2617329, at *7. Now, the daily average rate stands at 763 new cases, or over three times as high as in May. *COVID-19 in South Carolina*, https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/south-carolina-county-level-data-covid-19 (last visited Sept. 17, 2020).

85.    Indeed, in South Carolina COVID-19 cases have reached over 134,000, with 3,132 deaths. *Cases and Deaths in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last visited Sept. 17, 2020). At the time of the court's prior Order issuing an injunction in May, there were 10,096 reported cases of COVID-19 in South Carolina and 435 reported COVID-19-related deaths. *Thomas*, 2020 WL 2617329, at *7. And in fact, the trend of new daily cases has changed directions more than once since Plaintiffs filed the instant Motion.

*COVID-19 in South Carolina*, https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/south-carolina-county-level-data-covid-19 (last visited Sept. 17, 2020). The court thus finds little merit that a recent downward trend in cases reduces the burdens of the Witness Requirement.

86.     Moreover, masks and social distancing based on CDC guidelines will be recommended—but not enforced—at many polling places in South Carolina. Only 24% of counties and 23% of municipalities in South Carolina have ordinances requiring the use of a face covering in public. *See* S.C. EMERGENCY MGMT. DIV., https://scemd.maps.arcgis.com/apps/opsdashboard/index.html#/83d7888fef084a89b7677e76e35cf928 (last visited Sept. 17, 2020) (outlining mask mandates in eleven counties and sixty-one municipalities); MUN. ASS'N OF S.C., https://www.masc.sc/about/sc-municipalities/municipal-online-directory/by-cog (last visited Sept. 15, 2020) (listing a total of 46 counties and 270 municipalities in South Carolina). As a consequence, Plaintiffs' only options to cast a ballot are to either vote absentee and risk COVID-19 exposure through a witness or object, or vote in person and risk exposure to potentially many more individuals who may not be required to socially distance or wear a mask. Either choice imposes considerable burdens on Plaintiffs.

87.     In a recent case, the First Circuit succinctly described the burden imposed by a witness requirement.[33] As to a consent decree in Rhode Island, the First Circuit found

---

[33] However, at least one Circuit has found the burdens of a state's witness requirement on plaintiffs did not warrant an injunction. *Republican Nat'l Comm.*, 2020 WL 3619499, at *1–2. As discussed above, in a short opinion the Supreme Court subsequently issued a stay on remaining portions of the preliminary injunction because the injunction violated the principle "that lower federal courts should ordinarily not alter election rules on the eve of an election and afforded relief not sought in preliminary injunction motions." *Republican Nat'l Comm.*, 140 S. Ct. at 1207. Likewise, a district court within the Seventh Circuit recently found "the privilege of voting by mail does not implicate the fundamental right to vote," and as a consequence the plaintiffs could not show a likelihood of success under either *Anderson-Burdick* or *McDonald. Tully v. Okeson*, No. 1:20-CV-01271-JPH-

> [t]he burden imposed by [the witness] requirements in the midst of a pandemic is significant. First, many more voters are likely to want to vote without going to the polls and will thus only vote if they can vote by mail. Second, many voters may be deterred by the fear of contagion from interacting with witnesses or a notary. Could a determined and resourceful voter intent on voting manage to work around these impediments? Certainly. But it is also certain that the burdens are much more unusual and substantial than those that voters are generally expected to bear. Taking an unusual and in fact unnecessary chance with your life is a heavy burden to bear simply to vote.

*Common Cause R.I.*, 970 F.3d at 14–15.

88.    A district court in Virginia recently came to a similar conclusion when approving a consent decree for the state's June primaries:

> In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote. But these are not ordinary times. In our current era of social distancing-where not just Virginians, but all Americans, have been instructed to maintain a minimum of six feet from those outside their household-the burden is substantial for a substantial and discrete class of Virginia's electorate.

*League of Women Voters of Va.*, 2020 WL 2158249, at *8.[34] Accordingly, the court finds Plaintiffs have shown they will suffer a significant burden if forced to comply with the Witness Requirement.

89.    Once burdens are identified, a court evaluating a constitutional challenge to an election regulation must weigh the asserted burdens to the right to vote against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

90.    The Supreme Court has not identified any "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008). Rather, "[h]owever

---

DLP, 2020 WL 4926439, at *4 (S.D. Ind. Aug. 21, 2020). In the same vein, a district court within the Fourth Circuit recently found North Carolina's one witness requirement was not "unduly burdensome on even high-risk voters." *Democracy N.C.*, 2020 WL 4484063, at *33.

[34] Subsequently, the district court again approved a consent decree for the November 2020 elections and relied on the same reasoning. *League of Women Voters of Va.*, 2020 WL 4927524, at *9.

slight that burden may appear," the reviewing court must find that it is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

91.     But courts are not required to blindly accept a state's assertion that its interests are enough to outweigh a burden, and instead a court must examine whether a particular interest is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.*

92.     While states certainly have an interest in investigating absentee voter fraud and ensuring voter integrity, the interest will not suffice absent "evidence that such an interest made it necessary to burden voters' rights[.]" *Fish v. Schwab*, 957 F.3d 1105, 1133, (10th Cir. 2020) (affirming injunction against Kansas's documentary proof of citizenship requirement for voter registration).

93.     "In passing judgment, the court must . . . determine the legitimacy and strength of each of those interests [and] it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789

94.     For a state interest, Defendants and Intervenors shift their argument from the prior Motion for Preliminary Injunction and now assert "[t]he Witness Requirement serves an important law-enforcement investigatory function."[35] (ECF No. 93 at 49.) They specifically point to Lieutenant Logan, a longtime member of SLED who by declaration explained that "[t]he witness requirement for absentee ballots provides SLED, and all criminal investigators, with a significant

---

[35] In opposition to the prior preliminary injunction, Defendants argued the Witness Requirement was justified because it was intended to ensure the integrity of elections and offer protection from voter fraud. (ECF No. 32 at 5-6.) At the same time, Defendants admitted the Witness Requirement was ineffective to prevent absentee ballot fraud. The court ultimately enjoined the Witness Requirement for the June 2020 Primaries.

investigative lead to pursue in these cases because it provides another potential witness to interview." (ECF Nos. 93-8 at 2 ¶ 6; 94-2 at 2 ¶ 6.)

95.     The court agrees that, in the abstract, the state has a significant interest in investigating voter fraud. But the specific means of promoting that interest–here, the Witness Requirement–is marginal. *See also Common Cause R.I.*, 970 F.3d at 15 (explaining the state had a "substantial and important" interest in preventing voter fraud, but "the incremental interest in the specific regulation at issue (the two-witness or notary requirement) is marginal at best"). The sole evidence of the state's purported "important law-enforcement investigatory function" is the short declaration of Lieutenant Logan. (ECF Nos. 93-8; 94-2.) Yet the court is not required to take the state's conclusory assertions at face value simply because one veteran law enforcement officer describes the Witness Requirement as providing a "significant" lead in fraud investigations. (ECF Nos. 93-8 at 2 ¶ 6; 94-2 at 2 ¶ 6.)

96.     Moreover, Defendants' claims of an important investigatory interest are further diluted by scant underlying evidence of any absentee ballot fraud. Put differently, the fact the Witness Requirement may provide a lead to investigate absentee fraud is undercut by an utter dearth of absentee fraud. Indeed, the recent June 2020 Primaries occurred without the Witness Requirement and resulted in little to "no evidence of fraud . . . much less material evidence of the type of fraud that could be prevented by the [Witness Requirement] in the first place." *Common Cause R.I.*, 970 F.3d at 15. Specifically, Lieutenant Logan's declaration notes that he has one "ongoing investigation into allegations of fraudulent absentee voting in South Carolina," yet does not specify if this lone case arose from the June 2020 Primaries or if the Witness Requirement has assisted with his investigation. (ECF Nos. 93-8 at 2 ¶ 5; 94-2 at 2 ¶ 5.) Defendants and Intervenors do not raise other recent instances of alleged or actual absentee fraud in their briefing.

97.    Similarly, the court finds Defendant Andino's recent letter to election officials further dilutes the state's outlined interest. Just as she did for the June 2020 Primaries,[36] Defendant Andino sent a letter to elected officials to "express[] concerns about the pandemic and its impact on the conduct of all elections scheduled for 2020," and "underscore serious concerns related to the sage and efficient conduct of the November General Election." (ECF No. 78-1 at 1.) Defendant Andino noted that, "[t]wo weeks prior to the primaries, [this] court suspended the witness requirement for mail-in absentee ballots for the primary and runoffs only. This action gave voters the opportunity to cast their ballot in self-isolation and quarantine." (*Id.*) She went on to recommend "emergency changes to our election process be made in order to safely and securely conduct the 2020 General Election during the COVID-19 pandemic" including to again "[r]emove the witness requirement for absentee return envelopes." (*Id.* at 3.)

98.    Defendants attempt to discount these statements as personal views that do not opine on the constitutionality of South Carolina's current election procedures. Moreover, Defendants now assert, based on their newly defined state interest, that Defendant Andino has "no role" in law enforcement's investigatory function for the Witness Requirement. (ECF No. 93 at 49.)

99.    Yet the court still considers Defendant Andino's letters to be relevant. *See also Harding*, 2020 WL 5371350, at *3 (noting the Louisiana Secretary of State's public comments were relevant to the court's political question analysis); *League of Women Voters of Va.*, 2020 WL

---

[36] Director Andino previously stated:

> Absentee voting also requires voters to have another person witness their signature when returning their ballot. While election officials check the voter's signature, the witness signature offers no benefit to election officials as they have no ability to verify the witness signature. Removing the requirement for a witness signature would remove a barrier many voters would likely encounter while in self-isolation.

(ECF No. 1-1 at 4.)

4927524, at *14 (explaining the Virginia State Board of Elections, which sought to suspend the witness requirement, "actually has experience in enforcing Virginia's absentee ballot scheme and investigating Virginia election fraud"). As previously discussed, Defendant Andino is charged with ensuring the fair and impartial administration of elections and is likely one of the most qualified individuals to opine on election procedures in South Carolina. The fact Defendant Andino previously stated the Witness Requirement "offers no benefit to election officials as they have no ability to verify the witness signature" bears on the state's investigatory interest, even if defense counsel attempts to narrow the scope of the interest to only law enforcement. (ECF No. 1-1 at 4.) It is further telling that, despite the Witness Requirement apparently offering a "significant" lead on fraud, Defendant Andino still recommends suspending it for the November 2020 General Election.

100.    Lastly, the state's purported investigatory interest in the Witness Requirement is further lessened due to its role in South Carolina's statutory scheme for absentee voting. The court finds it difficult to imagine how the Witness Requirement amounts to a significant state interest for investigating absentee fraud when the SCEC has already verified a voter's identity before sending an absentee ballot. S.C. Code Ann. § 7-15-370 (requiring election officials to ensure an absentee ballot application is "validly completed"). Election officials have no way to verify a witness' signature (ECF No. 1-1), and the statute does not list any requirements or qualifications for individuals who may serve as a witness. S.C. Code Ann. § 7-15-220 (2011). It is unclear how a witness offers a *significant* investigatory lead when they do not have to verify—or indeed, even know—the identity of the voter.

101.    The breadth of eligible witnesses further diminishes the Witness Requirement's value, as the statute only requires a witness to, in essence, be able to see and to sign. It is doubtful

that large swaths of eligible witnesses, from eight-year-olds,[37] to white collar felons,[38] to those found mentally incompetent,[39] would offer much assistance when investigating absentee fraud. Further, the court would expect the penalty for absentee fraud to at least be harsher than a misdemeanor if concerns surrounding fraud were so pressing as to necessitate the Witness Requirement, as Defendants claim.[40] *See* S.C. Code Ann. § 7-15-340. Instead, it appears the Witness Requirement provides ineffectual support towards solving an insubstantial problem in South Carolina.  Given the above evidence, the court finds that the state's interest in using the Witness Requirement to investigate absentee fraud is minimal.

102.    Plaintiffs have shown a strong likelihood that the Witness Requirement's imposed burdens on Plaintiffs outweigh an investigatory law enforcement interest. Consequently, Plaintiffs are likely to prevail on their constitutional challenge to the Witness Requirement under the *Anderson-Burdick* balancing test because the character and magnitude of the burdens imposed on Plaintiffs in having to place their health at risk during the COVID-19 pandemic likely outweigh the extent to which the Witness Requirement advances the state's interests of investigating voter fraud.

ii.    *Likelihood of Suffering Irreparable Harm Absent an Injunction*

103.    The threatened "loss of First Amendment rights, for even minimal periods of time,

---

[37] By South Carolina statute, a child's out-of-court statements must be weighed using five factors to determine the trustworthiness of the statements. S.C. Code Ann. § 17-23-175(B) (2006). Yet a child may serve as a witness without any sort of examination into competence or credibility.

[38] Certain felons are prohibited from voting in South Carolina, yet may still serve as a witness. S.C. Code Ann. § 7-5-120(B) (1997).

[39] Individuals found to be "mentally incompetent as adjudicated by a court of competent jurisdiction" are likewise prohibited from voting, S.C. Code Ann. § 7-5-120(B), yet may still serve as a witness.

[40] For example, violation of the Candidate Collection Ban is subject to a felony. S.C. Code Ann. § 7-15-385.

unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1997)); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm").

104.    To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages available in the normal course of litigation are not enough. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough[,]" because of "the possibility that adequate compensatory or other corrective relief will be available at a later date[.]" *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). This "weighs heavily against a claim of irreparable harm." *Id.*

105.    "[A] preliminary injunction is not normally available where the harm at issue can be remedied by money damages." *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011).

106.    Here, Plaintiffs have demonstrated that the Witness Requirement would cause irreparable harm. Claims of infringement of a citizen's constitutional right to vote cannot be redressed by money damages, and therefore traditional legal remedies would be inadequate in this case. *See League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress.") Accordingly, to the extent that Plaintiffs have a likely constitutional violation, Plaintiffs have satisfied their initial showing of irreparable harm.

    *iii.    Balance of Equities and the Public Interest Factors*

107.    Regarding the final two factors—balance of the equities and the consideration of the public interest—the Fourth Circuit has likewise found these factors established when there is

a likely First Amendment violation. *Giovani Carandola*, 303 F.3d at 521 ("upholding constitutional rights surely serves the public interest").

108.    Above, the court found that Plaintiffs will suffer irreparable harm without an injunction of the Witness Requirement. Alternatively, there is no evidence that Defendants will suffer any harm if Plaintiffs' Motion is granted. Indeed, a government is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola*, 303 F.3d at 521; *accord Newsom v. Albemarle Cnty. School Bd.*, 354 F.3d at 261 (4th Cir. 2003).

109.    Temporarily enjoining the Witness Requirement promotes "the public interest in . . . safeguarding public health[.]" *Pashby*, 709 F.3d at 331. "The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease." *Diretto v. Country Inn & Suites by Carlson*, No. 16-cv-1037, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016).

110.    This is particularly true in the context of the "worst pandemic this state, country, and planet has seen in over a century." *League of Women Voters of Va.*, 2020 WL 2158249, at *10. Were it not for the current pandemic, this element may have cut the other way. But the court's decision is to be guided by "the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) (citing *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Considering the ramifications of the injunction during a pandemic, the public interest is served. *See, e.g., Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 924–25 (6th Cir. 2020) ("Were there no public health crisis,

then, the analysis would be relatively straightforward . . . But, of course, we are not living in normal times; we are living in pandemic times.").

111.    The evidence in the record points to the conclusion that adherence to the Witness Requirement in November would only increase the risk of contracting COVID-19 for members of the public with underlying medical conditions, the disabled, and racial and ethnic minorities.

112.    Strikingly, the Witness Requirement would still apply to voters who have already contracted COVID-19, therefore affirmatively mandating that an infected individual go "find" someone to witness their absentee ballot and risk exposing the witness (and whoever comes in contact with the witness) to the virus. The asymptomatic COVID-19 voter would unknowingly place potential witnesses at risk and the symptomatic COVID-19 voter would have trouble finding a willing witness. Defendants are also hard-pressed to convince this court, at least, that this predicament created by strict enforcement of the Witness Requirement is in the best interests of the public during a pandemic of this nature.

113.    Finally, the public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

114.    Accordingly, the court finds that granting Plaintiffs injunctive relief is in the public interest.

iv.     *Required Posting of Bond*

115.    Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

116.    The district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby*, 709 F.3d at 332 (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).

117.    After considering the circumstances alleged in the Motion for Preliminary Injunction, the court deems it appropriate to waive bond for Plaintiffs given the significance of this matter of local, national, and international public concern and the response it has garnered from all levels of government.[41] *See Hoechst Diafoil Co.*, 174 F.3d at 421 (acknowledging the requirement that a district court set an injunction bond and noting the court can set the bond "in such sum as the court deems proper").

H.    Candidate Collection Ban under the First and Fourteenth Amendments

118.    The court next turns to Plaintiffs' claims that the Candidate Collection Ban violates the First Amendment and Fourteenth Amendment.[42]

i.    *Clear Showing of Likely Success on the Merits*

119.    Plaintiffs claim South Carolina's ban on campaign staff assisting with absentee ballots violates First Amendment protections of "[e]lection-related speech and associational activities aimed at encouraging voters to participate in the political process[.]" (ECF No. 77 at 51.) Defendants counter that "[c]ollecting and returning ballots is not protected by the First Amendment," and point to other rulings by federal courts for support of their argument. (ECF No.

---

[41] The court likewise waived bond for Plaintiffs in its prior Order enjoining the Witness Requirement for the June 2020 Primaries. *Thomas*, 2020 WL 2617329, at *24.

[42] In the Motion for Preliminary Injunction, Plaintiffs argue the Candidate Collection Ban only violates the First and Fourteenth Amendments (ECF No. 77 at 51-59), despite claiming the ban also violates the Voting Rights Act in their Amended Complaint (ECF No. 69 at 34–36). The court limits its examination in the instant Motion to those arguments raised by Plaintiffs.

93 at 69.)

120.    Beginning with the text of the statute, S.C. Code § 7-15-385 states, in pertinent part:

[a] candidate or a member of a candidate's paid campaign staff including volunteers reimbursed for time expended on campaign activity is not permitted to serve as an authorized returnee for any person unless the person is a member of the voter's immediate family.

121.    As discussed above, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that a plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.

122.    Even so, when the activity underlying a statutory challenge involves no expressive conduct protected by the First Amendment, rational basis review is the appropriate standard. *Democracy N.C.*, 2020 WL 4484063, at *51 (citing *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *Voting for Am. Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013)); *New Ga. Project*, 2020 WL 5200930, at *22.

123.    Under rational basis review, legislative action must, "[a]t a minimum . . . be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "There is a 'strong presumption of validity' when examining a statute under rational basis review, and the burden is on the party challenging the validity of the legislative action to establish that the statute is unconstitutional." *Democracy N.C.*, 2020 WL 4484063, at *51 (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993)). Defendants "need not introduce evidence or prove the actual motivation behind passage but need only demonstrate that there is some legitimate justification that could have motivated the action." *Id.* (citing *FCC*, 508 U.S. at 315).

124.    The parties dispute the applicable standard of review. Plaintiffs emphasize that "[e]lection-related activities aimed at encouraging voters to participate in the political process are

protected by the First Amendment." (ECF No. 77 at 51.) They draw similarities between the instant claim and other cases finding protected political speech, such as when encouraging voters to register, *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006); circulating a petition, *Meyer v. Grant*, 486 U.S. 414, 421 (1988); or "broaden[ing] the base of public participation" by allowing independent voters to vote in a Republican primary. *Tashjian*, 479 U.S. at 214–15. (ECF No. 77 at 51.) Plaintiffs also point to two state court rulings that recently found state constitutional protections were implicated when collecting absentee ballots, and stayed absentee assistance restrictions. *DSCC v. Simon*, No.: 62-CV-20-585, at *52 (Minn. 2d Judicial Dist. July 28, 2020); *Driscoll v. Stapleton*, Case No. DV 20-408 (Mont. 13th Jud. Dist. Ct. filed May 22, 2020).

125.    However, several federal courts, including the Fifth and Ninth Circuits, "have determined that collecting ballots does not qualify as expressive conduct protected by the First Amendment." *New Ga. Project*, 2020 WL 5200930, at *21 ("Because delivering absentee ballot requests is not expressive conduct, it is subject only to rational basis review") (citing *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (finding the collection of absentee ballots is not expressive conduct); *Feldman v. Ariz. Sec'y. of State's Office*, 843 F.3d 366, 372 (9th Cir. 2016) (holding that collecting ballots is not expressive conduct "[e]ven if ballot collectors intend to communicate that voting is important"); *Voting for Am. Inc.*, 732 F.3d at 391 (finding the collection and delivering of voter-registration applications are not expressive conduct); *Democracy N.C.*, 2020 WL 4484063, at *50 ("Regarding the delivering of the absentee ballot requests, however, the court will follow the Fifth and Ninth Circuits in finding that the collecting and delivering of absentee ballot request forms is not expressive conduct and therefore does not implicate the First Amendment.")).

126.    As an initial matter, the court believes that rational basis review is the proper standard to examine Plaintiffs' challenge to the Candidate Collection Ban. As noted above, several federal courts have decided collecting absentee ballots or applications does not amount to protected speech. The court agrees with such reasoning that the act of collecting absentee ballots likely does not amount to expressive conduct under the First Amendment.[43] The court thus follows the persuasive federal authority outlined above and applies rational basis review.

127.    Here, Plaintiffs have not shown they are likely to succeed on the merits of their facial challenge to the Candidate Collection Ban.[44] As explained by Defendants, the Candidate Collection Ban

> promotes the State's substantial interest in preserving the integrity of elections by preventing voter fraud. Here, specifically, it is designed to [prevent] absentee voter fraud, which rocked the State not so long ago in Dillon County and has popped up around the country as well. Fortunately, section 7-15-385 serves as a deterrent for this type of voter fraud because it makes violations of the provision a felony under South Carolina law.

(ECF No. 94 at 43.) Defendants further note "it is beyond dispute that this statute was enacted to prevent the very conduct it prohibits." (*Id.*) The court finds the Candidate Collection Ban is rationally related to the government's interest in preserving the integrity of elections and preventing voter fraud. The restriction is therefore likely to be upheld as constitutional.

128.    Accordingly, the court finds Plaintiffs have not demonstrated a clear likelihood of success for their challenge to the Candidate Collection Ban.

---

[43] Moreover, the court notes that Plaintiffs have brought a facial challenge to the Candidate Collection Ban, rather than a challenge as applied to the current COVID-19 pandemic.

[44] When denying Defendants' prior Motion to Dismiss, the court previously observed that neither Defendants nor the court found precedent stating "that, **as a matter of law**, collecting absentee ballots is not expressive conduct." (ECF No. 71 at 9 (emphasis in original).) But this matter is now before the court at a different procedural stage, *i.e.*, whether Plaintiffs are likely to succeed on the merits of this claim.

3:20-cv-01730-JMC    Date Filed 09/18/20    Entry Number 109    Page 70 of 71

ii.   *Likelihood of Suffering Irreparable Harm Absent an Injunction, The Balance of Equities, and the Public Interest Factors*

129.   Generally, in determining whether to grant a motion for injunctive relief, "[t]he court must also consider the balance of hardships between the litigants and the impact on the public at large prior to issuing an injunction." *Uhlig, LLC*, 2012 WL 2458062, at *4.

130.   However, Plaintiffs have not made a clear showing that they will likely succeed on the merits of their assistance challenge. Accordingly, this court need not address the other necessary elements for preliminary injunctive relief. *See La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that [p]laintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief. The holding on the initial element is sufficient to vacate the injunction."); *Coleman v. Chase Bank*, C/A No. 3:14-cv-101, 2014 WL 2533400, at *3 (E.D. Va. June 5, 2014) ("Because [p]laintiffs cannot show a likelihood of success on the merits, the [c]ourt need not address the remaining factors.").

## IV.   CONCLUSION

For the reasons stated above, the court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Preliminary Injunction. (ECF No. 77.) Specifically, the court **GRANTS** Plaintiffs' Motion for Injunction as to the Witness Requirement and **ENJOINS** Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them, from enforcing the Witness Requirement set forth in S.C. Code Ann. § 7-15-380, and from enforcing the Witness Requirement set forth in any other South Carolina statutes, on registered absentee voters only during the November 2020 General Election occurring in the State of South Carolina. The court further **ORDERS** Defendants to immediately and publicly inform

70

South Carolina voters about the elimination of the Witness Requirement for absentee voting, in coordination with city and county election officials, county boards, and any other governmental entity that is responsible for assisting with the absentee voting process in South Carolina. Such public campaign shall include providing updated information regarding the instant injunction on all relevant websites, social media outlets (*i.e.*, Facebook, Instagram, Twitter, etc.), and other means of public dissemination as appropriate. The court hereby **DENIES** all remaining claims made by Plaintiffs in their Motion for Preliminary Injunction. (ECF No. 77.)

    **IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

September 18, 2020
Columbia, South Carolina